# 23-1112

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

HUI MA,

*Plaintiff-Appellant,*

JEREMY SCHNEIDER, Individually and on Behalf of All
Others Similarly Situated, WALTER DE SCHUTTER,

*Plaintiffs,*

—against—

LEADERSEL INNOTECH ESG,

*Movant-Appellant,*

JOSE LUIS VILLASENIN, WESLEY R. LEDBETTER,
CHUN MU HSUEH, NEIL SILVER, ELIZABETH SILVER,

*Movants,*

—against—

TELADOC HEALTH, INC., JASON GOREVIC, MALA MURTHY, STEPHANY
VERSTRAETE, BIMAL SHAH, RICHARD J. NAPOLITANO,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFF-APPELLANT AND MOVANT-APPELLANT

CAROL C. VILLEGAS
IRINA VASILCHENKO
MATTHEW J. GRIER
LABATON SUCHAROW, LLP
140 Broadway, 34th Floor
New York, New York 10005
(212) 907-0700

*Attorneys for Plaintiff-Appellant
and Movant-Appellant*

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE STATEMENT ................................................................. 1

JURISDICTIONAL STATEMENT ......................................................................... 1

ISSUES PRESENTED FOR REVIEW .................................................................... 2

INTRODUCTION ................................................................................................... 2

STATEMENT OF THE CASE ................................................................................ 5

I.      FACTUAL BACKGROUND ........................................................................ 5

        A.      Teladoc Acquired Livongo in a Historic Merger ............................... 5

        B.      Teladoc Failed to Fully Integrate Livongo in Multiple Key Areas ...... 6

                1.      Teladoc Struggled to Integrate Livongo's Sales Team .............. 6

                2.      Teladoc Failed to Integrate Critical Technology ...................... 7

        C.      Defendants Misled Investors About the Livongo Integration
                Progress ............................................................................................. 9

        D.      The Truth Gradually Emerges, Causing Billions in Investor
                Losses ............................................................................................... 11

II.     PROCEDURAL HISTORY AND RULING BELOW ................................... 12

SUMMARY OF ARGUMENT .............................................................................. 13

STANDARD OF REVIEW .................................................................................... 15

ARGUMENT ......................................................................................................... 16

I.      ISSUES REACHED BY THE DISTRICT COURT ..................................... 16

        A.      The SAC Pled Materially False and Misleading Statements ............. 16

                1.      The SAC Adequately Pled Misstatements Regarding Sales
                        Team Integration ................................................................... 17

2.    The SAC Adequately Pled Misstatements Regarding Integration of Technological Platforms ....................................26

    a.    Shah's February 11, 2021 Misstatement ........................26

    b.    Gorevic's February 24, 2021 Misstatements.................31

    c.    Murthy's April 28, 2021 Misstatements.........................34

    d.    Gorevic's November 10, 2021 Misstatement.................36

    e.    Verstraete's November 18, 2021 Misstatement .............37

3.    Teladoc Misleadingly "Pushe[d] Back" That the Integration Was "Behind" Schedule in October 2021.................................39

4.    Teladoc Issued Materially Misleading Warnings of Purely Hypothetical Livongo Integration Risks...................................41

5.    The Misstatements Are Not Inactionable Opinions.................44

6.    The Misstatements Are Material Misrepresentations and Omissions of Existing Facts, Not Mere Puffery ......................46

7.    The Misstatements Are Not Protected by the Safe Harbor, the Bespeaks Caution Doctrine, or the Truth-on-the-Market Defense....................................................................................50

B.    The District Court Abused Its Discretion in Denying Leave to Amend ....................................................................................55

II.    ISSUES NOT REACHED BY THE DISTRICT COURT............................57

A.    The Complaint Adequately Alleged Scienter .....................................58

B.    The Complaint Adequately Alleges Loss Causation ..........................62

C.    The Complaint Adequately Alleges Section 20(a) Claims .................64

CONCLUSION ...........................................................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020) .................................................................. 44-45, 46

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) .............................................................................55

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017) ...........................................................41

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .......................................................................................17

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008) ...........................................................54

*Buxbaum v. Deutsche Bank A.G.*,
    2000 WL 33912712 (S.D.N.Y. Mar. 7, 2000) ...............................................60

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014) ...................................................................... 62-63

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
    2018 WL 2382600 (S.D.N.Y. May 24, 2018) ...............................................47

*City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*,
    552 F. Supp. 3d 406 (E.D.N.Y. 2021) ................................................... 22, 34-35

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020) ................................................. 29-30, 43

*Cresci v. Mohawk Valley Cmty. Coll.*,
    693 F. App'x 21 (2d Cir. 2017) .....................................................................56

*Dalberth v. Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014) ..........................................................................49

*Eminence Cap., LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) .......................................................................55

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
　　794 F.3d 297 (2d Cir. 2015) ...............................................................58

*In re Extreme Networks, Inc. Sec. Litig.*,
　　2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ............................................22, 35

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
　　986 F. Supp. 2d 487 (S.D.N.Y. 2013) ...............................................43

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
　　268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...............................................52

*Freudenberg v. E*Trade Fin. Corp.*,
　　712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...............................................29, 52, 59, 62

*Galestan v. OneMain Holdings, Inc.*,
　　348 F. Supp. 3d 282 (S.D.N.Y. 2018) ...............................................*passim*

*Ganino v. Citizens Utils. Co.*,
　　228 F.3d 154 (2d Cir. 2000) ...............................................*passim*

*Hall v. The Child.'s Place Retail Stores, Inc*,
　　580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008) ...............................................53-54

*Hartford Courant Co. v. Pellegrino*,
　　380 F.3d 83 (2d Cir. 2004) ...............................................57-58

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
　　422 F. Supp. 3d 821 (S.D.N.Y. 2019) ...............................................60

*In re Hi-Crush Partners L.P. Sec. Litig.*,
　　2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ...............................................59

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
　　818 F.3d 85 (2d Cir. 2016) ...............................................48

*In re Initial Pub. Offering Sec. Litig.*,
　　241 F. Supp. 2d 281 (S.D.N.Y. 2003) ...............................................61

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*,
　　620 F.3d 137 (2d Cir. 2010) ...............................................51

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
14 F.4th 141 (2d Cir. 2021) ...........................................................*passim*

*Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221 (S.D.N.Y. 2006) ................................................54

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) .........................................................*passim*

*In re MBIA, Inc., Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010) ..........................................53, 54

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014) .........................................................*passim*

*New England Carpenters Guaranteed Annuity & Pension Funds v.
DeCarlo*,
80 F.4th 158 (2d Cir. 2023) ........................................................44, 45

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
455 F. App'x 10 (2d Cir. 2011) .....................................................*passim*

*In re Nielsen Holdings PLC Sec. Litig.*,
510 F. Supp. 3d 217 (S.D.N.Y. 2021) ......................................... 60-61

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) .........................................................*passim*

*In re Omega Healthcare Invs., Inc. Sec. Litig.*,
563 F. Supp. 3d 259, 269 (S.D.N.Y. 2021) ................................. 63-64

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension
Fund*,
575 U.S. 175 (2015)....................................................................44, 45

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt.
LLC*,
595 F.3d 86 (2d Cir. 2010) ...............................................................39

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015) ...............................................47

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) ...............................................53

*In re Scholastic Corp. Sec. Litig.,*
    252 F.3d 63 (2d Cir. 2001) ................................................61

*Set Cap. LLC v. Credit Suisse Grp. AG,*
    996 F.3d 64 (2d Cir. 2021) ........................................42-43, 43-44, 52-53

*In re Synchrony Fin. Sec. Litig.,*
    988 F.3d 157 (2d Cir. 2021) ......................................40, 46

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.,*
    531 F.3d 190 (2d Cir. 2008) ..................................... 61-62

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
    551 U.S. 308 (2007)........................................................58, 61

*In re Textron, Inc. Sec. Litig.,*
    2020 WL 4059179 (S.D.N.Y. July 20, 2020) (Cote, J.) ...................................16

*In re Turquoise Hill Res. Ltd. Sec. Litig.,*
    2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ...................................47

*In re Vivendi, S.A. Sec. Litig.,*
    838 F.3d 223 (2d Cir. 2016) ...............................................16

**Statutes & Rules**

28 U.S.C. § 1291 ...........................................................................2

28 U.S.C. § 1331 ...........................................................................1

Private Securities Litigation Reform Act of 1995 ...........................................*passim*

Securities Exchange Act Section 10(b), 15 U.S.C. § 78j(b)...........................*passim*

Securities Exchange Act Section 20(a), 15 U.S.C. § 78t(a) ...........................*passim*

Securities Exchange Act Section 27, 15 U.S.C. § 78aa...........................1

SEC Rule10-b5, 17 C.F.R. § 240.10b-5 ...............................................1

Fed. R. Civ. P. Rule 9(b)...........................................................55

Fed. R. Civ. P. Rule 12(b)(6) ...................................................................15

Fed. R. Civ. P. Rule 15 ...................................................................55, 57

Fed. R. Civ. P. Rule 54(b) ...................................................................2

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Lead Plaintiff-Appellant Leadersel Innotech ESG is an actively managed international equity mutual fund, with no parent corporation and no publicly held corporation owning 10% or more of its stock. Additional Plaintiff-Appellant Hui Ma is an individual, and accordingly, no disclosure is required.

## JURISDICTIONAL STATEMENT

Lead Plaintiff-Appellant Leadersel Innotech ESG ("Lead Plaintiff") and additional Plaintiff-Appellant Hui Ma (collectively, "Plaintiffs") bring this action against Teladoc Health, Inc. ("Teladoc," or the "Company"), Chief Executive Officer Jason Gorevic, Chief Financial Officer Mala Murthy, Chief Marketing & Engagement Officer Stephany Verstraete, Chief Medical Officer of Product & Analytics Bimal Shah, and Senior Vice President, Chief Accounting Officer, and Controller Richard Napolitano, ("Individual Defendants," and collectively, with Teladoc, "Defendants") under: (1) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("Section 10(b)"); and (2) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)").

The District Court had jurisdiction of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. The District Court entered

final judgment pursuant to Federal Rule of Civil Procedure 54(b) on July 6, 2023. SPA-30.[1] Plaintiffs filed a Notice of Appeal on August 4, 2023. A-781. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Whether, on *de novo* review, Plaintiffs adequately alleged material misrepresentations or omissions where Defendants repeatedly assured investors that specific aspects of the integration of a key acquisition were either completed or progressing smoothly, when this was demonstrably not the case.

2. Whether the District Court abused its discretion by denying Plaintiffs' request for leave to amend their complaint where the District Court's dismissal was its first review of the merits and hinged on fact-intensive falsity issues that could be cured on amendment.

## INTRODUCTION

This securities fraud action arises out of a failure by Teladoc, a telehealth company, to fully integrate one of its key competitors, Livongo Health, Inc. ("Livongo"), which Teladoc acquired in October 2020 for *$18.5 billion*. Defendants falsely assured investors throughout the Class Period (February 11, 2021–July 27, 2022, inclusive) that the integration was either progressing smoothly or fully

---

[1] Citations herein to the Joint Appendix and the Special Appendix are referred to as "A" and "SPA," respectively. All emphasis is added, and citations and quotation marks are omitted unless otherwise noted.

complete in specific key areas, including the companies' technology and sales teams. In reality, however, according to numerous, corroboratory sources—eleven confidential witnesses ("CWs"); many internal Teladoc documents; a November 10, 2021 *Business Insider* article (the "*Business Insider* Article") that constituted the first partial disclosure of the truth; and Defendants' own admissions at the end of the Class Period—the integration was *not complete or on track* in any of these aspects.

These sources confirm that Teladoc was unable to integrate critical technological systems—including, notably, the companies' product platforms, which were essential for Teladoc to provide the comprehensive, "whole-person" telecare that it touted as its key competitive advantage. Indeed, on the disclosure dates, Defendants admitted that they still had "*not finished*" "*integrating the Livongo products into our whole-person care experience*" and that this had adversely impacted sales, as it was a "challenge [] getting into a client and saying we'll be a *one stop shop when we can't show that yet.*" Importantly, CWs and internal documents show that Defendants had contemporaneous knowledge of these and other integration failures—like an inability to integrate the companies' sales teams, contrary to Defendants' representations that they had been "*fully integrated.*" For example, Defendant Shah received multiple emails from CW-2 informing him of product and sales team integration challenges before his misstatements touting the integration progress. Likewise, Defendant Gorevic acknowledged to CW-4 in

3

September 2021 that Teladoc still lacked an effective integration plan—almost *a year* after the acquisition.

Plaintiffs subsequently brought this action against Defendants under Section 10(b) and Section 20(a). In dismissing Plaintiffs' claims, the District Court erred in holding that Plaintiffs failed to adequately plead any actionable misstatements. Many of the Misstatements,[2] including, for example, representations that the sales teams were "fully integrated," are *directly contradicted* by Plaintiffs' allegations. Further, having chosen to discuss Teladoc's integration of Livongo, Defendants had an obligation to tell the whole truth about the severe integration problems plaguing the Company—which they failed to do. This Court should reverse the District Court's decision holding the Misstatements inactionable.

Further, the District Court abused its discretion in dismissing Plaintiffs' claims with prejudice because Plaintiffs did not propose specific amendments in their motion to dismiss opposition when making the request (in the alternative) for leave to amend upon a dismissal. Under this Court's precedent, Plaintiffs are not required to propose such amendments before a ruling by the Court identifying purported deficiencies in the complaint. Further, the District Court's dismissal

---

[2] Defendants' integration-related misstatements identified in Argument § I.A (the "Misstatements") are the only statements whose dismissal Plaintiffs challenge in the instant appeal. Plaintiffs are not appealing the dismissal of misstatements downplaying increased competition (SPA-25-28), nor several other integration-related misstatements.

hinged on fact-intensive falsity issues that could be cured on amendment. Thus, if this Court agrees with the District Court that Plaintiffs failed to plead actionable misstatements, it should nonetheless reverse the District Court's denial of leave to amend and allow Plaintiffs to replead.

<u>**STATEMENT OF THE CASE**</u>

**I.    FACTUAL BACKGROUND**

**A.    Teladoc Acquired Livongo in a Historic Merger**

Teladoc is a telehealth provider that offers various virtual healthcare services addressing a range of medical issues. A-215¶49. Historically, Teladoc had focused on treating acute conditions. A-222¶68. But more recently, Teladoc expanded its product portfolio through a series of acquisitions, with the goal of being the only telehealth company that can provide full-spectrum, "whole-person" virtual care, which treats the entire person—*i.e.*, patients' physical and mental health, and their acute as well as chronic needs. *Id*. Teladoc's quest to provide whole-person telecare took on added importance with the onset of the COVID-19 pandemic, which caused demand for telehealth services to skyrocket. A-224¶¶74-79.

The keystone in Teladoc's efforts to provide whole-person telecare came when Teladoc acquired Livongo on October 30, 2020 (the "Livongo Acquisition"), for approximately $18.5 billion—a record for the telehealth industry. A-228¶¶82-83. The acquisition was hailed by Defendants as "transformative" and crucial to solidifying Teladoc's position as the only provider of "whole person" virtual care

because Livongo was the leading provider of virtual *chronic* disease management, a segment where Teladoc was lacking. A-222¶68, A-228¶83, A-230-35¶¶88-102.

### B. Teladoc Failed to Fully Integrate Livongo in Multiple Key Areas

Teladoc's ability to successfully integrate this expensive acquisition was crucial to its financial success. Teladoc, however, experienced severe problems integrating Livongo, including failures to integrate (i) the companies' sales teams, and (ii) critical technological systems, *e.g.*, the companies' products, sales, and other data platforms.

### 1. Teladoc Struggled to Integrate Livongo's Sales Team

For more than a year after the Livongo Acquisition, Teladoc failed to integrate the companies' commercial organization, *i.e.*, the sales teams. SPA-19; A-418. Multiple CWs stated that Teladoc lacked a uniform sales strategy and training materials, and had "*siloed*" off the Livongo sales team, which was still focused on selling only Livongo products through at least October 2021. A-253-54¶145, A-255-56¶¶148-49, A-268¶179, A-269¶¶182-88, A-289-90¶235. Critically, sales-team CWs recalled that Teladoc "had no idea" where to put Livongo personnel by June 2021 and that through at least fall 2021 Teladoc had no integration plan for the sales teams, which were all running separately rather than being fully integrated. A-262-64¶¶165-71, A267¶177, A-281¶212. Multiple CWs and the *Business Insider* Article also recounted how the "hemorrhaging" of Livongo personnel impeded the

integration of the sales teams. A-277-78¶¶201-02, A-276¶198, A-281¶211, A-282¶216.

These allegations are supported by contemporaneous internal Teladoc documents from CW-2 (a Vice President in the Livongo—and then Teladoc—Sales Organization), illustrating the total lack of integration of the sales teams, with the Livongo team "cut off" and "on an island" apart from their Teladoc counterparts. A-264-67¶¶173-75, A-269-70¶¶181-82, A-279¶206.

### 2. Teladoc Failed to Integrate Critical Technology

Teladoc was also unable to fully integrate Livongo's technology—including its product platforms—which adversely impacted daily operations and sales as Teladoc could not provide the seamless "whole person" virtual care that Defendants repeatedly touted as its key competitive differentiator. *See* A-236¶106. For example, CW-2 said that the Teladoc executives who replaced the departed Livongo personnel after the acquisition did not know anything about Livongo products and made things up in client meetings, pitching them on a nonexistent "whole person platform." A-248¶132. Indeed, Teladoc only *began* to sell a *beta* version of a "whole person solution" based on Livongo products to a few clients *in January 2022*. A-257¶152.

Similarly, Teladoc sales representatives and senior executives, including Gorevic, repeatedly touted to potential customers the companies' combined "remote patient monitoring" ("RPM") capabilities, even though they never existed through

at least fall 2021. A-248-52¶¶132-43. Indeed, CW-2 wrote in internal emails to Shah shortly before the Class Period that she was "starting to feel uncomfortable on [Teladoc personnel] making up 'futures,'" *i.e.*, the capabilities of these future Livongo-Teladoc RPM products in client pitches that were *not* "*anchor[ed] . . . in reality.*" A-249-51¶¶135-38. In response, Shah acknowledged Teladoc's "imperative to have this together by [first half of 2021], but don't have details yet nor are [these products] ready for a client." A-251-52¶¶139-40. Teladoc, however, still did not have an integration plan for Livongo, including such RPM products, by then, as Chief Operating Officer ("COO") David Sides acknowledged to CW-2 at a June 2021 meeting. A-253¶144.

These product integration failures were (partially) confirmed in the *Business Insider* Article, which stated that the companies' "rushed union . . . made it difficult for Teladoc . . . to iron out its plan for new products," and that the companies' patient portals were "still separate apps" in November 2021. A-260-61¶¶161-62. Further, Defendants admitted at the end of the Class Period that Teladoc *still* had "not finished" "integrating the Livongo products into our whole-person care experience." A-300¶267; *see also* A-305¶282, A-308-09¶294.

Compounding Teladoc's product technology integration failures was its inability to integrate the companies' sales data systems ("Salesforce") and data analytics platforms ("Tableau"). CW-3 said that Teladoc hired

8

PricewaterhouseCoopers ("PwC") to integrate the Salesforce systems but that Teladoc was still only five months—or less than a *third* of the way—into PwC's 18-month timeline for the project by spring 2022. A-238-39¶¶113-14. CW-11 recounted that the integration of Tableau, which was used to analyze data for marketing, sales, and other purposes, had not even *started* by the end of the Class Period. A-240-47¶¶117-31. These Livongo integration problems negatively affected Teladoc's business, including because competitors exploited the problems to their advantage. A-284-88¶¶220-31.

## C. Defendants Misled Investors About the Livongo Integration Progress

Defendants did not disclose these integration problems to investors, instead repeatedly touting the integration's completion or substantial progress in several key areas. First, Gorevic touted Teladoc's integration of the commercial organization, including representing in February and April 2021 that these sales teams had been "*fully integrated.*" A-317¶308, A-328¶336.

Defendants similarly misrepresented the integration of Teladoc and Livongo's technological systems. For example, on February 11, 2021, Shah assured that the integration was "going really great," including because the two companies "*really do fit together*" "*from a technology perspective*" "*to provide . . . a continuum of care, a whole person experience*" and that "*we're already well on our way of building*" such combined products. A-310-11¶298. Similarly, Gorevic told investors later that

9

month that "[t]he *integration of our data platform and assets [i.e., products] also continues to progress*" and that "*[w]e have the capabilities* to deliver and manage care virtually across the spectrum for consumers." A-317-18¶¶308-09.

On April 28, 2021, Murthy touted Teladoc's "*very, very clear road map*" to integrating the products, assuring that they were "*well on our way to*" a "*deep integration*" of the companies' "*data.*" A-291-92¶240, A-329¶338. On November 18, 2021, Verstraete represented that "we brought together and *integrated the legacy Livongo and Teladoc marketing data and tech stacks* [*i.e.*, applications used for marketing purposes]." A-346¶392.

Defendants also denied integration problems when directly asked. For example, on October 28, 2021, Defendants denied integration delays when confronted by analysts, "*push[ing] back on the claim that TDOC is behind when it comes to the actual integration of Livongo.*" A-343¶381.

Finally, Defendants provided investors with misleading risk disclosures regarding the Livongo integration. Specifically, Teladoc's 2020 Form 10-K, filed on March 1, 2021 (the "2020 10-K"), and 2021 Form 10-K, filed on February 28, 2022 (the "2021 10-K"), both included purely *hypothetical* risk warnings about, *e.g.*, "*potential* difficulties" that Teladoc "*may* encounter in the integration process" that "*could* significantly disrupt our business," even though those very risks had *already* materialized. A-322-24¶¶319-22, A-351-53¶¶407-12.

10

**D.    The Truth Gradually Emerges, Causing Billions in Investor Losses**

On November 10, 2021, the *Business Insider* Article first partially revealed that Teladoc was struggling to integrate Livongo, causing Teladoc's stock price to fall over 4%. A-359-61¶¶437-46. But Defendants minimized the integration problems in the same article, with Gorevic falsely insisting that the product integration was still "*on track.*" A-361-62¶447. In an April 27, 2022 earnings announcement, Defendants further partially disclosed that the Livongo integration issues were adversely affecting Teladoc's financial results. A-362-71¶¶448-77. Indeed, Defendants reported reduced financial guidance and a goodwill impairment charge of *$6.6 billion*, which the market linked to Teladoc's poor integration of Livongo. *Id.* Gorevic also admitted that Teladoc still had "*not finished*" integrating Livongo's products, and that increased competitive "noise in the marketplace" had affected sales, including in Teladoc's chronic care (*i.e.*, Livongo) business. A-363-64¶¶451-54. Teladoc's stock price collapsed *over 40%* on this news. A-366¶459. Finally, on July 27, 2022, Defendants revealed the true extent of Teladoc's integration problems, disclosing another quarter of disappointing financial performance, which Defendants again attributed to the impact of continuing Livongo integration problems and "competitive noise," and another Livongo-related goodwill impairment charge of $3 billion. A-371-77¶¶478-99. Teladoc's stock price tumbled over 17%. A-373¶486.

## II. PROCEDURAL HISTORY AND RULING BELOW

This action was filed on June 6, 2022. A-6, ECF No. 1. On August 23, 2022, Leadersel Innotech ESG was appointed Lead Plaintiff, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). A-16, ECF No. 40 (the "Case Management Order"). The District Court also set the schedule for the filing of Lead Plaintiff's amended complaint, which it could further amend after Defendants moved to dismiss—though the District Court noted that, if Lead Plaintiff exercised that option, "[i]t is unlikely that Lead Plaintiff will have a further opportunity to amend." A-18.

Lead Plaintiff filed an Amended Complaint on September 30, 2022 (A-20, ECF No. 52), and Defendants filed their first motion to dismiss on November 3, 2022 (A-11, ECF No. 59).

Pursuant to the Case Management Order, on December 6, 2022, Lead Plaintiff and additional Plaintiff Hui Ma filed the Second Amended Complaint ("SAC"). A-11, ECF No. 63. On January 20, 2023, Defendants moved to dismiss. A-12-13, ECF Nos. 74-77. In their opposition to Defendants' motion (the "Opposition"), Plaintiffs requested another opportunity to amend if the District Court dismissed the SAC. A-755 n.40. Briefing on Defendants' motion to dismiss concluded on March 31, 2023. A-14, ECF No. 85. The District Court did not hold oral argument.

On July 5, 2023, the District Court issued an opinion and order (the "Order") erroneously holding that the SAC did not plead any actionable misstatements or omissions and denying Plaintiffs' request for leave to amend. SPA-1-29. The District Court did not address Defendants' additional scienter and loss causation arguments. SPA-14. The District Court rendered this decision with prejudice and entered final judgment on July 6, 2023. SPA-30. On August 4, 2023, Plaintiffs timely filed a Notice of Appeal. A-781.

## SUMMARY OF ARGUMENT

I.     The District Court erred in dismissing the Misstatements on falsity and materiality grounds.

*First*, the District Court erred in dismissing Misstatements representing that the companies' sales teams were "*fully integrated*," when, in reality, this integration was far from finished and riddled with severe problems, as shown by numerous specific CW accounts and internal documents that the District Court improperly ignored.

*Second*, the District Court erred in dismissing Defendants' Misstatements regarding the smooth progress of the integration of the companies' product, data, and other technology platforms. In truth, such integration was also far from finished and was undergoing severe setbacks based on specific CW allegations and Defendants' later admissions, which the District Court again improperly overlooked.

*Third*, the District Court erroneously dismissed a Misstatement that misleadingly reassured investors that the integration was not behind schedule—in direct response to analyst questions—when, in fact, the integration was significantly delayed.

*Fourth*, the District Court erred in dismissing Defendants' risk warnings regarding the Livongo integration, which misleadingly warned only of *potential* risks, when those risks had *already* materialized.

*Fifth*, the District Court erred in finding that certain Misstatements are inactionable opinions or puffery. All the Misstatements expressed certainty, misrepresenting specific, existing facts regarding the status of the integration, rendering them not opinions or mere rosy predictions. Even if opinions, such Misstatements are actionable because they omitted material, contrary facts.

*Sixth*, the Misstatements are not protected by the PSLRA safe harbor, bespeaks caution doctrine, or the truth-on-the-market defense, contrary to the District Court's erroneous finding that the Misstatements were inactionable due to Defendants' supposed "robust disclosures" of integration risks. The Misstatements refer to existing or past facts, which are paradigmatically not forward-looking, and the purported cautionary language, warning of merely *hypothetical* risks, was inadequate because such language itself was misleading. Further, Defendants failed

to meet their heavy burden of satisfying the truth-on-the-market defense by showing that these generic warnings sufficiently counterbalanced any misleading impression.

II.     The District Court abused its discretion in denying Plaintiffs' request to replead. Despite clear precedent that leave to amend should be freely granted, the District Court dismissed the SAC with prejudice, depriving Plaintiffs of the ability to cure any purported deficiencies identified for the first time in the Order.

III.    The District Court did not address Defendants' scienter, loss causation, and control person liability arguments. If this Court finds that Plaintiffs have adequately alleged actionable misstatements, and the Court chooses to address these additional elements, Plaintiffs respectfully request that the Court find that Plaintiffs have adequately alleged claims under Sections 10(b) and 20(a).

## STANDARD OF REVIEW

This Court reviews *de novo* a judgment of dismissal under Rule 12(b)(6), assuming all facts alleged in the complaint to be true and drawing all reasonable inferences in favor of plaintiffs. *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021).

This Court reviews a denial of leave to amend for abuse of discretion. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 169 (2d Cir. 2015).

# ARGUMENT

## I. ISSUES REACHED BY THE DISTRICT COURT

### A. The SAC Pled Materially False and Misleading Statements

When assessing falsity, courts must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor," even when non-fraudulent alternative interpretations of challenged statements are "not unreasonable." *Textron*, 14 F.4th at 147 (reversing dismissal on falsity grounds, in part, because "the District Court in effect required [plaintiffs] to show that [their] reading was superior to the court's own benign reading of those statements—a requirement we have described as error"), *vacating, in part, In re Textron, Inc. Sec. Litig.*, 2020 WL 4059179, at *1 (S.D.N.Y. July 20, 2020) (Cote, J.). Courts must review the statements "taken together and in context." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250-51 (2d Cir. 2014).

To support a finding of liability under Section 10 (b), there must be "an actual statement [] [made] that is either untrue outright or misleading by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016). "[S]o-called half-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud." *Id.* at 240. "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty *to tell the whole truth*." *JinkoSolar*, 761 F.3d at 250-51.

Materiality is established where there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). "Materiality is a mixed question of law and fact," and thus "a complaint may not properly be dismissed" on such grounds, unless the misrepresentations or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

### 1. The SAC Adequately Pled Misstatements Regarding Sales Team Integration

Gorevic repeatedly assured investors that the integration of Teladoc and Livongo's sales teams had been successfully completed in early 2021. A-317¶308, A-328¶336. The SAC, however, is replete with allegations showing that the sales teams were still *operating separately throughout 2021*, with the Livongo teams "siloed" or "cut off" from their Teladoc counterparts, as the Company lacked a coherent integration plan and suffered from severe attrition of sales personnel. A-262-84¶¶165-219. The District Court erred by ignoring these detailed factual allegations from numerous corroboratory sources and drawing inferences in favor of Defendants, rather than Plaintiffs.

On a February 24, 2021 earnings call, Gorevic told investors that "*[o]ur commercial organization is now fully integrated*, and our teams responsible for

cross-selling have been collaborating for months." A-317¶308. On an April 28, 2021 earnings call, Gorevic again asserted that Teladoc had "made considerable progress across our key work streams" on the Livongo integration, including that "*our commercial organization has been fully integrated* with sales teams selling across the entire whole-person portfolio of products since early this year." A-328¶336.

Both statements were false. Numerous sources show that Teladoc's and Livongo's commercial organizations—*i.e.*, the companies' sales teams, responsible for sales to commercial clients (SPA-19)—were not "fully integrated" and cross-selling the companies' products effectively when these statements were made. *Id.* Notably, CW-5, who was responsible for integrating the two companies' sales forces, recalled that the integration of these sales teams was still not complete by the time she left in *June 2021*—months after Gorevic's statements. A-281¶212.

Similarly, CW-2—a Sales Vice President at Livongo and then Teladoc—detailed Teladoc's failure to integrate Livongo's sales team through fall 2021 (when CW-2 left). For example, CW-2 said that Teladoc "had no idea" where to put Livongo personnel within Teladoc, as evidenced by the fact that CW-2's team was merged with another acquired team that sold to completely different buyers. A-264¶171. Similarly, CW-2 recounted that when going for client sales pitches at hospitals, she and other Livongo sales personnel would pitch entirely different groups at the hospital than the Teladoc sales personnel and only meet up afterwards,

showing the lack of overlap and synergies between the teams in any joint- or cross-sales of the companies' products. A-255-56¶148. Indeed, this organizational disorder was unsurprising given Teladoc's lack of a Livongo integration plan after the acquisition, as COO Sides acknowledged to CW-2 at a June 2021 internal meeting in Nashville. A-267¶177; *see also* A-262-64¶¶165-70 (CW-4 corroborating Teladoc's lack of an integration plan through at least September 2021).

Indeed, CW-2 stated that she would not have considered the commercial organization "fully integrated" by the time she left Teladoc in fall 2021 because the businesses were *still all running separately*. A-268-69¶179. She elaborated that there were no synergies and very little overlap between the sales teams, nor training materials on how to sell the two companies' products together. A-253-56¶¶145-49, A-268-71¶¶179-86.

Numerous internal documents further support CW-2's descriptions of sales-team integration failures. For example, from late 2020 to January 2021 (shortly before Gorevic's February 2021 Misstatement), CW-2 co-drafted talking points, titled "HHS Team Open Issues," to discuss with Teladoc management, including Joe DeVivo, the President of CW-2's group within Teladoc (the Hospital Health Systems or "HHS" division), regarding the Livongo sales team's fit into Teladoc. A-264-65¶173. These talking points posed questions evidencing the teams' lack of

integration: "What are we called?"; "How do we work with Teladoc"; "What can we sell?"; and "Clients (who we can target?)." A-264-67¶¶173-75.

Similarly, another CW-2 document (her notes from fall 2021) detailed the separation of Livongo sales personnel from their Teladoc counterparts: COO "Sides had no answer" to the question of "[w]hat is integration plan"; there was "[n]o synergy" among the sales teams; and Teladoc sales management had *"[b]uilt fence – put us [Livongo] on an island," "[c]ut off communications with ex-LVGO [Livongo] Team"*—meaning that Livongo personnel were excluded from Teladoc's HHS team meetings discussing sales strategy—and told them to "stay out of our swim lane." A-269-70¶¶181-82, A-279¶206. Additionally, CW-2 drafted an internal sales training presentation, last updated in late July 2021, because Teladoc sales personnel still had no idea about Livongo product capabilities and were ill-prepared for joint sales pitches, including due to the lack of "overlap" between the two companies. A-253-56¶¶145-48.

Other CWs also attested to the lack of integration of the two companies' sales teams. CW-7, a Growth Acquisition Manager responsible for encouraging clients' employees to sign up with Teladoc, worked on a team that was still focusing exclusively on selling Livongo products when she left Teladoc in October 2021 and stated that many of the business segments at Teladoc were "*siloed*" from their Livongo counterparts during her tenure. A-219-20¶62, A-271¶187. Similarly, CW-

6—a sales professional at Livongo and then Teladoc—explained that the Livongo integration was not complete when she left Teladoc in fall 2021 and that there was "misalignment" throughout the organization. A-275¶197. Specifically, CW-6 recalled that Teladoc did not know where to place her Livongo HHS team and that a proposed "solution" to combine her team with a preexisting Teladoc team in November 2020 "failed within a year" when the group dissolved. A-274-75¶¶195-97. Likewise, CW-1, a Senior Client Success Associate responsible for client retention and sales, said that her ex-Livongo team *was still operating separately* from their Teladoc counterparts when she left in January 2022. A-218¶56, A-271¶188.

Similarly, multiple CWs and the *Business Insider* Article described how severe attrition of Livongo personnel, including key executives who had institutional knowledge about Livongo and its products, impaired the integration of the sales teams. A-276-84¶¶198-219. CW-2 recalled that Teladoc let go all of Livongo's sales management, and her notes recount that the new Teladoc sales management had "[n]o depth of knowledge of LVGO [Livongo]," resulting in sales personnel pitching clients with non-existent product capabilities, which "frustrate[d] clients." A-248¶¶132-33, A-277-78¶¶201-03; *see also* A-281¶211 (CW-5: "outrageous" number of Livongo employees left post-Livongo Acquisition); A281-82¶¶213-14 (CW-6 and CW-8 describing "integration through attrition" depleting Teladoc of

key Livongo talent). Per CW-4, those departures included the top two executive heads of sales. A-276¶198. The *Business Insider* Article also described how the departure of all but "a few" members of Livongo leadership contributed to "confusion in the sales process." A-282¶216.

These numerous corroboratory allegations about the "woeful state of the sales force integration efforts" adequately plead the falsity of Defendants' statements that "suggest that the company had *successfully completed integration of the sales force*." *City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*, 552 F. Supp. 3d 406, 415-16 (E.D.N.Y. 2021); *see In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *19-20 (N.D. Cal. Mar. 21, 2018) ("*fully integrated* sales and marketing teams" statement false because CWs "paint a vastly different picture").

Despite these detailed factual allegations, the District Court improperly held that both of Gorevic's Misstatements about sales-team integration were not adequately alleged to be false. SPA-19-20. As for Gorevic's February 24, 2021 Misstatement, the District Court characterized CW-2's description of the lack of integration as a mere "difference of opinion," erroneously focusing *only* on CW-2's statement that she would not have considered the commercial organization integrated. SPA-19. The District Court entirely ignored the numerous other *facts* supplied by CW-2 to support her statement, including in the *internal documents* that the District Court never addressed—*e.g.*, that the Livongo and Teladoc sales teams

were still running separately when CW-2 left in fall 2021, with the Livongo team "[c]ut off" and "on an island," and that the two teams were not trained on selling the other company's products and going their separate ways when pitching the same clients—resulting in "no synergies" between the teams. *E.g.*, A-253-56¶¶145-49, A264-70¶¶171-82, A-279¶206. This account stands in stark contrast to Gorevic's claims that such sales teams were "fully integrated" and "collaborating" to cross-sell each company's products effectively. A-317¶308, A-328¶336.

Likewise, the District Court erroneously plucked out of context one statement by CW-7 that the Livongo and Teladoc teams were "siloed," again improperly discounting it as simply CW-7's "judgment about unidentified business segments" that was thus "not sufficiently tethered" to Gorevic's statement. SPA-20. But this finding disregards CW-7's role as a Growth Acquisition Manager with *sales* responsibilities (A-219-20¶62); thus, her statement about "siloed" business segments necessarily included the *sales* teams that she was part of. It also overlooks CW-7's additional factual support for her statement—*e.g.*, that when she left Teladoc in October 2021, her team was still selling *only* Livongo products. A-271¶187. Further, CW-7's description of the Livongo and Teladoc teams as "siloed" was corroborated by CW-2's many statements and documents, as well as CW-1 and CW-6's accounts that the two sales teams were operating separately long after Gorevic's "fully integrated" Misstatements. A-271¶¶187-88, A-275¶197.

Moreover, the District Court failed to consider—and view in a light most favorable to Plaintiffs—these numerous allegations from other CWs and the *Business Insider* Article substantiating the lack of integration between the sales teams. This includes, for example, CW-5, who was *responsible for integrating the two companies' sales forces* and who recalled that the integration was *not complete* by the time she left in June 2021 (A-281¶212), after both of Gorevic's "fully integrated" Misstatements. The District Court, without any analysis, lumped together all these other CWs' statements as simply opinions about "internal confusion," "misalignment," and "division," dismissing them as ordinary "general corporate discontent or upheaval" that was "not sufficiently tied to the work of the commercial organization." SPA-19. But the accounts of such severe organizational division and disorder from numerous CWs employed in the *sales* teams directly contradict Gorevic's portrayal of the two sales teams as "fully integrated"—*i.e.*, one unified salesforce that was successfully "collaborating" to drive sales. Thus, "the district court erred . . . by imposing its own reading of [plaintiff's] substantive fraud allegations without considering them in the light most favorable to [plaintiff]." *Loreley*, 797 F.3d at 174; *see also Textron*, 14 F.4th at 144-46 (district court erred in dismissing "progress" statements despite allegations from "a cadre of confidential informants").

Instead, the District Court held that Gorevic's February 24, 2021 Misstatement that the commercial organization had been "fully integrated" was an inactionable "opinion . . . made at a high level of generality when the company was describing its integration efforts as complex, challenging, and a work in progress." SPA-20. But Gorevic's statement was not "made at a high level of generality," as it specifically attested that the sales teams had been "fully integrated." A-317¶308. As explained *infra*, Argument § I.A.5, Gorevic's statement is also not an opinion, and even if it were, it constitutes an actionable one. Nor is Gorevic's statement shielded by adequate risk warnings for the reasons stated *infra*, Argument §§ I.A.4, I.A.7.

In holding Gorevic's April 28, 2021 Misstatement inactionable, the District Court again erroneously failed to consider *any* of the supporting allegations from CWs and internal documents. *Textron*, 14 F.4th at 145-46. Instead, the District Court held that the SAC failed to plead facts adequately alleging "the remainder of the statement was false"—*i.e.*, "that Teladoc did not have sales teams selling the entire whole-person portfolio of products by April 28, 2021." SPA-20-21. This, however, is directly contradicted by allegations described above detailing that Teladoc and legacy Livongo sales teams were not, in fact, successfully collaborating with each other and that Livongo sales teams were still selling exclusively Livongo products (not Teladoc's or combined products). A-253-56¶¶145-49, A-264-70¶¶171-82, A-271¶¶187-88, A-275¶197, A-279¶206, A-281¶212.

### 2. The SAC Adequately Pled Misstatements Regarding Integration of Technological Platforms

Defendants also made multiple Misstatements about Teladoc's integration of Livongo's technological systems, including product platforms, which were essential for Teladoc's ability to provide its much-touted "whole-person" telecare. The District Court found these statements inactionable, committing reversible error by misapplying the law of this Circuit in failing to view the allegations in the light most favorable to Plaintiffs and ignoring numerous specific factual allegations.

#### a. Shah's February 11, 2021 Misstatement

On February 11, 2021, when asked by a reporter for an update on the Livongo integration, Shah represented that it was "going really great," including that the two companies "*really do fit together*" "from a *technology perspective*" "*to provide . . . a continuum of care, a whole person experience*," and that Teladoc was "*well on [its] way of building . . . that highway* to quickly deliver" those integrated products. A-310-11¶298. This statement was materially false and misleading because Teladoc struggled and was unable to fully integrate Livongo's technology—including, critically, its product platforms. This adversely impacted Teladoc's business, as it was "not well on its way of building" the promised "whole person" telecare products. *Id.*

For example, CW-2 recounted—and provided internal documents showing—that Teladoc hoped to leverage Livongo technology to offer whole-patient products

26

such as RPM, but did not have such capabilities, nor an integration plan to provide such combined products, through at least fall 2021. A-132-57¶¶132-50. CW-2 raised concerns about the lack of combined Livongo-Teladoc RPM products to Shah in an October 29, 2020 email describing a meeting where Gorevic discussed with a hospital administrator the possibility of Teladoc "co-developing a patient focused 'subscription' model that would include urgent care (like Teladoc's Employee Benefit System) with chronic care (Livongo)." A-251¶139. In response, Shah confirmed via email to CW-2 (shortly before his February 11, 2021 Misstatement) that Teladoc lacked such capabilities and would not have them for some time: "[w]e know that there is an imperative to have this together *by [first half] 2021, but don't have details yet nor are ready for a client*." A-251-52¶¶138-40.

Similarly, on November 30, 2020, CW-2 emailed Shah that she was "*starting to feel uncomfortable on making up 'futures[,]'*"—*i.e.*, the capabilities of these future Livongo-Teladoc RPM products, because "Teladoc colleagues [who were] . . . pushing the RPM messaging" to numerous customers were pitching RPM capabilities that were *not* "*anchor[ed] . . . in reality.*" A-249-51¶¶135-38. Thus, Shah knew that Teladoc was nowhere near ready to provide such integrated products to customers when the Class Period began shortly thereafter, and would not be for a while.

The internal sales training presentation created by CW-2 (described *infra*, Argument § I.A.1), which was provided to senior management like DeVivo, shows that Teladoc still lacked whole-person RPM capabilities through at least July 2021 (when the presentation was last updated). A-253-54¶145. This presentation included a Venn diagram with Teladoc and Livongo on opposite sides and had the term "RPM" circled and crossed out in red in the middle portion where the two companies' circles intersected, demonstrating the lack of such RPM capabilities in the companies' product integration. A-254¶146. Indeed, Defendants did not have a plan to integrate Livongo technology and provide such RPM products by June 2021, as COO Sides admitted at a team meeting in Nashville. A-253¶144. By the time CW-2 left Teladoc in fall 2021, she confirmed that Teladoc was still unable to provide RPM. A-248-49¶134.

The *Business Insider* Article and additional CWs described Teladoc's inability to deliver integrated whole-person products based on Livongo technology. For example, the *Business Insider* Article described how "the rushed union [between the companies] led to confusion and made it difficult for Teladoc to work with customers and *iron out its plan for new products*" and that the companies' patient portals were *"still separate apps"* in November 2021. A-260-61¶¶161-62. CW-6 also recounted that doctors providing virtual care via the Teladoc platform could not access Livongo glucometer data through at least fall 2021. A-257¶151. CW-1 stated

that Teladoc only *began* to sell a *beta* version of a "whole person solution" based on Livongo products to a few clients in *January 2022*. A-257¶152.

Crucially, Defendants later admitted their failure to integrate Livongo's product platforms during the Class Period. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) ("subsequent admissions . . . established falsity"). For example, Gorevic acknowledged in the April 27, 2022 disclosure that "*admittedly, we're not done with that yet*"—referring to "integrating the Livongo products into our whole-person care experience." A-300¶267. Similarly, in the July 27, 2022 disclosure, Murthy admitted "[t]hat still continues"—referring to the "integration of our data that underpins bringing together all of our suite of products." A-305¶282. That same day, Defendants further admitted: "[t]he company's products *are not [] fully integrated yet*. For example, TDOC has three separate apps. So there is a bit of a challenge of getting into a client and saying we'll be a one stop shop when we can't show that yet." A-308-09¶294.

All of these allegations show that the companies did not "fit together" "from a technology perspective" and Teladoc was not "well on [its] way" to integrating these platforms to "quickly deliver" such "whole person" products. *See Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (statements that "inventory situation was 'in good shape' or 'under control'" false because defendants "allegedly knew that the contrary was true"); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water*

*Techs. Corp.*, 450 F. Supp. 3d 379, 410-12 (S.D.N.Y. 2020) (integration statements false where company "faced serious problems in integrating one of its new acquisitions").

Failing to consider these allegations, the District Court held that Shah's Misstatement that Teladoc and Livongo "really do fit together" constitutes an inactionable "opinion and/or expression[] of corporate optimism." SPA-17-18. However, as described *infra*, Argument §§ I.A.5-6, Shah's Misstatement is not an inactionable opinion, nor does it constitute puffery. Further, the District Court improperly isolated one aspect of Gorevic's statement—that the companies "really do fit together"—from the rest of the statement—which elaborated that it was specifically the companies' "*technology*" that "fit together" "to provide . . . a *whole-person* experience" (A-310-11¶298). This is directly contradicted by the many allegations regarding the lack of such whole-person products during the Class Period, as described above. *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) (finding "the combined companies fit perfectly together" statement actionable based on CW accounts of systems integration problems). The District Court's analysis also ignored the portion of Gorevic's statement where he claimed that Teladoc was "well on [its] way of building" whole-person integrated products (A-310-11¶298) even though this was not the case, as discussed above. *See Textron Inc.*, 14 F.4th at 145-46 ("misleading statements about

the company's progress" actionable). The District Court's disregard for the full context of Gorevic's statement is reversible error, as "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *Jinkosolar*, 761 F.3d at 250.

### b. Gorevic's February 24, 2021 Misstatements

On a February 24, 2021 earnings call, Gorevic represented to investors that "[t]he *integration of our data platform and assets [i.e. products] also continues to progress* as we work to unlock the power of *our combined data sets*. We are now capturing 2 million blood glucose data points per week . . . ." A-317¶308. On the same call, in discussing how Teladoc's "combination with Livongo" had enabled the Company to "leverag[e] [Livongo's] technology and data" to "extend[] our leadership position," Gorevic also assured that "*[w]e have the capabilities* to deliver and manage care virtually across the spectrum for consumers," referring to the "whole person" virtual products. A-317-18¶309. The above-detailed allegations regarding Teladoc's product integration failures render these statements materially misleading. *See supra*, Argument § I.A.2.a.

In particular, Gorevic's statement that "[w]e have the capabilities to deliver" whole-person products that integrated Livongo technology is false given the plethora of allegations establishing that Teladoc lacked such whole-person integrated products, including RPM, throughout the Class Period, let alone by February 24,

2021. *See supra,* Argument § I.A.2.a. Indeed, Gorevic admitted in April 2022, that "*we're not done with that yet*"—referring to "integrating the Livongo products into our whole-person care experience." A-300¶267.

These same allegations demonstrate the lack of progress integrating the two companies' products, rendering false Gorevic's claim that the integration of the Company's "*assets* [i.e., products] also continues to progress." *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011) (statement "that the restructuring was going according to plan" actionable); *Textron*, 14 F.4th at 145-46 ("progress" statement actionable).

The surrounding context of Gorevic's assurance about Teladoc's successful "progress" in integrating Livongo's "data platform and assets"—referencing "blood glucose data points" as a specific example—further supports its falsity because CW allegations reveal that Teladoc had not then integrated Livongo's diabetes glucometer technology and data into Teladoc's offerings. Specifically, per CW-6, Livongo sold a glucometer for diabetes patients that was accessible via the Livongo app, and it was Teladoc's vision to allow doctors to access the glucometer data during telecare sessions. A-257¶151. But doctors still could not access such data during virtual sessions when CW-6 left in fall 2021. *Id.*

Gorevic's specific claim that the integration of the companies' "*data platform[s]*" was "continu[ing] to progress" is also materially misleading. Contrary

to Gorevic's claim, the integration of critical data platforms was behind schedule and nowhere near complete during the Class Period. *See Galestan*, 348 F. Supp. 3d at 292, 300 ("*we have made meaningful progress* on implementing the technology integration required of the two networks" actionable). *First*, Teladoc experienced extensive problems integrating the companies' Salesforce systems, which is a CRM database that stores and tracks sales, customer, and product data. A-236-37¶107, n.17. Specifically, multiple CWs confirmed that the systems operated as separate platforms throughout the entire Class Period, which adversely impacted sales through delays and inefficiencies that led to customer losses. A-236-39¶¶107-14 (CW-3); A-239-40¶115 (CW-6); A-240¶116 (CW-2); A-242-43¶¶121-22 (CW-11); *see also* A-260-61¶161 (*Business Insider* Article: sales personnel "had a hard time navigating two separate internal systems" and had to pitch "customers without each other's full product details"). Notably, per CW-3, Teladoc hired PwC to help integrate the Salesforce systems only starting in fall 2021, and was still only five months—or less than a *third* of the way—in PwC's 18-month timeline for the project in spring 2022, near the end of the Class Period. A-238-39¶¶113-14.

*Second*, CW-11 stated that Teladoc similarly failed to integrate Tableau, a platform that stored patient and client data used for marketing, advertising, and sales. A-240-47¶¶117-31. This materially impacted Teladoc's sales efforts because, instead of having one system to pull client information from, sales personnel had to

pull information from multiple databases to get a fulsome picture of what a customer was already using from either Teladoc or Livongo, and what could also be realistically sold to them. A-242-45¶¶122-26.

The District Court ignored these allegations establishing the falsity of these Misstatements, instead erroneously deeming them inactionable opinions and/or puffery. SPA-17-20. As discussed *infra*, Argument §§ I.A.5-6, however, these statements are not puffery, nor inactionable opinions.

### c.    Murthy's April 28, 2021 Misstatements

On April 28, 2021—in response to an analyst's question about "an update on the [Livongo] platform integration side"—Murthy stated that "*we have a very, very clear road map*," referencing Teladoc's "*R&D [i.e., product] road map*," and that "in terms of *data integration*," "*we are well on our way to*" achieving "*deep integration*." A-291-92¶240. Murthy's statements are materially false and misleading because Teladoc was having severe problems with technological integration, including the companies' data and product platforms.

Defendants are not permitted to represent to investors that the integration of Livongo's products and data were "going according to plan" when this was not the case. *Celestica,* 455 F. App'x at 15. As detailed *supra*, Argument §§ I.A.2.a-b, Teladoc's data integration was facing extensive problems, and the Company thus was not "well on [its] way to" achieving "deep integration." *See Henry Schein*, 552

F. Supp. 3d at 410, 413 416 (upholding "statements about [] IT integration," *e.g.*, those touting "'*deep integration*' of software" based on, *inter alia*, later admission).

Further, contrary to Murthy's claim, Teladoc still had no "clear road map" for integrating the companies' products. Notably, in mid-June 2021—approximately six weeks after Murthy's statements—at a Nashville meeting, CW-2 directly asked COO Sides about the Company's plan to in integrate Livongo, including RPM products, and Sides responded that he was not aware of any plan, merely stating that it was a good question and "I don't know." A-253¶144; *see also* A-269¶181 (CW-2's notes: "David Sides had no answer" to "[w]hat is integration plan"). Similarly, CW-11 recounted that Teladoc had "no clear integration plan" for incorporating Livongo data during her tenure—which ended in June 2021. A-221¶66, A-241-42¶120, A-246-47¶128. Lastly, CW-4 recounted that it became apparent to her by around three months after the Livongo Acquisition that Teladoc did not know how to use or integrate Livongo and that Teladoc still had no adequate integration plan *as late as September 2021*. A-262¶165, A-263-64¶¶169-70. Gorevic effectively acknowledged this to CW-4 during their conversation at a meeting in Chicago in September 2021, where Gorevic finally unveiled a purported integration plan still lacking in any specifics. A-263-64¶169; *see Extreme Networks*, 2018 WL 1411129, at *17-18 ("on track" statement false based on CW allegations of the lack of an "integration plan, including [a] product roadmap for the combined company").

Despite these allegations from multiple CWs, the District Court's analysis ignored Murthy's April 28, 2021 statements entirely. Given that multiple CWs directly contradict Murthy's statement, the District Court's disregard of this statement and the corroborative evidence of its falsity constitutes reversible error.

### d. Gorevic's November 10, 2021 Misstatement

In the November 10, 2021 *Business Insider* Article, the first disclosure, Gorevic minimized the integration issues, representing that "[t]he vision that we laid out then — about whole-person care and bringing together the unique capabilities of two complementary companies to deliver something that really hasn't been done before — *is on track*." A-345¶386. Numerous allegations, as discussed *supra*, Argument §§ I.A.2.a-c, demonstrate that Teladoc's integration of Livongo's technology to provide such whole-person products was by no means "on track." *See, e.g.,* A-248-49¶134, A-257¶152 (CWs detailing that Teladoc lacked whole patient RPM capabilities at least through fall 2021 and that Teladoc only began selectively selling a beta version of a "whole person solution" based on Livongo products in January 2022); A-300¶267 (Gorevic "admit[ing]" in April 2022 that they were still "not done" with "integrating the Livongo products into our whole-person care experience").

Thus, Gorevic's statement touting the companies' product integration as "on track," when such integration had gone off the rails, is squarely actionable. *See*

*Celestica*, 455 F. App'x at 15 (representation "that the restructuring was going according to plan" actionable); *Galestan*, 348 F. Supp. 3d at 292 ("integration . . . remains on track" actionable).

Despite these ample and specific allegations demonstrating the falsity of Gorevic's Misstatement, the District Court improperly held this statement inactionable because it is a "general[]" statement of "opinion and optimism" and because Teladoc put out "contemporaneous robust disclosures of the challenges and risks it was facing." SPA-23-24. But as discussed *infra*, Argument §§ I.A.5-6, Gorevic's Misstatement is not mere puffery, nor an inactionable opinion. Nor is this statement immunized by adequate risk warnings (*see infra*, Argument §§ I.A.4, I.A.7), particularly as Gorevic's Misstatement was a false denial and reassurance to investors in direct response to the media's report of Teladoc's integration problems, designed to downplay these challenges rather than "robust[ly]" disclose them.

### e.    Verstraete's November 18, 2021 Misstatement

During Teladoc's Investor Day on November 18, 2021, Verstraete misleadingly represented that "we brought together and *integrated the legacy Livongo and Teladoc marketing data and tech stacks*." A-346¶392. CW allegations adequately pled the falsity of this Misstatement. Specifically, CW-11 recounted her understanding that "tech stacks" referred to applications used for marketing purposes, such as email blasts or text messages to customers to market products, and

that the marketing team mined data from Tableau for these tech stacks. A-348¶397. But CW-11 confirmed that Teladoc did not even *begin* the process of integrating Livongo's and Teladoc's Tableau data systems, which were used for important *marketing* purposes—let alone *complete* it—until after the Class Period. A-348-49¶398. Thus, Teladoc could not have integrated the companies' "marketing data" or "tech stacks"—*i.e.*, applications that relied on such data—at this time because Teladoc had not yet even begun the integration of the platforms that stored such marketing data—*i.e.*, Tableau—until after the Class Period.

The District Court held that Verstraete's Misstatement is inactionable primarily because the "statement refers specifically to marketing data and tech stacks" and "does not refer to data systems or Tableau." SPA-22. But the District Court's analysis missed the crucial point that Tableau is a system for storing patient and/or client *data used for marketing purposes*, among other things. A-348¶397. Thus, there could be no integration of *marketing data* and tech stacks without integrating Tableau. Indeed, CW-11 explained how personnel could not pull client information from a single system and instead had to pull information from multiple databases to get a fulsome picture of a customer's needs. A-242-45¶¶122-26.

Further, the District Court observed that the SAC "relies on complaints by its CWs about Teladoc's 'marketing strategies,' . . . and about delays in integrating 'data systems'"—and that these allegations do not render Verstraete's specific

38

reference to "marketing data and tech stacks" untrue. SPA-21-22. But the District Court failed to apply this Circuit's precedent requiring that "once a company speaks on an issue or topic, there is a duty *to tell the whole truth*," *JinkoSolar*, 761 F.3d at 250—a standard that Verstraete's Misstatement failed to satisfy by concealing the true state of Teladoc's integration of marketing technology, thus creating the misleading impression that such efforts were on track. The high degree of "[p]recision" demanded by the District Court (SPA-22)—in effect, a literal word-for-word contradiction between the Misstatement and the SAC's allegations—is not required. "The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead." *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010). Further, in crediting such a "benign reading of [Verstraete's] statements" and "requir[ing] [Plaintiffs] to show that [their] reading was superior," the District Court committed the same reversible error it did in *Textron*. 14 F.4th at 147.

### 3. Teladoc Misleadingly "Pushe[d] Back" That the Integration Was "Behind" Schedule in October 2021

On October 28, 2021, Credit Suisse issued a report that contained a post-quarterly conference call discussion where Teladoc management falsely assured analysts that the integration of the two companies was not behind schedule—an alleged misstatement the District Court entirely ignored in its analysis. A-343¶379; SPA-17 n.4.

As detailed in this report, in response to the analysts' concerns that the Livongo integration "might be slightly behind schedule," Teladoc stated that "[t]he success that the company is having with multi-product sales is a good proof point behind that integration. Overall, *management pushes back on the claim that TDOC is behind when it comes to the actual integration of Livongo*." A-343¶381.

The above-detailed allegations demonstrate that "actual integration of Livongo" was "behind" schedule. For example, Teladoc was less than a *third* of the way into PwC's 18-month timeline to integrate Salesforce by spring 2022 (A-238-39¶¶113-14), and the integration of Tableau had not even started by the end of the Class Period (A-240-247¶¶117-31). And Defendants admitted in April and July 2022 that the companies' products *still* had not been integrated to provide the touted whole-person care. A-300¶267, A-305¶282, A-308¶294. Thus, Defendants' Misstatement "push[ing] back" to reassure analysts that the integration was on schedule was false. *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167-70 (2d Cir. 2021) (CEO's reassurance, in response to an analyst's inquiry, that defendants were "not getting any pushback" from retail partners held false).

The District Court ignored this statement in its analysis, noting only in a footnote—without any citation or analysis—that statements by "unnamed individuals and summarized in the Credit Suisse analyst report . . . are not pled with the particularity required by the PSLRA." SPA-17 n.4. But the District Court ignored

that the Credit Suisse report "incorporated" and "disseminated" to investors statements Defendants made to the analysts in specified interviews, as the report made clear by directly attributing the statements to Teladoc "management"—thus making this statement actionable under *Novak*. 216 F.3d at 314-15; A-343¶¶379-81; *see In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 663-64 (S.D.N.Y. 2017) (statement "attributed in [] article to an unidentified speaker at [company]" adequately pled). To require more "would lead to the absurd result that a corporate defendant could never be found liable for securities fraud so long as it took care to ensure that its statements were attributed only to the company and not to an individual." *Id.* at 664.

### 4. Teladoc Issued Materially Misleading Warnings of Purely Hypothetical Livongo Integration Risks

Teladoc's 2020 10-K (filed on March 1, 2021) and 2021 10-K (filed on February 28, 2022)—both of which were signed by Gorevic, Murthy, and Napolitano—included materially misleading risk disclosures, as they characterized certain Livongo integration challenges as purely hypothetical risks, when in fact those risks had already materialized. A-322-24¶¶319-22, A-351-53¶¶407-12.

*First*, both Forms 10-K stated that "[w]e *may* have difficulty integrating the Livongo business, and the anticipated synergies and other benefits of the combined company *may* not be realized." A-322¶319, A-351¶407.

*Second*, both Forms 10-K stated that:

We *may* fail to realize some or all of the anticipated benefits of the merger [with Livongo] *if* the integration process takes longer than expected or is more costly than expected. Our failure to meet the challenges involved in successfully integrating the operations of the two companies or to otherwise realize any of the anticipated benefits of the merger, including additional cost savings and synergies, *could* impair our operations. In addition, the overall integration of Livongo post-merger will continue to be a time-consuming and expensive process that, without proper planning and effective and timely implementation, *could* significantly disrupt our business.

A-323¶320, A-352¶408.

*Third*, both Forms 10-K characterized certain integration challenges as only "*potential* difficulties [that Teladoc] *may* encounter in the integration process." A-323¶321, A-352¶411.

These hypothetical risk warnings were misleading and actionable because they only warned about *potential* risks that "may" or "could" occur when those risks—*i.e.*, significant integration problems—had *already* materialized, as discussed above. *Supra*, Argument §§ I.A.2; A-322-25¶¶319-27, A-351-55¶¶407-19. The District Court, however, held that these statements "made clear to any reasonable investor that the integration process was complex and that different components of the integration effort might progress at different rates." SPA-24. In so holding, however, the District Court ignored clear precedent from this Court holding similar hypothetical risk warnings actionable.

Specifically, as this Court has repeatedly held, "cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in

fact, materialized." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021). Thus, this Circuit has upheld similar hypothetical risk disclosures as materially misleading where they warned of only risks that "could" or "may" occur, when such risks had already arisen. *Id.*; *see also e.g.*, *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized.").

Accordingly, Teladoc's hypothetical risk warnings about "potential difficulties" that Teladoc "*may* encounter in the integration process" and which "*could* significantly disrupt our business," including specifically "the integration of management teams, strategies, technologies and operations, products and services" were misleading because significant integration problems in these key areas had *already* materialized. A-322-24¶¶319-22, A-351-53¶¶407-12. *See Evoqua*, 450 F. Supp. 3d at 411-12 (risk disclosure that company "*might* 'have difficulty in operating or integrating any acquired businesses'" misleading because "[integration] was *already* going poorly"). Therefore, even if these Misstatements did warn "that different components of the integration effort *might* progress at different rates"

(SPA-24)—which they do not[3]—such warnings are materially misleading because the warned-of "risk[s] ha[d], in fact, materialized." *Credit Suisse*, 996 F.3d at 85.

### 5. The Misstatements Are Not Inactionable Opinions

The District Court erred in holding that many of Defendants' Misstatements were inactionable opinions. SPA-18-22. A "statement of fact 'expresses certainty about a thing,' while a statement of opinion does not." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 169 (2d Cir. 2023) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)). Statements of opinion "often include qualifying language (like 'I believe' or 'I think') that conveys a lack of certainty about the thing being expressed." *Id*.

None of the Misstatements were accompanied by any such opinion qualifiers. A-310-11¶298, A-317-18¶¶308-09, A-322-24¶¶319-22, A-328¶336, A-329¶338, A-343¶381, A-345¶386, A-346¶392, A-351-53¶¶407-12.[4] Instead, the Misstatements convey certainty. *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020) (statement was not an inactionable opinion because speaker "flatly"

---

[3] Indeed, the District Court did not identify any such warnings speaking to differential integration progress rates. SPA-23-24.

[4] The only portion of any Misstatement that arguably contains an opinion qualifier is Murthy's April 28, 2021 statement that "I would say we are well on our way to do it"—referring to a "deep integration" of the companies "data." A-329¶338. But the rest of her Misstatement is even more definitive: "The good thing is *we have* a very, very clear road map." *Id*.

represented a "supposed fact" rather than "couch[ing] his representation . . . with prefatory language like 'I believe' or 'In my estimation'"). According to Defendants, Teladoc's and Livongo's commercial organization had purportedly been "*fully integrated*" by February or April 2021. A-317¶308, A-328¶336. Likewise, statements that the companies apparently "*really do fit together*," "[t]he integration of our data platform and assets also *continue[d] to progress*" (and was "*on track*"), and Teladoc "*ha[d] the capabilities* to deliver and manage care virtually across the spectrum for consumers" A-310-11¶298, A-317-18¶¶308-09, A-345¶386) are "matter[s] of objective fact" rather than "opinions." *DeCarlo*, 80 F.4th at 170.

Even if the Misstatements are "opinions," they are actionable under binding precedent. As an initial matter, as described *infra*, Argument § II.A, the SAC sufficiently pled that Defendants knew that their Misstatements were false. Thus, the SAC adequately alleged that "the speaker[s]" of the Misstatements "did not hold the belief[s] [they] professed"—rendering any such opinions actionable. *Omnicare*, 575 U.S. at 186. Such subjective falsity, however, is not required. "By pointing out that a statement of opinion, *even if believed*, may nonetheless be actionable *if it contains a factual misstatement or is rendered misleading by the omission of material facts*, *Omnicare* expanded the scope of issuer liability for statements of opinion." *DeCarlo*, 80 F.4th at 169.

The Misstatements satisfy the *Omnicare* standard, as they contained factual misstatements—*e.g.*, it was demonstrably the case that the sales teams were *not* "fully integrated," and that the combined Company did *not* yet "have the capabilities" to provide whole-person products. A-310-11¶298, A-317-18¶¶308-09, A-345¶386. These and other Misstatements also omitted many material facts about Teladoc's integration problems, as discussed above, which "substantially undermine" the positive statements. *Abramson*, 965 F.3d at 177; *see also Galestan*, 348 F. Supp. 3d at 303 (even if opinions, integration statements that "the combined companies fit perfectly together" are actionable based on material omissions). Thus, even if any of the Misstatements are considered opinions, they are actionable.

### 6. The Misstatements Are Material Misrepresentations and Omissions of Existing Facts, Not Mere Puffery

The District Court erred in holding that certain Misstatements were immaterial puffery or corporate optimism. SPA-17. The Misstatements are not merely "vague positive statements regarding . . . [Teladoc's] business practices" like those found to be inactionable puffery by this Court in *Synchrony*, 988 F.3d at 170 ("pretty confident" and "pretty positive" inactionable).

Nor are the Misstatements mere "rosy predictions," but instead are "misrepresentations of existing facts" about the status of the companies' integration, like those found actionable by this Court in *Novak*. 216 F.3d at 315 (statements that "the inventory situation was 'in good shape' or 'under control'" were not

"expressions of optimism, and other puffery"). Defendants definitively claimed, for example, that the companies "fit together" "from a technology perspective" (A-310-11¶298) and that the integration "continue[d] to progress" (A-317¶308) and was "on track" (A-361-62¶447) while, as in *Novak*, Defendants "knew that the contrary was true." *Id.*; *see infra,* Argument § II.A. These Misstatements "concretely assured investors," that the integration was completed or progressing well in several specific, key respects, thus rendering such statements actionable. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *35, 39 (S.D.N.Y. Sept. 2, 2022).

Indeed, courts in this Circuit regularly hold similar statements actionable. *E.g., Galestan*, 348 F. Supp. 3d at 303 ("Defendants offered more than 'rosy predictions' because they stated that integration was going smoothly," and "statements such as 'the combined companies fit perfectly together'" were actionable); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) (not puffery where "Progress Statements [] definitively claimed that CBI '*continue[s] to make progress and substantial progress* on [the projects]' despite reports of delays").

Further, "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015). Here, the District Court ignored key context that provided more specificity. For example, the District Court isolated Shah's statement about the

integration "going really great" (SPA-17), omitting Shah's subsequent explanation discussing the companies' purported "fit" from "a technology perspective" and that Teladoc was "well on [its] way" to building integrated, whole-person products. A-310-11¶298. Similarly, as to Gorevic's statement that the companies' integration "continues to progress" (SPA-17), the District Court omitted that Gorevic was speaking specifically about the companies' "data platform and assets" and ignored the next sentence where Gorevic specified that the Company was "now capturing 2 million blood glucose data points per week" as a concrete example of such purportedly successful integration. SPA-17; A-317¶308; *see also supra,* Argument § I.A.2.b.

The District Court also erred in holding that the "generality of many of the statements of opinion and optimism to which the SAC points prevents them from rising to the level of materiality required" under *Indiana Public Retirement System v. SAIC, Inc.*, 818 F.3d 85, 97-98 (2d Cir. 2016). SPA-23. The statements at issue in *SAIC*—touting the company's "culture of high ethical standards, integrity, operational excellence, and customer satisfaction" and its "reputation for upholding the highest standards of personal integrity and business conduct," 818 F.3d at 97-98—are nothing like the Misstatements. Defendants represented objectively verifiable facts regarding specific aspects of the Livongo integration or Teladoc's post-acquisition capabilities—*e.g.*, that the companies' sales teams had been "fully

48

integrated," that Teladoc "ha[d] the capabilities" or was "on track" to deliver whole-person integrated products, and that Defendants had a clear product "road map." A310-11¶298, A-317-18¶¶308-09, A-345¶386, A-387¶528.

Indeed, Teladoc's ability to integrate its *$18.5 billion* acquisition was central to the Company's financial success, as Defendants repeatedly acknowledged (*e.g.*, A-230-35¶¶88-102). Thus, the Misstatements concealing Teladoc's integration failures in key operations like product and other technological systems and sales teams are not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question." *Ganino*, 228 F.3d at 162. The District Court ignored this standard for materiality, which is a "mixed question of law and fact," that is therefore not generally decided on a motion to dismiss. *Id.*

For example, the District Court rejected Plaintiffs' "omissions theory" because "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." SPA-23 (quoting *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014)).[5] But these severe integration problems were not trivial facts that investors might "like to know." Given the "transformative" nature of the $18.5 billion Livongo Acquisition—that would enable Teladoc to deliver the vaunted "whole-product" virtual products essential to

---

[5] Unlike here, *Dalberth*, 766 F.3d at 174, was a ruling on defendants' motion for *summary judgment*.

its competitive advantage—and the centrality of the companies' integration to the acquisition's success, Plaintiffs sufficiently established the requisite showing that the integration problems were matters that reasonable investors "would have considered significant in making investment decisions." *Ganino*, 228 F.3d at 162. The significant (*e.g.*, over 40%) drops in Teladoc's stock price upon the disclosures further support materiality. *See Celestica*, 455 F. App'x at 15-16.

Further, the District Court observed that the Misstatements and omissions were not material because "Teladoc was only obligated to disclose additional facts if doing so was necessary to make a statement not misleading." SPA-23-24. However, as described *supra*, the Misstatements are misleading because, *inter alia*, they tout specific aspects of Teladoc and Livongo's integration while, at a minimum, failing to disclose the severe problems plaguing the integration of the two companies. "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *JinkoSolar*, 761 F.3d at 250-51. Defendants failed to do so here.

### 7. The Misstatements Are Not Protected by the Safe Harbor, the Bespeaks Caution Doctrine, or the Truth-on-the-Market Defense

The PSLRA safe harbor does not shield any of the Misstatements from liability. Indeed, the District Court did not expressly hold that any of the integration Misstatements qualified for safe harbor protection. But the District Court held that

the Misstatements were inactionable because Defendants issued "contemporaneous robust disclosures of the challenges and risks [Teladoc] was facing." SPA-23-24. In so holding, the District Court appears to invoke either the bespeaks caution doctrine, which is a judicially created doctrine codified by statute in the safe harbor, or the truth-on-the-market defense. None of these defenses is applicable and the District Court's dismissal on this ground constituted reversible error.

First, the Misstatements are not forward-looking, rendering both the safe harbor and bespeaks caution inapplicable. *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010) ("bespeaks caution does not apply insofar as those characterizations communicate present or historical fact"). The Misstatements refer to existing or past facts regarding the progress of the integration which are paradigmatically not forward-looking. *E.g.*, A-328¶336 ("our commercial organization *has been fully integrated*"); A-318¶309 ("[w]e *have* the capabilities to deliver and manage care virtually across the spectrum for consumers"); A-329¶338 ("*we have* a very, very clear road map"); A-361¶447 (integration "*is* on track"). *See Celestica*, 455 F. App'x at 15 ("that the restructuring *was going according to plan*" statements not forward-looking as they "reported on past or present circumstances"); *Galestan*, 348 F. Supp. 3d at 304.

Even if any of the Misstatements are forward-looking, they are not shielded by the safe harbor or bespeaks caution because they were not accompanied by

adequate cautionary language.[6] The District Court highlighted Teladoc's "warnings" that: (i) "[c]ombining the businesses of Teladoc and Livongo may be more difficult, costly or time-consuming than expected" and "any delays encountered in the integration process[] could have an adverse effect" on the combined Company's financial results"; and (ii) there could be no assurances "that [Teladoc's and Livongo's] businesses [could] be integrated successfully." SPA-24. These putative warnings contained in Teladoc's Registration Statement (A-477-78) are far from "robust." Instead, they are merely vague truisms applicable to any entity undergoing a merger. *See Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 548 (S.D.N.Y. 2017) ("[T]he relevant cautionary language must be prominent and specific, and must directly address exactly the risk that . . . was not disclosed."). Thus, such generic warnings about potential future risks applicable to any integration are insufficient.

The District Court also held that the risk warnings in Teladoc's 2020 10-K and 2021 10-K sufficiently shielded Defendants from liability. But, as discussed *supra*, Argument § I.A.4, these so-called risked disclosures are themselves materially false and misleading and, therefore, do not qualify as meaningful cautionary language sufficient to absolve Defendants. *Credit Suisse*, 996 F.3d at 85-

---

[6] The Misstatements are also not protected by the safe harbor because they were made with actual knowledge of falsity (*see* Argument § II.A, *infra*). *See Freudenberg*, 712 F. Supp. 2d at 194.

86. Indeed, "bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). Thus, Defendants' boilerplate "warnings" about hypothetical integration problems that "could" or "may" occur in the future do nothing to immunize their Misstatements that misled investors about the then-current state of the integration.

Alternatively, the argument that the integration risks were already known to the market via these public risk disclosures is, at its core, the truth-on-the-market defense, which "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Ganino*, 228 F.3d at 167. Defendants bear a high burden of proof on this affirmative defense—they must show that that "the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Id. see also In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 581 (S.D.N.Y. 2010) (defendants' burden is "extremely difficult"). The District Court erroneously ignored this stringent standard.

Defendants failed to meet their burden here because "many" specific and substantial integration "problems"—and their adverse financial impact—were not "adequately disclosed" until the end of the Class Period. *Hall v. The Child.'s Place*

*Retail Stores, Inc.*, 580 F. Supp. 2d 212, 229 (S.D.N.Y. 2008). Further, Defendants falsely reassured investors that specific aspects of the integration were either complete or making substantial progress. *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006) (rejecting truth-on-the-market defense because any investor concern "was counteracted by [defendants'] contemporaneous statements"); *see, e.g.*, A-343¶381 ("management pushes back on the claim that TDOC is behind when it comes to the actual integration of Livongo"). Defendants also made contemporaneous denials on and after the partial disclosures. *E.g.*, A-345¶¶386-87, A-346¶392, A-355-56¶¶422-23. Further, positive analyst coverage echoing Defendants' Misstatements during the Class Period confirms that the market remained misled despite Defendants' purportedly curative disclosures. *E.g.*, A-331¶343, A-342-43¶378; *see In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 161 (S.D.N.Y. 2008) (rejecting the defense where analyst reports indicate that "analysts were unaware" of the issues). Finally, the substantial drops in Teladoc's stock price upon the disclosures further support that the market did not know the truth previously. *MBIA,* 700 F. Supp. 2d at 582.

Accordingly, the District Court erred in holding that Defendants' Misstatements were immunized by these defenses.

**B. The District Court Abused Its Discretion in Denying Leave to Amend**

In their Opposition, Plaintiffs requested an opportunity to amend the SAC if the District Court granted Defendants' Motion. A-755 n.40. Plaintiffs noted that such amendment may include adding new, relevant developments that occurred after the SAC's filing, which Plaintiffs were still investigating. *Id.* The District Court, however, dismissed the SAC with prejudice, denying Plaintiffs' request. SPA-28-29. This ruling constituted abuse of discretion.

Rule 15(a) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave when justice so requires." "The permissive standard of Rule 15 is consistent with our strong preference for resolving disputes on the merits." *Loreley*, 797 F.3d at 190. This is especially true where, as here, plaintiffs must meet a heightened pleading standard under Rule 9(b) and the PSRLA. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (liberal grants of leave to amend are "especially important in the context of the PSLRA"). Thus, "courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Accordingly, denying leave to amend is only justified where there is "undue delay, bad faith, dilatory motive, [or] futility." *Loreley*, 797 F.3d at 190. The District Court did not find any of these circumstances present here. SPA-28.

Ignoring these principles, the District Court refused to grant Plaintiffs the opportunity to amend the SAC primarily because Plaintiffs have "not identified how further amendment would address the deficiencies in [the] SAC," faulting Plaintiffs for not "attach[ing] a proposed amended complaint" to their Opposition. *Id*. But, as this Court has repeatedly cautioned in reversing denials of leave to amend as abuse of discretion under similar circumstances, "[g]enerally, we will not deem a request for leave to amend insufficient on the basis of form alone." *Loreley*, 797 F.3d at 190 (rejecting argument that "denial of leave was proper because of the informality of the request, which was raised 'in the alternative' at the end of [p]laintiffs' brief opposing the motion to dismiss," rather than a motion attaching a proposed amended complaint); *Cresci v. Mohawk Valley Cmty. Coll.*, 693 F. App'x 21, 25 (2d Cir. 2017) ("the court's error was all the more egregious because [plaintiff], in his papers opposing the motion to dismiss, had expressly asked to be allowed to replead in the event of an adverse ruling").

Importantly, this Court has explained that "[w]ithout the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Loreley*, 797 F.3d at 190. "It is the District Court's ruling, not the defendant's arguments in support of a motion to dismiss, that puts a plaintiff on notice of the complaint's deficiencies." *Cresci*, 693 F. App'x at 25.

Additionally, the District Court denied Plaintiffs' request because "[L]ead [P]laintiff was warned that, after filing the SAC, it would likely not have a further opportunity to amend the complaint." SPA-28-29. The District Court was referencing its Case Management Order, which warned that if Lead Plaintiff chose to amend rather than oppose Defendants' motion to dismiss the First Amended Complaint, they likely could not amend again. A-18. Such a warning, however, was "improper" because it "presented Plaintiffs with a Hobson's choice: agree to cure deficiencies *not yet fully briefed and decided* or forfeit the opportunity to replead" after a future ruling by the District Court. *Loreley*, 797 F.3d 190.

In sum, "the court's denial of leave to replead, simultaneously with its decision that the complaint was defective, effectively deprived [Plaintiffs] of a reasonable opportunity to seek leave to amend. Such a denial is not compatible with the liberal objective of Rule 15." *Cresci*, 693 F. App'x at 25. Therefore, this ruling constitutes abuse of discretion.

## II.   ISSUES NOT REACHED BY THE DISTRICT COURT

Because the District Court found that Plaintiffs did not plead any actionable misstatements, it did not address whether Plaintiffs adequately pled scienter or loss causation. SPA-14. If this Court exercises its "authority to decide issues that were argued before but not reached by the district court," *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 90 (2d Cir. 2004), Plaintiffs respectfully request that the

Court hold that the SAC adequately pleaded scienter, loss causation, and claims under Section 20(a).

## A. The Complaint Adequately Alleged Scienter

To adequately allege the requisite "strong inference" of scienter, Plaintiffs need not plead "smoking-gun" proof. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313-14, 323-24 (2007). Instead, scienter is pled by alleging (1) Defendants' "motive and opportunity" to defraud, or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307-08. To plead recklessness, Plaintiffs must demonstrate that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). Importantly, the Court must "assess all the allegations holistically" to determine if Plaintiffs' inference is "at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 322-24. Here, the SAC's allegations, viewed holistically, adequately pled scienter.

**CW Allegations and Documents:** The SAC's detailed allegations from 11 CWs establish a strong inference of scienter. *See Celestica*, 455 F. App'x at 14. For example, CW-2 and internal Company documents confirm that Shah was *directly informed* that Teladoc was struggling with product and sales team integration shortly

before his February 2021 Misstatement touting the integration's successful progress. A-248-52¶¶134-43, A-289¶233, A-309-10¶298.

CW-2's documents also show that Gorevic was personally involved in pushing Teladoc's non-existent integrated RPM capabilities in client meetings, which supports that he was at least reckless in later touting product and sales team integration. A-383¶517. "[C]orroboration from multiple [other CW] sources also supports an inference of scienter" as to Gorevic. *Freudenberg*, 712 F. Supp. 2d at 197; *e.g.,* A-385-86¶523 (CW-4: in fall 2021 Gorevic acknowledged integration difficulties, including the lack of an adequate integration plan); A-382¶¶514-15 (CW-2: Gorevic fielded questions about Livongo integration difficulties, providing evasive responses). Additionally, Sides—who admitted there was no integration plan at a June 2021 meeting attended by CW-2—reported directly to Gorevic. A-268-69¶179, A-384¶512.

**Core Operations:** Core operations allegations "can provide supplemental support for . . . scienter." *Celestica*, 455 F. App'x at 14, n.3. This doctrine "permits an inference that a company and its senior executives" have knowledge of information concerning "core" matters, which are those "critical to the long term viability" of a company and affect a "significant source of income*." In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013). Here, Teladoc's integration of Livongo was "core" given the size and "transformative"

nature of this $18.5 billion acquisition. A-228¶82, A-230¶89, A-233¶97. *See Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 853 (S.D.N.Y. 2019) (core operations applied where acquisition was "biggest part of [company's] ambitious growth strategy" and "significant source of income"). Moreover, successfully integrating the two companies was essential for Teladoc to provide the vaunted "whole person" products. A-230-34¶¶88-99, A-378-80¶¶501-08. Further, Individual Defendants were "personally involved" in the Livongo integration, as they publicly confirmed, which "provide[s] strong circumstantial evidence of conscious misbehavior." *Buxbaum v. Deutsche Bank A.G.*, 2000 WL 33912712, at *19 (S.D.N.Y. Mar. 7, 2000); *e.g.*, A-381-82¶¶511-13; *see also* A-234-35¶¶101-02, A-251-52¶¶138-43, A-263-64¶¶169-70, A-280¶228, A-382-86¶¶514-25 (CWs confirming Defendants' close monitoring of integration).

**Other Circumstantial Evidence:** Defendants also repeatedly denied or minimized integration problems—even in response to direct analyst and press questions about such concerns. *See, e.g.,* A-310-11¶¶297-98, A-328-29¶¶336-38, A-343¶¶379-81, A-355-56¶¶422-23. *See Celestica*, 455 F. App'x at 14 (that these were "subject[s] about which investors and analysts often inquired" supported scienter). Further, "Defendants' own admissions" in April and July 2022 regarding Teladoc's continued product integration failures (A-261¶163, A-300¶¶266-68, A-305-

06¶¶281-84) further support scienter. *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 227 (S.D.N.Y. 2021).

**Insider Trading:** While Plaintiffs have no obligation to plead motive, the SAC sufficiently does so. *Tellabs*, 551 U.S. at 325. "The motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). Here, Gorevic, Murthy, and Verstraete made substantial stock sales during the Class Period while Teladoc's share price was trading at an artificially inflated value due to Defendants' Misstatements. *E.g., In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 365-66 (S.D.N.Y. 2003) ("hundreds of thousands of dollars" in stock sales "plainly satisfied" motive) ("*IPO*"). Gorevic reaped almost $30 million in proceeds from these sales, while Murthy made nearly $2 million, and Verstraete reaped over $4 million in proceeds. A-387-88¶¶531-32. Additionally, Verstraete, Murthy, and Gorevic, respectively sold 43.1%, 29%, and 21.6%, of their Class Period Teladoc stock holdings. *Id.*; *see IPO*, 241 F. Supp. 2d at 367-68 (10% threshold for "unusual" trading).

**Corporate Scienter:** Plaintiffs may plead scienter for "a corporate defendant without doing so with regard to a specific individual defendant"—*e.g.*, by alleging the scienter of someone "whose intent could be imputed to the corporation."

61

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Corporate scienter may be established through non-defendant "high-level" employees who did not make any misstatements. *Loreley*, 797 F.3d at 177-78. Here, the SAC alleges widespread knowledge within Teladoc—including by non-defendant senior executives like COO Sides and HHS President DeVivo— of severe integration challenges, which pleads corporate scienter. *E.g.*, A-253¶144 (Sides' knowledge); A-383¶516 (DeVivo discussing integration problems); A-264-67¶¶173-75, A-385¶522 (January 2021 document showing that DeVivo was apprised of sales team integration failures).

### B.     The Complaint Adequately Alleges Loss Causation

Plaintiffs' burden of pleading loss causation "is not a heavy one." *Loreley*, 797 F.3d at 187. "The complaint must simply give [d]efendants '*some* indication' of the actual loss suffered and of a *plausible* causal link between that loss and the alleged misrepresentations." *Id.* Thus, "[t]here is no heightened standard for pleading loss causation," and Plaintiffs "need only plead a short and plain statement, pursuant to [Rule] 8(a)." *Freudenberg*, 712 F. Supp. 2d at 202. Further, loss causation may be shown by a "corrective disclosure" of the fraud, or by the "materialization of [a] risk" that the fraud had concealed or obscured. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014).

The three alleged disclosures here incrementally revealed that—contrary to Defendants' prior statements touting the successful progress of the Livongo integration—the integration was a disaster, which materially, adversely affected Teladoc's business. *E.g.,* A-359-77¶¶437-99. These disclosures resulted in substantial drops in Teladoc's stock price. A-361¶446, A-366¶459, A-373¶486. Such allegations amply plead the requisite causal link.

*First*, the November 10, 2021 *Business Insider* Article disclosed that the Livongo integration was struggling, causing Teladoc's stock price to fall over 4.2%. A-359-61¶¶437-46. *Second*, on April 27, 2022, Teladoc issued its quarterly earnings results, including lowered financial guidance and a $6.6 billion goodwill impairment charge, which the market tied to the Livongo integration problems, and admitted that Teladoc still had not integrated Livongo's products, causing Teladoc's stock price to tumble over 40%. A-362-71¶¶448-75. *Finally*, on July 27, 2022, Defendants disclosed a second quarter of disappointing results, which Defendants again attributed to the impact of unresolved Livongo integration issues—*e.g.*, that the product and data integration "*still continues*"—as well as another goodwill impairment charge of $3 billion, prompting a stock price drop of over 17.6%. A-371-77¶¶478-99. These disclosures revealed the full, severe extent of Teladoc's integration problems, as supported by the "sharp drops in [Teladoc's] share price" and analyst reactions, which "suggest that the market had not fully internalized the

extent of the risks" earlier. *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 269 (S.D.N.Y. 2021).

### C. The Complaint Adequately Alleges Section 20(a) Claims

The District Court dismissed Plaintiffs' Section 20(a)'s control person liability claims against the Individual Defendants solely because it rejected the underlying Section 10(b) claims. SPA-28. Because that ruling was erroneous, the District Court's dismissal of Section 20(a) claims also must be reversed.

### CONCLUSION

Plaintiffs respectfully request that this Court reverse the Judgment of the District Court and remand for further proceedings. To the extent that this Court finds the claims defective in a manner that could be cured by amendment, Plaintiffs respectfully request the action be remanded with leave to amend.

DATED: November 17, 2023

LABATON SUCHAROW LLP

By: */s/ Irina Vasilchenko*
Carol C. Villegas
Irina Vasilchenko
Matthew J. Grier
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
ivasilchenko@labaton.com
mgrier@labaton.com

*Counsel for Lead Plaintiff Leadersel*
*Innotech ESG and Additional Plaintiff*
*Hui Ma, and Lead Counsel for*
*the Proposed Class*

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements**

1.     This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and the word limit of 2d Cir. R. 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,983 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Times New Roman font.

Dated: November 17, 2023

*/s/ Irina Vasilchenko*
Irina Vasilchenko

# SPECIAL APPENDIX

# TABLE OF CONTENTS

PAGE

Opinion and Order of the Honorable Denise Cote, dated July 5, 2023 .. SPA-1

Judgment, dated July 6, 2023 ...................................... SPA-30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X
                                        :
                                        :     22cv4687 (DLC)
IN RE TELADOC HEALTH, INC. SECURITIES   :
LITIGATION                              :     OPINION AND
                                        :        ORDER
                                        :
---------------------------------------- X

APPEARANCES:

For lead plaintiff and the proposed class:
Carol C. Villegas
Irina Vasilchenko
David J. Schwartz
Philip J. Leggio
Labaton Sucharow LLP
140 Broadway
New York, NY 10005

For additional plaintiff Hui Ma:
Brian Schall
The Schall Law Firm
2049 Century Park East, Suite 2460
Los Angeles, California 90067

James W. Johnson
Labaton Sucharow, LLP
140 Broadway
New York, NY 10005

For defendants:
Daniel J. Kramer
Audra J. Soloway
Caitlin E. Grusauskas
Marisa A. Papenfuss
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

DENISE COTE, District Judge:

    Investors in Teladoc Health, Inc. ("Teladoc" or "the

Company") have brought this putative securities class action

against the Company and several of its senior executives.  Lead plaintiff alleges that the defendants made misleading statements following Teladoc's $18.5 billion acquisition of Livongo Health, Inc. ("Livongo").  According to lead plaintiff, the defendants' statements artificially inflated the price of Teladoc's stock between February 11, 2021 and July 27, 2022 (the "Class Period").  The defendants have moved to dismiss the complaint. The defendants' motion to dismiss is granted.

## Background

The following facts are drawn from the Second Amended Complaint ("SAC") and documents relied upon by the SAC.  For the purposes of deciding this motion, the SAC's factual allegations are accepted as true, and all reasonable inferences are drawn in the plaintiffs' favor.

Teladoc is a leading provider of virtual healthcare services.  Traditionally, the Company focused on "treating acute conditions (such as providing short-term solutions to a sudden onset of an injury or illness)."  In the midst of growing competition in the telehealth industry, Teladoc expanded its product portfolio through a series of acquisitions, "with the goal of staying competitive by providing full-spectrum, 'whole-person' virtual care."  The whole-person approach "seeks to treat the entire person -- i.e., both their physical and mental

health, their acute episodic needs as well as their chronic and complex needs and taking care of them on a preventive basis."

The individual defendants, Jason Gorevic, Mala Murthy, Bimal Shah, Richard Napolitano, and Stephany Verstraete are, respectively, Teladoc's Chief Executive Officer; Chief Financial Officer; former Chief Medical Officer; Senior Vice President, Chief Accounting Officer and Controller; and Chief Marketing and Engagement Officer.  This lawsuit stems from the Company's merger with Livongo in October 2020.

I.   The Livongo Merger

On August 5, 2020, Teladoc entered into a merger agreement with Livongo, a leading provider of virtual chronic disease management.  The Teladoc-Livongo merger substantially expanded the Company's chronic care business and, according to the registration statement, represented a "significant opportunity to provide whole-person care as a comprehensive partner."  The merger closed on October 30, 2020.  The combined entity remained under the Teladoc name and ticker.  Teladoc paid approximately $18.5 billion in consideration for Livongo.  The Company's chronic care business is now referred to as Livongo.

The Company's S-4 registration statement, filed in connection with the merger on September 11, 2020, explained several of the key risks involved with the deal, including:

- "Combining the businesses of Teladoc and Livongo may be more difficult, costly or time-consuming than expected and the combined company may fail to realize the anticipated benefits of the merger, which may adversely affect the combined company's business results and negatively affect the value of the common stock of the combined company following the merger."

- "The failure to integrate successfully the businesses and operations of Teladoc and Livongo in the expected time frame may adversely affect the combined company's future result."

- "Failure to attract, motivate and retain executives and other key employees could diminish the anticipated benefits of the merger."

The registration statement gave "no assurances" that Teladoc and Livongo could be "integrated successfully."

II.  Class Period Events

The Class Period runs from February 11, 2021 to July 27, 2022.  Although the SAC is lengthy and the allegations are voluminous, its contentions center around two themes.  It asserts that (1) the defendants painted an unjustifiably positive picture of the status of the Teladoc–Livongo integration, and (2) the defendants downplayed rising competition within the virtual healthcare industry.  The alleged misrepresentations, which are also described in the discussion that follows, largely arose in the context of the following events and filings.

A.    Q4 and FY 2020 Earnings, WTF Health Interview, and Bill Frist Interview

On February 11, 2021, Shah participated in an interview with WTF Health.  In that interview, Shah spoke optimistically about the Livongo integration, noting it was "going really great."

On February 24, the Company hosted a conference call to discuss its Q4 2020 financial results, the Company's first quarterly report following the merger.  On that call, Gorevic provided an update on the progress of the integration.  Gorevic also discussed the Company's competitive advantage within the telehealth industry and discussed market opportunities for BetterHelp, the Company's mental health platform.

On March 1, the Company filed its 2020 Form 10-K.  In the 2020 10-K, Teladoc disclosed several risks related to the merger, including:

- Teladoc "may have difficulty integrating the Livongo business, and the anticipated synergies and other benefits of the combined company may not be realized[;]"

- The success of the merger "will depend in large part on the success of the management of the newly combined company in integrating the operations, strategies, technologies, and personnel of the two companies[;]" and

- "[P]otential difficulties" could arise with regard to "the retention of and possible decrease in business from the existing customers," "the integration of corporate cultures and maintenance of employee morale," and "the retention of key employees," among others.

Moreover, the Company warned that "[e]ven if integration is successful, anticipated cost savings, synergies and other benefits may not be achieved."

As for the Company's competitive positioning, the 2020 10-K warns: "[w]e operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition and results of operations will be harmed;" competition within the virtual care market was "expect[ed] to [] increase[], which could make it difficult for [Teladoc] to succeed;" and that "[Teladoc's] competitors could also be better positioned to serve certain segments of our markets, which could create additional price pressure."

On March 15, Gorevic discussed the progress of the Livongo integration in an interview with former Senator Bill Frist.  He touted the companies' "cultural alignment" but admitted their integration "certainly [faced] challenges."

B.   Q1 2021 Earnings and CNBC Interview

On April 28, 2021, Teladoc held its Q1 2021 earnings call. Gorevic provided an update on the integration, reporting "considerable progress."  Gorevic also discussed the competitive landscape in response to an analyst's question about the Company's "most recent thoughts on competition" and how the

"competitive landscape has [] changed over the last couple of years."

On May 11, Gorevic participated in an interview with CNBC. In that interview, Gorevic discussed the growing competition in the telehealth industry and spoke optimistically about "the market demand and consumer demand for unified integrated solutions."

C.   June 2021 Investor Meetings

On June 1 and 8, 2021, the Company held investor meetings. At the June 1 meeting, Gorevic was asked about Teladoc's competitive positioning given the entry of "retail giants like Amazon and more recently, Walmart" into the telehealth market.

Credit Suisse issued an analyst report on June 8, following a meeting with Teladoc.[1]  In their report, the analyst summarized positive remarks management had made about the Livongo integration.

D.   Q3 2021 Earnings and October and November 2021 Reports

On October 27, 2021, Teladoc hosted its Q3 2021 earnings call.  Gorevic briefly discussed the status of the Livongo integration.

_____

[1] The parties have not provided the June 8, 2021 Credit Suisse report.

On October 28, Credit Suisse issued another analyst report that contained a post-quarterly conference call discussion with Teladoc management.  Management commented on the status of the Livongo integration, and the analyst reported that "management pushe[d] back on the claim that [Teladoc] is behind [schedule] when it comes to the actual integration of Livongo."

On November 10, Business Insider published an article detailing challenges that Teladoc was facing with the integration, including a "culture clash" between the two companies.  Teladoc's stock price fell 4.21% that day.  The Business Insider article contained an interview with Gorevic in which he responded that the integration efforts remained "on track."

On November 18, the Company hosted its 2021 Investor Day.  Verstraete commented on the integration and Gorevic touched on the Company's competitive advantages.  Also on November 18, Gorevic was interviewed by CNBC.  CNBC questioned Gorevic about increasing competition in the telehealth industry.

E.   Q4 and FY 2021 Earnings and JPM Healthcare Conference

On January 10, 2022, Teladoc participated in JPMorgan's annual healthcare conference.  Defendants again discussed competition within the telehealth industry.  On February 22, Teladoc held its Q4 2021 earnings call.  Gorevic spoke about

Teladoc's online mental health platform, BetterHelp, noting its "tremendous track record."

On February 28, Teladoc filed its 2021 Form 10-K. The 2021 10-K included cautionary language about the Livongo integration, including that Teladoc "may" not realize all of the anticipated synergies and benefits of the Livongo merger "if the integration process takes longer than expected or is more costly than expected." It added that the integration "will continue to be a time-consuming and expensive process that, without proper planning and effective and timely implementation, could significantly disrupt our business." The 2021 10-K then listed a number of "potential difficulties [that Teladoc] may encounter in the integration process."

The 2021 10-K also warned about competition in the telehealth industry. For instance, it noted that Teladoc "operate[s] in a competitive industry, and if we are not able to compete effectively, our business, financial condition, and results of operations will be harmed." It also cautioned that increased competition in the virtual healthcare market "could": (1) "make it difficult for [Teladoc] to succeed," (2) "negatively impact [] sales,

profitability, and market share," and (3) "create additional price pressure."

F.   Q1 and Q2 2022 Earnings

On April 27, 2022, the Company issued a press release and held an earnings call regarding its Q1 2022 earnings.  In the press release, Teladoc reported a net loss per share of $41.58, primarily driven by a non-cash goodwill impairment charge of $6.6 billion.  Teladoc also revised its FY 2022 revenue and adjusted EBITDA projections down "to reflect dynamics" the Company was "currently experiencing in the direct-to-consumer (D2C) mental health and chronic condition markets."  In the press release, Gorevic further explained that:

> In the D2C mental health market, higher advertising costs in some channels are generating a lower-than-expected yield on our marketing spend.  In the chronic condition market, we are seeing an elongated sales cycle as employers and health plans evaluate their long-term strategies to deliver the benefits and care that their populations need.

Later that day, Teladoc held its Q1 2022 earnings call.  Murthy explained that "[t]he goodwill impairment was triggered by the sustained decline in Teladoc Health share price."  Gorevic also addressed the revised guidance figures, citing lower expected growth at BetterHelp and a lowered outlook for chronic care revenue (i.e., Livongo).  In the Q&A portion of the call, Gorevic discussed the status of the Livongo integration,

and expressed continued optimism about the benefits of the merger.  The following day, Teladoc's shares fell 40.15%.

On July 27, 2022, Teladoc issued a press release and held an earnings call regarding its Q2 2022 earnings.  Teladoc reported a net loss per share of $19.22, driven by a second non-cash goodwill impairment charge of $3 billion.  Again, Teladoc attributed the goodwill impairment to "the decline in Teladoc Health share price."  On the earnings call, Murthy stated that the integration process remained ongoing.  Gorevic acknowledged that, as with the first quarter, the growth in the Company's chronic care business (i.e., Livongo) continued to slow. Gorevic attributed the slowed growth "at least in part due to competitive noise as the market transitions from stand-alone point solutions to integrated whole-person virtual care."  On the heels of the news, Teladoc's stock price fell 17.67%.

III. Procedural History

This action was filed on June 6, 2022, as a putative class action.  On August 17, the case was reassigned to this Court. On August 23, Leadersel Innotech ESG was appointed as lead plaintiff.  Also on that day, a schedule was set for filing amended pleadings.

Lead plaintiff filed its first amended complaint on September 30.  On November 3, the defendants moved to dismiss

the first amended complaint.  Instead of opposing the motion to dismiss the first amended complaint, lead plaintiff filed a second amended complaint (the "SAC") on December 6.[2]  The SAC alleges (1) violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b); and (2) "control person" liability under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  The SAC asserts that defendants made a variety of misleading statements that masked the true extent of Teladoc's difficulties integrating Livongo and the competitive pressures it faced.

Defendants moved to dismiss the SAC on January 20, 2023. The motion became fully submitted on March 31.

## Discussion

To survive a motion to dismiss for failure to state a claim, a complaint "must plead enough facts to state a claim to relief that is plausible on its face."  <u>Green v. Dep't of Educ. of N.Y.</u>, 16 F.4th 1070, 1076-77 (2d Cir. 2021) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  In securities fraud actions,

---

[2] The lead plaintiff was warned on August 23, 2022 that, after filing the SAC, it would likely not have a further opportunity to amend the complaint.

> [t]he Court may also consider any written instrument
> attached to the complaint, statements or documents
> incorporated into the complaint by reference, legally
> required public disclosure documents filed with the
> SEC, and documents possessed by or known to the
> plaintiff upon which it relied in bringing the suit.

Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation

omitted).

Under SEC Rule 10b-5, it is unlawful to "make any untrue

statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading . . .

in connection with the purchase or sale of any security."  17

C.F.R. § 240.10b-5; see also 15 U.S.C. § 78j(b).  "Section 20(a)

provides that individual executives, as controlling persons of a

company, are secondarily liable for their company's violations

of the Exchange Act."  Altimeo Asset Mgmt. v. Qihoo 260 Tech.

Co. Ltd., 19 F.4th 145, 152 (2d Cir. 2021) (citation omitted).

Complaints alleging securities fraud violations are subject

to a heightened pleading standard pursuant to the PSLRA and Rule

9(b), Fed. R. Civ. P.  To state a claim for relief under § 10(b)

and Rule 10b-5, a plaintiff must allege that a defendant:

> (1) made misstatements or omissions of material fact,
> (2) with scienter, (3) in connection with the purchase
> or sale of securities, (4) upon which the plaintiff
> relied, and (5) that the plaintiff's reliance was the
> proximate cause of its injury.  In addition, because
> such a claim sounds in fraud, the plaintiff must state

> with particularity the circumstances constituting
> fraud.

Altimeo Asset Mgmt., 19 F.4th at 149-50 (citation omitted).

"The PSLRA requires plaintiffs to specify each misleading
statement; set forth the facts on which a belief that a
statement is misleading was formed; and state with particularity
facts giving rise to a strong inference that the defendant acted
with the required state of mind." In re Synchrony Fin. Sec.
Litig., 988 F.3d 157, 167 (2d Cir. 2021) (citation omitted).

The defendants argue that the SAC fails to adequately plead
(1) statements that qualify as material misrepresentations, (2)
scienter, and (3) loss causation.  Because the SAC fails to
identify a material misrepresentation, it is not necessary to
assess the adequacy of its assertion of scienter or loss
causation.

I.   Legal Standard

A.   Material Misrepresentations or Omissions

"A statement is materially misleading when the defendants'
representations, taken together and in context, would have
misled a reasonable investor." Altimeo Asset Mgmt., 19 F.4th at
151 (citation omitted).  "To be material, a statement must, in
the view of a reasonable investor, have significantly altered
the total mix of information available." Plumber & Steamfitters
Local 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 100-01

14

(2d Cir. 2021) (citation omitted).  "Omissions are material when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  <u>Altimeo Asset Mgmt.,</u> 19 F.4th at 151 (citation omitted).[3]

### B.   Opinion

To adequately plead a misleading statement of opinion,

> [t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion -- facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have -- whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

<u>Tongue</u>, 816 F.3d at 209 (quoting <u>Omnicare, Inc. v. Laborers Dist. Council Constr. Ind. Pension Fund</u>, 575 U.S. 175, 194 (2015)).  The investor must show (1) "that a statement of opinion contained one or more embedded factual statements that can be proven false," or (2) "that a statement of opinion, without providing critical context, implied facts that can be proven false."  <u>Abramson v. Newlink Genetics Corp.</u>, 965 F.3d 165, 175 (2d Cir. 2020).  A reasonable investor understands, however, that "opinions sometimes rest on a weighing of

---

[3] The plaintiffs assert that the defendants omitted key information from their statements about competition and the Livongo integration, which rendered those statements misleading.

competing facts," and that it "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." Tongue, 816 F.3d at 210 (citation omitted). Moreover, "[g]eneric, indefinite statements of corporate optimism typically are not actionable." Abramson, 965 F.3d at 173.

### C.  Forward-Looking Statements

Forward-looking statements are not actionable under the PSLRA "if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading." In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016) (citation omitted). "[A] forward-looking statement is protected . . . if any of the three prongs applies." Id. at 245-46. When the forward-looking statement is made at the time a company makes a filing with the SEC that contains meaningful cautionary language on the topic, the cautionary language in the filing protects the contemporaneous forward-looking statement.

## II.  Application

The SAC asserts that a host of statements made by the defendants during the Class Period are actionable as false and

materially misleading, even though Teladoc accurately reported
its financial results during the same period.  Those statements
can be grouped into two categories -- statements of optimism
regarding Teladoc's integration of the Livongo business
("Integration Statements"), and statements regarding Teladoc's
position within the telehealth industry ("Competition
Statements").[4]

    A.   Integration Statements

    The SAC's Integration Statements are largely non-actionable
statements of opinion and/or expressions of corporate optimism.
The following are representative examples taken from the SAC:

- Defendants spoke repeatedly about the two companies'
  "aligned" cultural values, their "shared mission," and how
  they "really do fit together."

- Defendants referred to the Company's "progress" integrating
  Livongo, commenting, inter alia: it "continues to
  progress," was "well on [its] way," "on track," or "so far,
  so good."

- Defendants stated that the merger would create "new
  opportunities" and was "resonating in the marketplace."

To the extent these are statements of corporate optimism, they
are "precisely the type of puffery that [the Second Circuit] and
other circuits have consistently held to be inactionable."  In

---

[4] The SAC also points to several statements that were made by
unnamed individuals and summarized in the Credit Suisse analyst
report and the Business Insider article.  Those statements are
not pled with the particularity required by the PSLRA.

re Synchrony Fin. Sec. Litig., 988 F.3d 157, 170 (2d Cir. 2021)

(citation omitted).[5]

Only five of the Integration Statements warrant further discussion.  They are:

1) A February 24, 2021 statement that "our commercial organization is now fully integrated."[6]

2) A February 24, 2021 statement that Teladoc "[had] the capabilities to deliver and manage care virtually across the spectrum for consumers."

3) An April 28, 2021 statement that Teladoc had "made considerable progress across our key work streams" on the integration, including that the "commercial organization has been fully integrated with sales teams selling across the entire whole-person portfolio of products."

4) A November 10, 2021 statement that Teladoc had launched a new service which "fully blends Livongo's assets with Teladoc's."

5) A November 18, 2021 statement that Teladoc "integrated the legacy Livongo and Teladoc marketing data and tech stacks."

The SAC does not adequately plead that any of these representations was false or materially misleading.  The first

---

[5] Because defendants only cited four statements as examples of puffery, lead plaintiff argues that the defendants "concede the rest are not puffery."  This argument fails.  In their motion, the defendants argue that "many of the statements about integration efforts . . . are quintessential corporate puffery and subjective statements of opinion."  That they only discuss four examples in depth does not waive this objection.

[6] This representation was repeated with slight variations throughout the Class Period.  The February 24, 2021 statement is the earliest identified in the SAC.

three statements appear in the earnings calls for Q4 2020 and Q1 2021.

In the first statement, made roughly four months after the merger, Gorevic refers to the integration of the companies' commercial organization.  He does not define what he means by Teladoc's "commercial organization," but the parties agree that the commercial organization is responsible for sales to commercial clients such as health plans and employers.  The SAC pleads that Confidential Witness ("CW") 2, who was a Vice President in the Livongo and then Teladoc sales organization until the fall of 2021, "would not have considered the commercial business 'fully integrated'" because "the businesses were all running separately."  This difference of opinion is insufficient to plead a claim of falsity.

In opposing this motion, the lead plaintiff points to other statements from the SAC in which CWs opined on "internal confusion, 'misalignment,' and division" between the personnel from the two companies as well as a "hemorrhaging of key Livongo employees."  Descriptions of general corporate discontent or upheaval are not sufficiently tied to the work of the commercial organization to render Gorevic's opinion about the integration of its operations false.  The lead plaintiff relies as well on a statement by CW 7, who worked as a Growth Acquisition Manager at

Livongo and then Teladoc until October 2021, that "many" of the business segments at Teladoc were "siloed."  Again, CW 7's judgment about unidentified business segments within Teladoc is not sufficiently tethered to the commercial organization's integration to render Gorevic's statement false.  More is required to allege a plausible claim of falsity than is pleaded in the SAC.  Gorevic's statement of opinion is made at a high level of generality and was made at a time when the company was describing its integration efforts as complex, challenging, and a work in progress.

The second statement, which was also made during the Q4 2020 earnings call, was that Teladoc had the "capabilities to deliver and manage care virtually across the spectrum for consumers."  This is a classic statement of opinion.  The statement was made in the course of a description of how the merger with Livongo had expanded Teladoc's capabilities.  The SAC does not explain how this statement of opinion contained any embedded fact statements that were false or was otherwise actionable.

The SAC does not plausibly plead that the third statement, made in the Q1 2021 earnings call, is false.  When read in context, the "progress" to which the speaker refers appears to be the integration of the commercial organizations.  The SAC

does not plead facts to support a claim that the remainder of the statement was false, to wit, that Teladoc did not have sales teams selling the entire whole-person portfolio of products by April 28, 2021.

The fourth statement, which appeared in the report of an interview with Teladoc's CEO published in <u>Business Insider</u>, is about a service that "fully blends" the assets of Livongo with those of Teladoc.  The SAC asserts that the statement created the false impression that Teladoc had fully integrated "Livongo's product platforms" with Teladoc's.  That is not a fair reading of the statement.  The article explored why it was taking Teladoc and Livongo "longer than expected" to accomplish their original vision.  Teladoc's CEO expressed pride about the Company's progress but did not represent at any point that all product platforms had been fully integrated or that the aim of the merger had been fully accomplished.

Lastly, the SAC asserts that the statement made at a Teladoc Investor Day on November 18, 2021 -- that Teladoc had "integrated the legacy Livongo and Teladoc marketing data and tech stacks" -- was false.[7]  The SAC, however, does not include allegations about the failure to integrate "marketing data" or

---

[7] The parties have not provided the complete transcript of the Investor Day remarks.  The few pages provided by the defendants do not include the passage on which the SAC relies.

"tech stacks." Instead, it relies on complaints by its CWs about Teladoc's "marketing strategies," about Teladoc relying on Livongo to provide "data science personnel," and about delays in integrating "data systems." The most relevant allegations in the SAC are provided by CW 11, who was a Senior Director of Analytics at Livongo and held the same role at Teladoc until June 2021. According to the SAC, CW 11 "believed" that the term "tech stacks" refers to applications used for marketing purposes, such as email blasts or text messages sent to customers. CW 11 reported that Teladoc's marketing team mined data from a data system named Tableau to populate its tech stacks, but that Teladoc did not begin, much less complete, the process of integrating Teladoc's and Livongo's Tableau data systems during the Class Period. This is insufficient to plausibly plead falsity. Precision matters. The Investor Day statement refers specifically to marketing data and tech stacks. It does not refer to data systems or to Tableau. Therefore, even if the SAC adequately pleads that the term "tech stacks" is a reference to email blasts and text messages, it does not adequately plead that they had not been "integrated" by November 2021.

In its opposition to this motion, the lead plaintiff argues that Teladoc's general statements of optimism about the

integration of the two companies are actionable because they created the false impression that the integration "was completed or progressing successfully."  For example, the SAC alleges that Gorevic mislead investors during the March 15, 2021 interview with Bill Frist when he stated that the integration was going "very well" and that the "the cultural alignment [was] very strong," but failed to mention "substantial personnel integration problems, . . . heavy attrition, and other company culture clash issues."  In another example, the SAC alleges that Gorevic misled investors, in connection with his November 10, 2021 Business Insider interview, when he described the integration as "on track" and did not mention that "Teladoc was nowhere near completing the integration of the [companies'] Salesforce systems."

There are several difficulties with the lead plaintiff's omissions theory.  The generality of many of the statements of opinion and optimism to which the SAC points "prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."  Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 97-98 (2d Cir. 2016).  Moreover, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."  Dalberth v. Xerox Corp., 766 F.3d 172, 183 (2d Cir. 2014).

Teladoc was only obligated to disclose additional facts if doing
so was necessary to make a statement "not misleading." Matrixx
Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)
(citation omitted).  In light of defendants' contemporaneous
robust disclosures of the challenges and risks it was facing,
the SAC has failed to plead that the statements it has
identified misled a reasonable investor.  For example, even
before the Livongo merger closed, Teladoc warned that
"[c]ombining the businesses of Teladoc and Livongo may be more
difficult, costly or time-consuming than expected" and "any
delays encountered in the integration process[] could have an
adverse effect" on the combined Company's financial results.
Teladoc also expressly disclaimed any assurances "that
[Teladoc's and Livongo's] businesses [could] be integrated
successfully."  Teladoc warned investors in its 2020 and 2021
Form 10-Ks that "the overall integration of Livongo post-merger
will continue to be a time-consuming and expensive process that
. . . could significantly disrupt our business."  These and many
other warnings made clear to any reasonable investor that the
integration process was complex and that different components of
the integration effort might progress at different rates.

B.   Competition Statements

The second category of alleged misstatements concerns Teladoc's place in the competitive landscape.  The SAC does not plausibly allege that any of the Competition Statements are misleading.

Again, most of the identified Competition Statements are classic statements of opinion for which there is no plausible pleading of falsity.  For example, the SAC points to Gorevic's response in the February 24, 2021 earnings call to a question about employers' expansion of their own telehealth services.  Gorevic stated that Teladoc saw that market as an "underpenetrated" opportunity.  At a June 1, 2021 conference, in response to a question about small-sized competitors, Gorevic explained that Teladoc wins in that match-up because of its "multiproduct breadth of solutions."  During an April 27, 2022, earnings call, Gorevic asserted that the market was "responding well to" Teladoc's multiproduct sales.  The SAC does not plead that these statements of opinion were embedded with factual statements that were false or implied facts that were false.

Many of the other Competition Statements identified in the SAC express optimism about Teladoc's ability to compete within the telehealth market, and specifically about its new "whole-person" product offerings.  Expressions of optimism are not

generally actionable, and the SAC does not plausibly allege that these statements are so.

Lastly, the SAC asserts that the Company improperly downplayed the impact on Teladoc's business of the growing competition in the virtual healthcare market.  Lead plaintiff points to Gorevic's statement in the April 28, 2021 earnings call that Teladoc "almost never" bumped into many of the competitors that an analyst had just listed, and that Teladoc was not seeing some of the new entrants "gain traction."  The SAC does not plead that either of these observations was false. The SAC relies on statements from CW 1 that Teladoc was experiencing increased competition with CVS and from CW 2 that Teladoc competitors "were able to steal clients from Teladoc by citing the integration problems."  Neither of these statements contradicts Gorevic's statements.

Moreover, Teladoc repeatedly warned investors of the risks posed by competition.  For example, in the Company's 2020 Form 10-K filed on March 1, 2021, Teladoc cautioned "[w]e operate in a competitive industry, and if we are not able to compete effectively, our business, financial condition and results of operations will be harmed."  The 2020 10-K added that Teladoc "currently face[s] competition . . . from a range of [named] companies," and noted that "potential Clients may accept

competitive solutions in lieu of purchasing [Teladoc's]

solutions." These warnings were repeated in Teladoc's 2021 Form

10-K filed on February 28, 2022.[8]

There is a separate reason that many of the statements

about competition identified in the SAC are not actionable. The

forward-looking Competition Statements challenged in connection

with the Company's earnings announcements were accompanied by

cautionary language throughout the Class Period. For example,

in Q1 2022, the Form 10-Q stated:

> Many statements made in this Quarterly Report on Form
> 10-Q that are not statements of historical fact,
> including statements about our beliefs and
> expectations, are forward-looking statements and
> should be evaluated as such. . . . these statements
> are not guarantees of performance or results.

The accompanying Press Release included similar language:

> This press release contains "forward-looking
> statements" within the meaning of the safe harbor
> provisions of the [PSLRA]. . . . Our actual results
> and financial condition may differ materially from
> those indicated in the forward-looking statements.

And in the quarterly earnings call, Gorevic prefaced his

comments with a "disclaimer," stating:

> [C]ertain statements made during this call will be
> forward-looking statements as defined by the [PSLRA].

---

[8] Lead plaintiff argues that these risk disclosures were
"insufficient and themselves misleading because such risks had
already materialized." There is nothing misleading in these
disclosures. Teladoc repeatedly disclosed the impact that
competitive pressure was having on the Company's financials. It
lowered its financial projections in part to account for that
competitive pressure in April 2022.

# SPA-28

> Such forward-looking statements are subject to risks,
> uncertainties and other factors that could cause the
> actual results for Teladoc Health to differ materially
> from those expressed or implied on this call.

Teladoc repeated these risk disclosures in quarterly SEC filings
throughout the Class Period.[9]

## III. Request for Leave to Amend

Lead plaintiff requests that, if the defendants' motion to
dismiss is granted, it be given leave to amend the SAC.  In
general, leave to amend should be "freely give[n] when justice
so requires."  Fed. R. Civ. P. 15(a)(2).  Leave to amend may be
denied, however, "for good reason, including futility, bad
faith, undue delay, or undue prejudice to the opposing party."
Eastman Kodak Co. v. Henry Bath LLC, 936 F.3d 86, 98 (2d Cir.
2019) (citation omitted).  Additionally, a plaintiff "need not
be given leave to amend if it fails to specify . . . how
amendment would cure the pleading deficiencies in its
complaint."  TechnoMarine SA v. Giftports, Inc., 758 F.3d 493,
505 (2d Cir. 2014).

Lead plaintiff's request for leave to amend is denied.
Lead plaintiff has not identified how further amendment would
address the deficiencies in SAC.  Nor has it attached a proposed
amended complaint.  Moreover, lead plaintiff was warned that,

---

[9] Because lead plaintiff has failed to state a claim under §
10(b) of the Securities Exchange Act, the claims under § 20(a)
are also dismissed.

28

after filing the SAC, it would likely not have a further opportunity to amend the complaint.  It has not shown that this warning should be ignored.  For instance, it has not identified any argument made by the defendants in their pending motion to dismiss which could not have been anticipated from the arguments the defendants made in their original motion.

## Conclusion

The defendants' January 20, 2023 motion to dismiss is granted.  The Clerk of Court shall enter judgement for the defendants and close the case.

Dated:      New York, New York
            July 5, 2023

                                    _____
                                    DENISE COTE
                                    United States District Judge

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

22 **CIVIL** 4687 (DLC)

**I N RE TELADOC HEALTH, INC. SECURITIES
L ITIGATION**

**JUDGMENT**

-------------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated July 5, 2023, defendants' January 20, 2023 motion

to dismiss is granted. Judgement is entered for the defendants; accordingly, the case is closed.

**Dated:** New York, New York

July 6, 2023

**RUBY J. KRAJICK**

_____
**Clerk of Court**

**BY:**

_____
**Deputy Clerk**