# 23-1112

## In the United States Court of Appeals for the Second Circuit

HUI MA, PLAINTIFF-APPELLANT,

*and*

JEREMY SCHNEIDER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; WALTER DE SCHUTTER, PLAINTIFFS,

*v.*

LEADERSEL INNOTECH ESG, MOVANT-APPELLANT,

*and*

JOSE LUIS VILLASENIN, WESLEY R. LEDBETTER, CHUN MU HSUEH, NEIL SILVER, ELIZABETH SILVER, MOVANTS,

*v.*

TELADOC HEALTH, INC., JASON GOREVIC, MALA MURTHY, STEPHANY VERSTRAETE, BIMAL SHAH, RICHARD J. NAPOLITANO, DEFENDANTS-APPELLEES

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 22-4687) (THE HONORABLE DENISE COTE, J.)*

### BRIEF OF DEFENDANTS-APPELLEES

MATTEO GODI
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*

DANIEL J. KRAMER
AUDRA J. SOLOWAY
CAITLIN E. GRUSAUSKAS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*1285 Avenue of the Americas*
*New York, NY 10019*
*(212) 373-3000*

# TABLE OF CONTENTS

Page

Statement of jurisdiction.......................................................................1

Statement of the issues ........................................................................1

Statement of the case ...........................................................................1

    A.     Background..............................................................................4

    B.     Procedural background ..................................................12

Summary of argument .......................................................................15

Standard of review..............................................................................17

Argument...............................................................................................18

I.     The district court correctly held that plaintiffs failed to allege any actionable material misstatements ....................................18

    A.     The allegations in the second amended complaint, taken together and in context, did not identify any material misstatements....................................................................18

    B.     Plaintiffs' arguments based on cherry-picked, out-of-context statements do not do not plead the material falsity of any alleged misstatement...........................................26

        1.     Statement by Shah on February 11, 2021 ...........................26

        2.     Statements by Gorevic on February 24, 2021 ....................28

        3.     Statement by Gorevic on April 28, 2021 ..............................32

        4.     Statement by Murthy on April 28, 2021 ...............................33

        5.     Statement by Gorevic on November 10, 2021 ....................34

        6.     Statement by Verstraete on November 18, 2021 ...............35

        7.     Statement by "Management" on October 28, 2021.............37

        8.     Form 10-Ks for 2020 and 2021 ..............................................39

II.   Alternatively, the complaint should have been dismissed because it failed to allege a strong inference of scienter or loss causation .........42

    A.   Plaintiffs did not allege a strong inference of scienter .................43

        1.   Plaintiffs did not allege motive or opportunity by any individual defendant ...............43

        2.   Plaintiffs did not allege conscious misbehavior or recklessness by any individual defendant...........46

        3.   Plaintiffs did not allege corporate scienter.........52

    B.   Plaintiffs did not allege loss causation ...........53

III.  The district court correctly dismissed with prejudice and denied leave to amend ...........56

Conclusion...........61

## TABLE OF AUTHORITIES

### CASES

*ABKCO Music, Inc.* v. *Sagan*,
  50 F.4th 309 (2d Cir. 2022)...........60

*In re AppHarvest Securities Litigation*,
  Civ. No. 21-7985, 2023 WL 4866233 (S.D.N.Y. July 31, 2023) ..............40, 42

*Arkansas Public Employees' Retirement System* v.
*Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022)...........43, 44, 45, 46

*Avon Pension Fund* v. *GlaxoSmithKline PLC*,
  343 Fed. Appx. 671 (2d Cir. 2009) ...........44

*Balintulo* v. *Ford Motor Co.*,
  796 F.3d 160 (2d Cir. 2015) ...........18

*Black* v. *Ganieva*,
  No. 22-1524, 2023 WL 2317173 (2d Cir. Mar. 2, 2023)...........58, 60

Cases—continued:

*In re Bristol-Meyers Squibb Securities Litigation,*
312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................45

*Buxbaum* v. *Deutsche Bank A.G.,*
Civ. No. 98-84602000 WL 33912712 (S.D.N.Y. Mar. 7, 2000) ......48

*Central States, Southeast and Southwest Areas Pension Fund* v.
*Federal Home Loan Mortgage Corp.,*
543 Fed. Appx. 72 (2d Cir. 2013) ......................................................56

*City of Dearborn Heights Act 345 Police & Fire R* v. *Axonyx,*
374 Fed. Appx. 83 (2d Cir. 2010) ......................................................50

*City of Omaha Police & Fire Retirement System* v. *Evoqua*
*Water Technologies Corp.,*
450 F. Supp. 3d 379 (S.D.N.Y. 2020) ................................................41

*Cosmas* v. *Hassett,*
886 F.2d 8 (2d Cir. 1989) ...................................................................52

*Dalberth* v. *Xerox Corp.,*
766 F.3d 172 (2d Cir. 2014) ...............................................................37

*In re DDAVP Direct Purchaser Antitrust Litigation,*
585 F.3d 677 (2d Cir. 2009) .........................................................47, 48

*In re Diebold Nixdorf, Inc., Securities Litigation,*
Civ. No. 19-6180, 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ....25

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v.
*JP Morgan Chase Co.,*
553 F.3d 187 (2d Cir. 2009) ...........................21, 22, 46, 47, 48, 50

*Elliot Association* v. *Covance, Inc.,*
2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ....................................22

Page(s)

Cases—continued:

*In re Ferrellgas Partners, L.P., Securities Litigation,*
Civ. No. 16-7840, 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018),
*aff'd,* 764 Fed. Appx. 127 (2d Cir. 2019) ....................................................23, 24

*Frederick* v. *Mechel OAO,*
475 Fed. Appx. 353 (2d Cir. 2012) ....................................................51

*Grossman* v. *Novell, Inc.,*
120 F.3d 1112 (10th Cir. 1997) ....................................................24

*In re Hain Celestial Group, Inc. Securities Litigation,*
20 F.4th 131 (2d Cir. 2021) ....................................................46

*IBEW Local Union No. 58 Pension Trust Fund & Annuity
Fund* v. *Royal Bank of Scotland Group, PLC,*
783 F.3d 383 (2d Cir. 2015) ....................................................18, 22, 59

*Indiana Public Retirement System* v. *SAIC, Inc.,*
818 F.3d 85 (2d Cir. 2016) ....................................................22, 37

*In re Initial Public Offering Securities Litigation,*
241 F. Supp. 2d 281 (S.D.N.Y. 2003) ....................................................44

*International Code Council, Inc.* v. *UpCodes Inc.,*
43 F.4th 46 (2d Cir. 2022) ....................................................21

*IWA Forest Industry Pension Plan* v. *Textron Inc.,*
14 F.4th 141 (2d Cir. 2021) ....................................................17

*Jackson* v. *Abernathy,*
960 F.3d 94 (2d Cir. 2020) ....................................................43, 51, 52, 53

*Kalnit* v. *Eichler,*
264 F.3d 131 (2d Cir. 2001) ....................................................44

*Lentell* v. *Merrill Lynch & Co.,*
396 F.3d 161 (2d Cir. 2005) ....................................................54

iv

Cases—continued:

*In re Level 3 Communications, Inc. Securities Litigation,*
    667 F.3d 1331 (10th Cir. 2012) ..........................................................22

*Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Securities, LLC,*
    797 F.3d 160 (2d Cir. 2015) .............................................................60

*Martin* v. *Quartermain,*
    732 Fed. Appx. 37 (2d Cir. 2018) ...................................................32

*In re Merrill Lynch Ltd. Partnerships Litigation,*
    154 F.3d 56 (2d Cir. 1998) ..........................................................57, 58

*Meyer* v. *Jinkosolar Holdings Co.,*
    761 F.3d 245 (2d Cir. 2014) .......................................................36, 37

*National Credit Union Administrative Board* v.
    *U.S. Bank National Association,*
    898 F. 3d 243 (2d Cir. 2018) .............................................................58

*New England Carpenters Guaranteed Annuity and*
    *Pension Funds* v. *DeCarlo,*
    80 F.4th 158 (2d Cir. 2023) .......................................................19, 20

*New Orleans Employees Retirement System* v. *Celestica, Inc.,*
    455 Fed. Appx. 10 (2d Cir. 2011) ....................................................25

*In re Noah Educational Holdings, Ltd. Securities Litigation,*
    Civ. No. 08-9203, 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ....................40

*North Collier Fire Control and Rescue District Firefighter Pension*
    *Plan and Plymouth County Retirement Association* v.
    *MDC Partners, Inc.,*
    Civ. No. 15-6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ........45

*Novak* v. *Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ....................................38, 43, 47, 49, 51

Page(s)

Cases—continued:

*Omnicare, Inc.* v. *Laborers District Council Construction*
    *Industry Pension Fund,*
    575 U.S. 175 (2015) .............................................................................19

*In re Omnicom Group, Inc. Securities Litigation,*
    597 F.3d 501 (2d Cir. 2010) ...........................................................54

*Plumbers & Pipefitters Local Union 719 Pension Fund* v.
    *Zimmer Holdings, Inc.,*
    679 F.3d 952 (7th Cir. 2012) ...........................................................51

*In re Pretium Resources Inc. Securities Litigation,*
    256 F. Supp. 3d 459 (S.D.N.Y. 2017),
    *aff'd,* 732 Fed. Appx. 37 (2d Cir. 2018) .......................................20

*Public Employees Retirement Association of New Mexico* v.
    *PricewaterhouseCoopers LLP,*
    305 Fed. Appx. 742 (2d Cir. 2009) .................................................60

*Ritchie Cap. Mgmt., L.L.C.* v. *General Electric Capital Corp.,*
    821 F. 3d 349 (2d Cir. 2016) ...........................................................57

*Rombach* v. *Chang,*
    355 F.3d 164 (2d Cir. 2004) .....................................21, 35, 40, 41

*Rosner* v. *Star Gas Partners, L.P.,*
    344 Fed. Appx. 642 (2d Cir. 2009) .................................................59

*Rothman* v. *Gregor,*
    220 F.3d 81 (2d Cir. 2000) ...............................................................46

*San Leandro Emergency Medical Group Profit Sharing Plan* v.
    *Philip Morris Companies, Inc.,*
    75 F.3d 802 (2d Cir. 2021) .......................................................27, 28

*In re Synchrony Financial Securities Litigation,*
    988 F.3d 157 (2d Cir. 2021) ...............................................21, 22, 38

Cases—continued:

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)..................................................................43

*In re Textron, Inc. Securities Regulation*,
 Civ. No. 19-7881, 2020 WL 4059179 (S.D.N.Y. July 20, 2020) .....................25

*Tongue* v. *Sanofi*,
 816 F.3d 199 (2d Cir. 2016) ...............................................20

*Town of Davie Police Officers Retirement System* v. *City of North Miami Beach Police Officers' & Firefighters' Retirement Plan*,
 No. 21-909, 2021 WL 5142702 (2d Cir. Nov. 5, 2021) ...................................51

*In re Vivendi, S.A. Securities Litigation*,
 838 F.3d 223 (2d Cir. 2016) ......................................................23, 25

## STATUTES AND RULES

15 U.S.C. § 78u-5(c)...................................................................25

28 U.S.C. § 1291 ...........................................................................1

28 U.S.C. § 1331 ...........................................................................1

Fed. R. Civ. P. 9(b) ....................................................................17

Fed. R. Civ. P. 12(b)(6)................................................................17

Fed. R. Civ. P. 15(a)....................................................................60

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331.  The district court entered final judgment on July 6, 2023.  S.A. 30.  Appellants filed a timely notice of appeal on August 4, 2023.  J.A. 781.  The jurisdiction of this Court rests on 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the district correctly dismissed the second amended complaint for failure to allege any actionable material misstatements.

2.      Whether, in the alternative, the district court could have dismissed the complaint for failure to allege scienter and/or loss causation.

3.      Whether the district court correctly dismissed the second amended complaint with prejudice and denied leave to file a third amended complaint.

## STATEMENT OF THE CASE

The district court correctly dismissed, with prejudice, the securities fraud claims asserted against Teladoc Health, Inc., a virtual healthcare provider, and certain of its employees.  Plaintiffs have chosen to appeal the district court's order only with respect to certain of the alleged misstatements—those through which, they claim, Teladoc overstated the progress of its integration with Livongo Health, Inc., after the companies' $18.5 billion merger in October of 2020.  But plaintiffs' second amended complaint does not plead any material

false statements by defendants, let alone scienter or loss causation. And plaintiffs' plea that it was an abuse of discretion for the district court to deny their perfunctory request to file a *fourth* complaint is meritless.

The faulty premise of plaintiffs' securities fraud theory is that Teladoc falsely represented that its integration with Livongo had been fully accomplished without difficulties. But Teladoc never represented that the integration of these multi-billion-dollar companies was a *fait accompli*. Even before the merger, and continuing throughout the putative class period, defendants were transparent about the risks and challenges of integrating Teladoc's and Livongo's operations. At all times, defendants made clear that integration was a work in progress. None of the specific statements that plaintiffs challenge is actually false when read in context. Moreover, the second amended complaint relies largely on subjective, anecdotal critiques by confidential witnesses—whose opinions concerning various aspects of the integration efforts were more negative than Teladoc management's. But plaintiffs cannot fashion a fraud theory from quintessential corporate puffery, subjective opinions, and forward-looking statements simply because junior employees held opinions that differed from management. The district court correctly dismissed plaintiffs' claims with prejudice for failure to plead falsity.

Though the district court did not (and needed not) go any farther, there are two alternative grounds to affirm its dismissal of the second amended complaint. *First*, plaintiffs do not plead the requisite inference of fraudulent intent—indeed, the competing non-fraudulent inferences are far stronger. If defendants were trying to artificially inflate Teladoc's stock price by touting the integration's success, they would not have warned the market, from the start, of the various risks associated with that integration or made clear that progress was ongoing. And the fact that individual defendants increased their Teladoc stock holdings over the purported class period, and did not engage in any unusual trading, refutes any suggestion of fraudulent intent. Nor do any allegations support a strong inference of recklessness. *Second*, none of the alleged corrective disclosures actually revealed any previously undisclosed "truth" about Teladoc's integration challenges—thereby failing to allege loss causation, too. Indeed, two of the three "corrective disclosures" relate to plaintiffs' now-abandoned competition-related claims, and revealed nothing new about integration at all. Though the district court declined to reach those arguments, either independently supports affirmance.

Plaintiffs' last-ditch effort to revive their meritless claims—by asking this Court to find an abuse of discretion in the district court's denial of their informal and perfunctory request, made in a footnote, to file a *third* amended complaint—fares no better. The court correctly dismissed the second

amended complaint with prejudice because plaintiffs failed to follow the court's clear instructions that further amendments were unlikely to be permitted, and did not show how further amendment would cure the myriad deficiencies in the second amended complaint.

For all of those reasons, this Court should affirm.

### A.    Background

1.    Teladoc provides virtual healthcare services to consumers through a network of qualified providers.  J.A. 222, ¶ 67.  The individual defendants—Jason Gorevic, Mala Murthy, Bimal Shah, Richard Napolitano, and Stephany Verstraete—are, respectively, Teladoc's Chief Executive Officer; Chief Financial Officer; former Chief Medical Officer; Senior Vice President, Chief Accounting Officer and Controller; and Chief Marketing & Engagement Officer. *See* J.A. 216-217, ¶¶ 50-55.

On August 5, 2020, Teladoc announced its decision to merge with Livongo, a provider of healthcare monitoring products and services.  J.A. 228-229, ¶¶ 82-86.  The $18.5 billion Livongo deal, "a record in the telehealth industry," would combine Teladoc and Livongo to become "the largest telehealth company."  J.A. 228, ¶¶ 82-83.  That acquisition expanded Teladoc's product portfolio "with the goal of staying competitive by providing full-spectrum, 'whole-person' virtual care."  J.A. 222, ¶ 68.  Today, Teladoc offers chronic-care solutions, including under the brand name Livongo.  J.A. 199, ¶ 3.

Before the merger, Teladoc warned investors that the $18.5 billion acquisition posed significant challenges, and gave "no assurances" that Teladoc and Livongo could be "integrated successfully." J.A. 478. Specifically, Teladoc's S-4 statement, issued prior to the putative class period, made clear that the integration "may be more difficult, costly or time-consuming than expected[,] and the combined company may fail to realize the anticipated benefits of the merger." J.A. 477. That integration risk, Teladoc continued, "may adversely affect the combined company's business results and negatively affect the value of the common stock." *Id.* Moreover, a "failure to integrate successfully the businesses and operations of Teladoc and Livongo in the expected time frame," and a "[f]ailure to attract, motivate[,] and retain executives and other key employees[,] could diminish the anticipated benefits of the merger," J.A. 475, 478. Teladoc listed various "issues" that would need to be "addressed" in order to successfully integrate, including "combining the companies' operations and corporate functions," "integrating personnel from the two companies," "integrating the companies' technologies," and "integrating and unifying the offerings and services." J.A. 478. "If key employees of Teladoc or Livongo depart, the integration of the companies may be more difficult" and the combined company "may lose significant expertise and talent," and there was no assurance "that the combined company will be able to attract or retain key employees." J.A. 475-476.

2.     The merger between Teladoc and Livongo closed on October 30, 2020.  J.A. 235, ¶ 103.  Over the following year, the ongoing integration efforts were the subject of various statements by Teladoc's management.  Certain of those statements were challenged in this lawsuit, and a subset of those remain at issue on appeal.

On February 11, 2021, Shah participated in an interview with WTF Health.  J.A. 310, ¶ 297.  During that interview, Shah opined that the Livongo integration was "going really great," adding that "what became evident really early on" was that Livongo and Teladoc had "a shared mission" and "shared culture."  J.A. 310, ¶ 298.  Shah explained how it had "been really exciting . . . understanding how these three chassis"—namely, Teladoc, Livongo, and InTouch (another recent acquisition)—"from a technology perspective, a consumer engagement perspective[,] really do fit together to provide . . . a continuum of care, a whole person experience[,] . . . that really is going to deliver on that promise."  *Id.*  Shah added:  "[N]ow we've got the assets in [] place and it's really the onus on the internal teams to execute to deliver that vision, and we're already well on our way of building . . . that highway to quickly deliver that [vision] to the consumers and to our clients."  *Id.*

On February 24, 2021, Teladoc held an earnings call to discuss its Q4 2020 financial results, during which Gorevic also spoke to the progress of the

integration.  J.A. 317, ¶¶ 307-308.  Gorevic reported that the company's "commercial organization"—responsible for sales to commercial clients such as health plans and employers—was "now fully integrated, and [the] teams responsible for cross-selling have been collaborating for months."  J.A. 317, ¶ 308.  Gorevic emphasized that full integration was ongoing, noting that "[t]he integration of [its] data platform and assets also continue[d] to progress."  *Id.*

On March 1, 2021, Teladoc filed its 2020 Form 10-K, once again disclosing a series of risks related to the merger.  The company warned that, "[e]ven if integration is successful, anticipated cost savings, synergies[,] and other benefits may not be achieved."  J.A. 485.  More specifically, Teladoc explained that it "may have difficulty integrating the Livongo business, and the anticipated synergies and other benefits of the combined company may not be realized."  J.A. 484.  Teladoc added that the success of the merger "will depend in large part on the success of the management of the newly combined company in integrating the operations, strategies, technologies, and personnel of the two companies."  *Id.*  Lastly, echoing its pre-merger S-4 statement, Teladoc warned investors of the "potential difficulties" that "may" arise with regard to, among others, "the integration of corporate cultures and maintenance of employee morale" and "the retention of key employees."  *Id.*

On March 15, 2021, Gorevic participated in an episode of former Senator Bill Frist's podcast. J.A. 325, ¶ 328. When asked if "the assimilation" of Livongo and Teladoc was going well, Gorevic optimistically responded that it was going "very well,  .  .  .  as well as [he] could possibly have hoped for." J.A. 325-326, ¶ 329. Still, Gorevic explained that the integration was at very early stages, and that "there are certainly challenges." J.A. 326, ¶ 329. In light of the pandemic, they had " never been in the same room together," he explained, adding that he had "whole teams of people all around the world now who [he had] never met so [he was] anxious, quite frankly, to go on the tour and start to .  .  . be face to face with those teams." *Id.*

On April 28, 2021, Teladoc held an earnings call to discuss its Q1 2021 financial results. During that call, Gorevic explained that Teladoc had "now executed on the first wave of th[e] integration," which would "continue to develop over the course of [the] year." J.A. 672. The "commercial organization has been fully integrated with sales teams selling across the entire whole-person portfolio of products since early this year." J.A. 328, ¶ 336. Gorevic added that the company had "closed several deals for [its] new integrated mental health product," which combined Teladoc and Livongo resources and "enabled the first wave of members to access and register for Livongo programs from within the Teladoc app." J.A. 328, ¶ 336. Gorevic explained how that was "an

important first step." J.A. 669. Murthy stated that, "in terms of data integration[,] . . . that requires deep integration," which she "would say [Teladoc is] well on [its] way to do." J.A. 329, ¶ 338. She explained that Teladoc had "a very, very clear road map," which the leadership team spent "a fair amount of time . . . prioritizing," and she "expect[ed] 2021 to be an investment year, [which] is stacked and aligned against those very clear priorities in the R&D road map." *Id.*

On October 27, 2021, Teladoc held an earnings call to discuss its Q3 2021 financial results. J.A. 338, ¶ 366. During that call, Murthy explained that the company was investing resources into the "continued integration of Livongo, enhancements to [its] integrated data platform[,] and expansions into new markets." J.A 682. According to a Credit Suisse report issued the next day, summarizing the call, Teladoc management said that "it is still early on . . . with this being the first year post-merger." J.A. 649. The report also stated that "management pushe[d] back on the claim that [Teladoc] is behind [schedule] when it comes to the actual integration of Livongo." J.A. 651.

On November 18, 2021, Teladoc hosted its 2021 Investor Day. J.A. 346, ¶ 392. During the event, Verstraete commented on the integration: "Now if we were to look under the proverbial hood of the engagement engine, over the course of this year, we've significantly deepened our capabilities as we brought

together and integrated the legacy Livongo and Teladoc marketing data and tech stacks, right?" *Id.*

3. Plaintiffs contend that Teladoc made three corrective disclosures. Two of the alleged corrective disclosures concern alleged misstatements about increasing market competition—which the district court dismissed and plaintiffs have abandoned on appeal. Only one of the alleged corrective disclosures relates to the alleged misstatements concerning the Livongo integration.

*First*, on November 10, 2021, *Business Insider* published an article discussing challenges Teladoc was facing with the integration of Livongo, including a "culture clash" between the two companies. J.A. 283, ¶ 219. "[A] spokesperson for Teladoc acknowledged the integration was an issue in the first six months but said was less of an issue today." J.A. 298, ¶ 260. The *Business Insider* article also contained an interview with Gorevic, in which he stated that "he was proud of the company's progress," and that the company "launched two connected services in 2021, one of which fully blends Livongo's assets with Teladoc's." *Id.* Gorevic added: "The vision that we laid out then—about whole-person care and bringing together the unique capabilities of two complementary companies to deliver something that really hasn't been done before—is on track." *Id.*

*Second*, on April 27, 2022, Teladoc held an earnings call to discuss its Q1 2022 financial results. J.A. 355, ¶ 420. On that call, Gorevic briefly mentioned

the status of the integration, but shared nothing new: "over the last 12-plus months, we've been working on integrating the Livongo products into our whole-person care experience," "[a]nd admittedly, we're not done with that yet." J.A. 363, ¶ 451. The quarterly results relied on by plaintiffs otherwise concerned the now-dismissed alleged misstatements about increased competition. In particular, Teladoc revised its FY 2022 revenue and earnings projections downwards, to reflect "dynamics" the company was "currently seeing in the direct-to-consumer mental health and chronic condition markets." J.A. 700. Gorevic explained that "the biggest driver of this dynamic is smaller private competitors pursuing . . . low- or no-return customer acquisition strategies in an attempt to establish market share." J.A. 701. Teladoc also reported a net loss per share of $41.58 driven by a non-cash goodwill impairment of $6.6 billion. S.A. 10. Teladoc did not attribute the increased competitive pressures or goodwill impairment to issues with the integration.

*Third*, on July 27, 2022, Teladoc held an earnings call to discuss its Q2 2022 financial results. J.A. 371, ¶ 478. Again, Murthy briefly repeated that Teladoc and Livongo "continued integration of [their] data that underpins bringing together all of [their] suite of products." J.A. 372, ¶ 480. Instead, the quarterly results relied on by plaintiffs concerned the now-dismissed alleged misstatements about increased competition. Gorevic explained that the company "continue[d] to see our pipeline of Chronic Care deals develop[] more

slowly than [it] anticipated at the start of the year." J.A. 372, ¶ 482. Gorevic attributed the slowdown "to competitive noise as the market transitions from stand-alone point solutions to integrated whole-person virtual care," as he had previously explained in April. *Id.* He also mentioned how the "heightened economic uncertainty over the past several months [was] increasingly playing a part." J.A. 708. Teladoc reported a net loss per share of $19.22, driven by a second non-cash goodwill impairment charge of $3 billion. *See* S.A. 11. As with the April 2022 earnings report, Teladoc did not attribute the increased competitive pressures or goodwill impairment to issues with integration.

### B. Procedural Background

1. The original putative class action complaint was filed on June 6, 2022. *See* J.A. 6. On August 23, 2022, a lead plaintiff was appointed, and the district court (Cote, J.) issued a schedule for filing amended pleadings and dispositive motions. *See* J.A. 9-10. The court instructed that, if defendants filed a motion to dismiss the amended complaint, plaintiffs could either oppose the motion or file a second amended complaint. *See* J.A. 18. But, the court explained, it was "unlikely" that plaintiffs would be allowed to file a third amended complaint if they chose to oppose the motion to dismiss. *Id.*

On September 30, 2022, plaintiffs filed their first amended complaint. *See* J.A. 20-187. On November 3, 2022, defendants filed a motion to dismiss. J.A. 11. Instead of opposing the motion, plaintiffs elected to file their second

amended complaint (SAC) on December 6, 2022. J.A. 192. As relevant here, the SAC challenged certain statements by defendants regarding the progress of Teladoc's integration of the Livongo business, *see, e.g.*, J.A. 317-319, ¶¶ 307-313, as well as certain statements concerning the competitive pressures faced by Teladoc, *see, e.g.*, J.A. 319-322, ¶¶ 314-318.

2.    On January 20, 2023, defendants filed their second motion to dismiss on the grounds that plaintiffs failed to allege any material misstatements or omissions, scienter, or loss causation. *See* J.A. 425-450. Plaintiffs' opposition argued that the SAC sufficiently alleged all of the elements of securities fraud. *See* J.A. 728-755. In a footnote, plaintiffs "request[ed] another opportunity to amend if the [district court] grants the [motion to dismiss], despite [the court's] prior comment on further amendment[s]" in its scheduling order. J.A. 755 n. 40.

The district court granted the motion to dismiss with prejudice as to all of the alleged misstatements. The court held that the challenged integration statements "are largely non-actionable statements of opinion and/or expressions of corporate optimism"—that is, "precisely the type of puffery that [the Second Circuit] and other circuits have consistently held to be inactionable." S.A. 17 (citation omitted). The court also stressed how the "generality of many of the statements of opinion and optimism" challenged by plaintiffs "prevents them" from rising to the level of fraud. S.A. 23. The court also held that, due

to "defendants' contemporaneous robust disclosures of the challenges and risks it was facing," and the highly general nature of many of the challenged statements, plaintiffs "failed to plead that the statements . . . identified misled a reasonable investor." S.A. 23-24. Lastly, the court proceeded to focus on five statements in greater detail, four of which remain at issue on appeal—by Gorevic and Shah on February 24; by Gorevic on April 28; and by Verstraete on November 18. *See* S.A. 18. Noting that certain of those statements were highly general and/or "classic" statements of opinion, the court concluded that plaintiffs' various confidential-witness allegations—often offered without any nexus to the subject matter of the statements at issue—did not render those challenged statements false, because they merely highlighted a "difference of opinion . . . insufficient to plead . . . falsity." S.A. 18-22.

The district court also denied plaintiffs' request for leave to amend. *See* S.A. 28-29. The court found that plaintiffs had "not identified how further amendment would address the deficiencies" in the SAC, nor had they "attached a proposed amended complaint." S.A. 28. Moreover, the district court referred back to its "amend or oppose" warning, and concluded that plaintiffs had "not shown that this warning should be ignored." S.A. 28-29.

3. On August 4, 2023, plaintiffs filed a notice of appeal. J.A. 781. On appeal, plaintiffs do not challenge the dismissal with respect to statements concerning competitive pressures faced by Teladoc. *See* Br. 4 n. 2. Plaintiffs'

appeal only focuses on statements concerning the Livongo integration, and even then they only appeal as to a subset of the misstatements alleged in the SAC: Shah's February 11, 2021 statement, *see* J.A. 310-311, ¶ 298; Gorevic's statement on February 24, 2021, *see* J.A. 317-318, ¶¶ 308-309; two statements on April 28, 2021, one by Gorevic, *see* J.A. 328, ¶ 336, and one by Murthy, *see* J.A. 329, ¶ 338; Gorevic's statement on November 10, 2021, *see* J.A. 345, ¶ 386; Verstraete's statement on November 18, 2021, *see* J.A. 346, ¶ 392; a statement by Teladoc's "management" on October 28, 2021, *see* J.A. 343, ¶ 381; and statements contained in Teladoc's Form 10-Ks filed on March 1, 2021, *see* J.A. 322-324, ¶¶ 319, 321, and on February 28, 2022, *see* J.A. 351-353, ¶¶ 407, 408, 411. *Cf.* J.A. 458-462 (chart of all alleged integration misstatements).

## SUMMARY OF ARGUMENT

I.A.   The district court correctly held that plaintiffs failed to allege any actionable material misstatements. When taken together and in context, all of the integration-related statements at issue on appeal are general, forward-looking statements of corporate optimism, puffery, or expressions of opinion. And Teladoc repeatedly warned, both before and during the class period, that the Livongo integration was complex, challenging, and ongoing. None of the challenged statements are materially false or misleading.

B.     On appeal, plaintiffs ask this Court to ignore the full context of the statements, based on cherry-picked snippets removed from context and accompanying information and warnings.  Plaintiffs also rely on subjective accounts from their confidential witnesses, which the district court correctly held amounted, at most, to subjective differences of opinion concerning the ongoing integration efforts.  But, even reviewing each statement individually, the SAC does not plead with the required particularity that any of the challenged statements were materially false or misleading.

II.     Though this Court need not go farther to affirm the district court's decision, there are two alternative grounds for affirmance:  the SAC failed to allege a strong inference of scienter and loss causation.

A.     Plaintiffs did not allege a strong inference of scienter—indeed, the far more plausible inference from plaintiffs' allegations is that the defendants were open about the integration challenges following the record-breaking merger with Livongo.  To start, plaintiffs did not allege motive or opportunity by any individual defendant:  several defendants increased their holdings of Teladoc stock, and none of the trading activity that plaintiffs isolate was unusual.  Plaintiffs also did not allege conscious misbehavior or recklessness by any individual defendant:  the SAC lacks factual allegations that defendants deliberately made false statements, let alone that defendants knew that any statement was not accurate.  Lastly, plaintiffs did not allege corporate scienter

because they cannot point to allegations supporting a strong inference that *anyone* had the requisite intent to impute to Teladoc itself.

B.     Plaintiffs did not allege loss causation, either.  One alleged corrective disclosure, at most, simply described the materialization of previously disclosed integration risks, and thus was not "corrective."  And the remaining two alleged corrective disclosures concerned Teladoc's revision of financial projections due to competitive pressures—yet plaintiffs are not challenging the dismissal of statements concerning competition on appeal.

III.   The district court correctly dismissed with prejudice and denied leave to amend.  As to the dismissal with prejudice, district courts do not abuse their discretion where they dismiss with prejudice based on plaintiffs' failure to abide by an "amend or oppose" order.  Under these circumstances, any purported error in denying leave to amend was harmless.  In any event, the district court correctly held that leave to file a *fourth* complaint should not be granted because further amendments would be futile.

## STANDARD OF REVIEW

This Court reviews de novo a dismissal under Rule 12(b)(6).  *IWA Forest Industry Pension Plan* v. *Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021).  Securities fraud claims are subject to the heightened pleading standards under the Private Securities Litigation Reform Act and Rule 9(b), which require plaintiffs to state "with particularity the circumstances constituting fraud."

*IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund* v. *Royal Bank of Scotland Group, PLC*, 783 F.3d 383, 389 (2d Cir. 2015).

This Court generally reviews a denial of leave to amend for abuse of discretion, except that it "conducts a de novo review" when "denial of leave to file a revised pleading is based on . . . futility." *Balintulo* v. *Ford Motor Co.*, 796 F.3d 160, 164 (2d Cir. 2015).

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT PLAIN-TIFFS FAILED TO ALLEGE ANY ACTIONABLE MATERIAL MISSTATEMENTS

The challenged statements at issue on appeal are not actionable as fraud; instead, as the district court held, they are general, forward-looking statements of puffery or expressions of opinion. In arguing that those statements misled investors, plaintiffs focus myopically on individual, cherry-picked phrases out of context. *See* Br. 16-54. But, when read in context, none of the quotes plaintiffs isolate are actually false or materially misleading. This Court should affirm the dismissal of the SAC for failure to plead falsity.

### A. The Allegations In The Second Amended Complaint, Taken Together And In Context, Did Not Identify Any Material Misstatements

As the district court correctly recognized, the SAC does not allege any materially false or misleading statement because the challenged statements

are "statements of opinion," S.A. 17; because they are "expressions of corporate optimism" and "puffery," S.A. 17-18, whose "generality . . . prevents them from rising to the level of materiality required" for securities fraud, S.A. 23 (quotation marks and citation omitted); and because, "[i]n light of defendants' contemporaneous robust disclosures of the challenges and risks it was facing, the SAC has failed to plead that the statements it has identified misled a reasonable investor," S.A. 24. At bottom, all of plaintiffs' claims fail to grapple with the nature of the challenged statements—subjective, forward-looking opinions and highly general statements of puffery—and with Teladoc's repeated warnings that the Livongo integration was complex, challenging, and ongoing. The district court's ruling should be affirmed.

1.    The district court was correct that the challenged statements are largely inactionable statements of opinion. *See* S.A. 17. Statements of opinion, even if they "turned out to be wrong," are not actionable, unless the complaint alleges both that the statements were objectively false *and* that the speaker did not actually "hold the belief she professed," or omitted information about the basis for their opinion. *Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 182, 185-186 (2015). For example, Shah's and Murthy's statements that Teladoc was "well on [its] way," J.A. 310-311, ¶ 298; J.A. 292, ¶ 240, are statements that "turn[] on the exercise of subjective judgment." *New England Carpenters Guaranteed Annuity and*

*Pension Funds* v. *DeCarlo*, 80 F.4th 158, 170 (2d Cir. 2023). Plaintiffs cannot establish those statements are false "merely by showing that other reasonable alternative views exist," "even if most of the existing facts [were to] cut against the statement[s]." *Id.*

At most, plaintiffs allege differences of opinion between the speakers and various confidential witnesses. That does not give rise to fraud. For example, Gorevic's statement that the commercial organization was "fully integrated" was not rendered false by CW-6's opinion that there was "misalignment" within the company, *see* J.A. 275, ¶ 197; by CW-7's allegation that in October 2021 "many of the business segments at Teladoc were 'siloed,'" J.A. 271, ¶ 187; or CW-1's recollection that the integration was "happening from the top down," J.A. 271, ¶ 188. Shah's statement about the "fit" between the companies was similarly not rendered false by CW-2's concerns, expressed to Shah months earlier, over "client pitches" and the integration of a specific product feature (remote patient monitoring or RPM). J.A. 249-251, ¶¶ 135-138. In short, a single employee's subjective concern does not give rise to a fraud claim, *see Tongue* v. *Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016), because "differences of opinion, even stark differences," are not enough, *In re Pretium Resources Inc. Securities Litigation*, 256 F. Supp. 3d 459, 481 (S.D.N.Y. 2017) (citation omitted), *aff'd*, 732 Fed. Appx. 37 (2d Cir. 2018).

2.     The district court was also correct that the challenged statements are largely inactionable expressions of corporate optimism and puffery uttered at a high-level of generality.  *See* S.A. 17-18, 23.  The law is clear that "[e]xpressions of puffery and corporate optimism do not give rise to securities violations."  *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  Consider the high-level statements of Gorevic, Murthy, and Verstraete—about the "commercial organization" being "fully integrated," J.A. 317-318, ¶¶ 308-309; Teladoc being "well on [its] way to do" "data integration," J.A. 329, ¶ 338; Teladoc's "vision" for "whole-person care" being "on track," J.A. 345, ¶ 386; and "marketing data and tech stacks" having been "brought together and integrated," J.A. 346, ¶ 392.  Those are "subjective statements of opinion which cannot be proven false."  *International Code Council, Inc.* v. *UpCodes Inc.*, 43 F.4th 46, 60 (2d Cir. 2022).  They are, in other words, "[v]ague positive statements regarding a corporate entity's . . . business practices," which "are 'too general to cause a reasonable investor to rely upon them' and therefore are 'precisely the type of puffery that this [Court] and other circuits have consistently held to be inactionable.'"  *In re Synchrony Financial Securities Litigation*, 988 F.3d 157, 170 (2d Cir. 2021) (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)).

Quite simply, the generality of the challenged statements "prevents them from rising to the level of materiality required" by the securities laws. *Indiana Public Retirement System* v. *SAIC, Inc.*, 818 F.3d 85, 97-98 (2d Cir. 2016) (quotation omitted). For example, Shah's statements that the integration was "going really great" and that Teladoc was "well on [its] way" to achieving its "vision," J.A. 310-311, ¶ 298, are classically "[v]ague positive statements," *In re Synchrony*, 988 F.3d at 170, that are "too general to cause a reasonable investor to rely upon them," *ECA*, 553 F.3d at 206. They are indistinguishable from statements that an integration is "off to a promising start," which this Court has deemed inactionable puffery. *IBEW Local,* 783 F.3d at 392. Similarly, Gorevic's statement to *Business Insider* that his vision was "on track," J.A. 345, ¶ 386, is precisely the sort of expression of corporate optimism that courts routinely hold to be immaterial and inactionable. *See, e.g.*, *In re Level 3 Communications, Inc. Securities Litigation*, 667 F.3d 1331, 1338, 1340 (10th Cir. 2012) ("acquisitions were on track," "integration of all the acquired companies is progressing well," and "overall integration effort is tracking within expectations"); *see also Elliot Association* v. *Covance, Inc.*, 2000 WL 1752848, at *2, *10 (S.D.N.Y. Nov. 28, 2000) (merger "was on track to close").

3. The district court was also correct that, in light of defendants' repeated risk disclosures, the challenged statements were not misleading. *See*

S.A. 24. "The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor." *In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 250 (2d Cir. 2016) (emphasis in original) (quotation marks and citation omitted). Before the merger closed and throughout the class period, Teladoc repeatedly warned about the integration risks associated with such a large merger, valued at $18.5 billion. For example, Teladoc's S-4 statement, filed before the start of the class period, explicitly stated that "[c]ombining the businesses of Teladoc and Livongo may be more difficult, costly, or time-consuming than expected." J.A. 477. It also warned that integration efforts "could result in the loss of key Teladoc or key Livongo employees, the loss of customers, . . . [and] inconsistencies in standards, controls, procedures, and policies." J.A. 478. Teladoc's 2020 Form 10-K, issued at the outset of the class period, included similar warnings, *see* J.A. 484, and Teladoc repeated those warnings in its 2021 Form 10-K, *see* J.A. 502. Gorevic even acknowledged "challenges" during a podcast on March 15, 2021. *See* J.A. 325-326, ¶ 328-329.

Particularly in the context of a complicated corporate merger, courts recognize that "rosy" general statements about the status of an integration are not misleading when tempered by cautionary statements. For example, consider the decision in *In re Ferrellgas Partners, L.P., Securities Litigation*,

Civ. No. 16-7840, 2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 Fed. Appx. 127 (2d Cir. 2019). There, plaintiffs challenged statements that the integration was "smooth and seamless," "on pace," and "on track," and that the acquisition leading to the integration had "been everything we hoped for." *Id.* at *3, *5-*6. The district court held that those statements were "mostly rosy affirmations that do not contain guarantees," were "far too vague to be actionable," and were "made in the wake of a range of cautionary statements directed at the exact risks that [p]laintiffs claim caused [the integration] to undershoot its financial targets." *Id.* at *12-*13 (cautioning that financial resources to satisfy financial obligation "may" be lacking). The Second Circuit affirmed for "substantially the [same] reasons." *Ferrellgas*, 764 Fed. Appx. at 128; *see also, e.g.*, *Grossman* v. *Novell, Inc.*, 120 F.3d 1112, 1121 (10th Cir. 1997). The same is true here. Teladoc made cautionary statements prior to and throughout the integration. *See, e.g.*, J.A. 477-478, 484, 502. Those cautionary statements, as the district court held, "made clear to any reasonable investor that the integration process was complex and that different components of the integration effort might progress at different rates." S.A. 24.

4. At most, the challenged statements are largely inactionable forward-looking ones, *see* S.A. 16, "identified and accompanied by meaningful cautionary language" or not "made with actual knowledge that [they were]"

false or misleading." *Vivendi*, 838 F.3d at 245. For example, Gorevic's statement that the "vision . . . to deliver something that really hasn't been done before . . . is on track," J.A. 345, ¶ 386, and Shah's statement that the integration with Livongo "really is going to deliver on that promise" and "vision" of a "a whole person experience," J.A. 310, ¶ 298, are forward-looking statements not actionable under the securities laws. *See also* 15 U.S.C. § 78u-5(c). Those statements are simply unlike those at issue in the decisions on which plaintiffs rely (at 32), such as *New Orleans Employees Retirement System* v. *Celestica, Inc.*, 455 Fed. Appx. 10 (2011), where this Court held that specific representations conveying "that the restructuring was going according to plan" and "present inventory was under control" were actionable because they "reported on past or present circumstances." *Id.* at *15; *see also In re Textron, Inc. Securities Regulation*, Civ. No. 19-7881, 2020 WL 4059179, at *10-11 (S.D.N.Y. July 20, 2020) (alleged misstatements involving specific representations that the company had achieved "significant reduction" in assets).

*  *  *  *  *

In short, plaintiffs' suggestion that that Teladoc's "[m]erger-related reporting was all roses is divorced from [their] own pleadings and [d]efendants' other public statements." *In re Diebold Nixdorf, Inc., Securities Litigation*, Civ. No. 19-6180, 2021 WL 1226627, at *10 (S.D.N.Y. Mar. 30, 2021).

### B. Plaintiffs' Arguments Based On Cherry-Picked, Out-Of-Context Statements Do Not Plead The Material Falsity Of Any Alleged Misstatement

In addition to the defects identified above, none of the challenged statements, even if examined one by one, is alleged with particularity to be materially false or misleading. On appeal, plaintiffs ask the Court to reverse the district court's careful decision by myopically focusing on cherry-picked quotes and inapposite confidential-witness allegations. Plaintiffs cannot manufacture fraud by ignoring both the broader context of the statements they challenge or by pointing to inapposite and subjective confidential witness opinions.

#### 1. *Statement By Shah On February 11, 2021*

Plaintiffs call out a statement made by Shah on February 11, 2021, just a few months after the merger closed, that Teladoc was "well on [its] way of building . . . that highway to quickly deliver [a whole person experience] to the consumers and to [its] clients." J.A. 311, ¶ 298. Plaintiffs argue that this vague, forward-looking opinion statement was false "because Teladoc struggled and was unable to fully integrate Livongo's technology—including, critically, its product platforms"—and, therefore, actionable. Br. 26. Plaintiffs are wrong.

Plaintiffs argue that Shah's statement was an unqualified assertion about the integration of product platforms. *See* Br. 26. It was not. During the interview, Shah queried "how do we make it more convenient and improve the

experience for people who are seeking out health care," and noted that it had been "really exciting" to start "understanding" the "fit" between Teladoc, Livongo, and InTouch in the context of "consumer engagement," with an eye toward "deliver[ing] on the promise" of a "whole person experience." J.A. 310-311, ¶ 298. Nowhere did Shah represent that any particular product platform or product necessary for the ultimate achievement of that "vision" were, at that time, fully developed and integrated. Rather, he was clear that work remained: the integration effort was "going to deliver" on the "promise" of a "whole person experience," and the "onus [was] on the internal teams to execute to deliver that vision." *Id.*

Plaintiffs are also incorrect (at 29) that defendants conceded the falsity of Shah's statement based on three "later admi[ssions]," in April and July 2022, indicating that integration of data and products was "not done . . . yet," J.A. 300, ¶ 267 (Gorevic), and "still continues," J.A. 305, ¶ 282 (Murthy), and that "[Teladoc] has three separate apps," J.A. 309, ¶ 294 (Credit Suisse report). None of those render Shah's opinion "false at the time" it was stated. *San Leandro Emergency Medical Group Profit Sharing Plan* v. *Philip Morris Companies, Inc.*, 75 F.3d 802, 812-813 (2d Cir. 2021). Shah made no specific representation that product platforms had been fully integrated, instead

speaking generally about understanding the synergies between the three companies and their capability to deliver, *eventually*, on Teladoc's vision of a whole-person experience. *Id.*

### 2. Statements By Gorevic On February 24, 2021

Plaintiffs next isolate a series of quotes from a statement by Gorevic on a February 24, 2021 earnings call. *See* J.A. 317-318, ¶¶ 308-309. Contrary to plaintiffs' arguments, *see* Br. 17-25, 31-34, those quotes were not materially false or misleading.

*First*, plaintiffs focus on Gorevic's statement that Teladoc had "the capabilities to deliver and manage care virtually across the spectrum for consumers." J.A. 318, ¶ 309. Plaintiffs claim this statement "refer[s] to the 'whole person' virtual products," and argue that it is false in light of "allegations establishing that Teladoc lacked such whole-person integrated products, including RPM, throughout the [c]lass [p]eriod." Br. 31 (citation omitted). But Gorevic's statements plainly concerned the "capability" to realize the goals of the merger in combining the two companies' offerings to produce a full spectrum of healthcare options, "ranging from wellness and prevention to coordination of care for people living with chronic conditions, to high acuity for those dealing with critical illness." J.A. 318, ¶ 309. And Gorevic noted how Teladoc "signed multiple cross-sales" as evidence of the ability to market the full range

of the combined product offerings, and offered two specific examples. *Id.* Nowhere do plaintiffs allege that Teladoc was not generally offering that range of options, let alone that it did not sign those sales. Instead, plaintiffs argue (at 31-32) that Gorevic's statement was false because, according to confidential witnesses, Teladoc was not yet offering a specific product feature (RPM)—but Gorevic did not mention RPM or *any* specific product in his high-level statement.

*Second*, plaintiffs turn their attention to Gorevic's statement that Teladoc is "now capturing 2 million blood glucose data points per week." J.A 317, ¶ 308. According to plaintiffs, Gorevic's statement is false because "Teladoc had not then integrated Livongo's diabetes glucometer technology and data into Teladoc's offerings," as purportedly shown by CW-6's allegation that doctors could not access glucometer data during telecare sessions. Br. 32. But doctors' ability (or inability) to view that data in a specific setting does not render false Gorevic's statement about how much data was captured.

*Third*, plaintiffs highlight Gorevic's statement that "[t]he integration of our data platform and assets also continues to progress as we work to unlock the power of our combined data sets." J.A 317, ¶ 308. Plaintiffs argue that assertion is "materially misleading," because "the integration of critical data platforms was behind schedule and nowhere near complete during the [c]lass [p]eriod." Br. 32-33. But, again, Gorevic never referred to any specific data

platform or software; never stated that such integration was complete (indeed, he made clear it was "continuing"); and never promised any particular timeline for completion. J.A. 317-318, ¶ 309.

*Fourth*, plaintiffs challenge Gorevic's statement that Teladoc's "commercial organization is now fully integrated, and our teams responsible for cross selling have been collaborating for months." J.A 317, ¶ 308. According to plaintiffs, that statement was false because "the companies' sales teams, responsible for sales to commercial clients" were not "fully integrated and cross-selling the companies' products effectively." Br. 17-18 (citation omitted). Plaintiffs' allegation that the cross-selling was not "effective" merely reflects their opinion—it does not allege that sales teams had not been "been collaborating for months—and since Gorevic did not quantify the effectiveness of the cross-selling, that opinion cannot render Gorevic's statement false. In any event, Gorevic warned that the impact Teladoc would see from cross-selling was "relatively small in the back half" of 2021, and that the company was "really looking at . . . impact on 2022." J.A. 664.

In an effort to allege that the "commercial organization" was not "fully integrated," plaintiffs rely on a smattering of confidential-witness opinions. *See* Br. 18-22. But those efforts fail. For example, plaintiffs rely on CW-7's allegation that "many of the business segments at Teladoc were 'siloed,'" J.A. 271, ¶ 187, and on a statement from CW-1 (an associate-level employee whose

"responsibilities included client retention and sales and 'client happiness,'"
J.A. 218, ¶ 56) that "her legacy Livongo team was still operating separately
from their Teladoc counterparts," J.A. 271, ¶ 188. But, as the district court
held, those allegations concerning "unidentified" teams are not sufficiently
particularized or "tethered to the commercial organization's integration to
render Gorevic's statement false." S.A. 20. And plaintiffs effectively concede
(at 17-19) that, as Gorevic stated, the commercial integration was "fully inte-
grated" because those "teams responsible for cross-selling ha[d] been collab-
orating for months." J.A. 317, ¶ 308. Indeed, the fact that, at some unspecified
time after the merger, Teladoc and Livongo sales personnel visited hospitals
together, separated and pitched to multiple groups of hospital personnel, and
then reconvened to "meet up afterwards," Br. 18-19 (citing J.A. 255-256,
¶ 148), actually demonstrates that the teams *were* fully integrated: the sales
team, comprised of Teladoc and Livongo personnel, coordinated their pitches.
CW-1's displeasure that "higher-up[]" teams had been "integrating before her
team would have," J.A. 271, ¶ 188, does not render Gorevic' statement false.

Lastly, plaintiffs focus on CW-2's documents about the integration pro-
cess in the company's Hospital Health Systems division. *See* Br. 22-23 (citing
J.A. 253-256, ¶¶ 145-149, J.A. 264-270, ¶¶ 171-182, J.A. 279, ¶ 206). At most,
those documents show staff infighting; issues with the integration of InTouch
(not relevant here); confusion among the sales team over the availability of

RPM capabilities; and CW-2's personal dismay that a proposal she made was not implemented (for reasons she does not know). Even if those documents could be construed as "facts," and even assuming Gorevic had been made aware of those "facts," plaintiffs "allege merely that [Teladoc] should have drawn different conclusions from those facts," which is insufficient to "give rise to a claim of objective falsity." *Martin* v. *Quartermain*, 732 Fed. Appx. 37, 41 (2d Cir. 2018).

### 3. *Statement By Gorevic On April 28, 2021*

Plaintiffs' next focus on a statement by Gorevic during the next earnings call on April 28, 2021. Br. 18-25. Gorevic stated that, "[a]s we previously noted, our commercial organization has been fully integrated with sales teams selling across the entire whole-person portfolio of products since early this year." J.A. 328, ¶ 336. Once again, plaintiffs argue that statement is false because "Teladoc and legacy Livongo sales teams were not, in fact, successfully collaborating with each other" and "Livongo sales teams were still selling exclusively Livongo products (not Teladoc's or combined products)." Br. 25 (citations omitted).

As the district court correctly concluded, "[w]hen read in context, the 'progress' to which the speaker refers appears to be the integration of the commercial organizations." S.A. 20. And, as argued at pp. 28-32, *supra*, plaintiffs failed to allege that the remainder of that statement, concerning "sales across

the entire whole-person portfolio of products," is materially false or misleading, *see* S.A. 20-21—let alone that Gorevic knew it was false. Indeed, plaintiffs admit the ability of sales teams to cross-sell: the SAC describes how Teladoc "closed several deals for our new integrated mental health product that combines the Teladoc therapists and psychiatrists with the Livongo digital mental health capabilities to deliver a market-leading solution." J.A. 328, ¶ 336. Plaintiffs' opinion on whether that was "successful" does not create a fraud claim.

### 4. *Statement By Murthy On April 28, 2021*

Plaintiffs turn to a statement made by Murthy during that same April 28 earnings call that Teladoc had "a very, very clear road map," and that "data integration . . . requires deep integration[,] [a]nd [she] would say we are well on our way to do it." J.A. 329, ¶ 338. According to plaintiffs, that was false because "because Teladoc was having severe problems with technological integration, including the companies' data and product platforms." Br. 34.

But plaintiffs have not alleged that statement is false. Plaintiffs argue (at 35) that there was no "clear road map," because a confidential witness found "underwhelming" a presentation by Gorevic five months later regarding Teladoc's integration plan, J.A. 263-264, ¶ 169-70, and because CW-2 was "worried" by David Sides's (Teladoc's Chief Operating Officer) purported responses (such as "[t]hat's a great question" or "I don't know") to CW-2's questions about the Livongo integration, J.A. 253, ¶ 144; *see also* J.A. 315, ¶ 304(c);

J.A. 330, ¶ 342.  But a single employee's subjective opinion that Gorevic's discussion of the integration plan was "underwhelming" does not render false Murthy's opinions that she had a "clear" road map that management prioritized and invested in, or that the company was "well on its way" with respect to that road map.  J.A. 329, ¶ 338.  Indeed, plaintiffs admit "there may have been a plan [but] the process was very slow."  J.A. 241 ¶ 120.  That criticism does not plead falsity.

### 5.  *Statement By Gorevic On November 10, 2021*

Plaintiffs also challenge Gorevic's November 10, 2021 statement to *Business Insider*, which was quoted as:  "The vision that we laid out then—about whole-person care and bringing together the unique capabilities of two complementary companies to deliver something that really hasn't been done before—is on track."  J.A. 345, ¶ 386.  According to plaintiffs, because "integration had gone off the rails," that statement "is squarely actionable."  Br. 36.

Plaintiffs are wrong that Gorevic's statement was false (or even actionable in the first place, *see* pp. 20-21, *supra*).  Not only is Gorevic's statement that his "vision" is "on track" too subjective and vague to be actionable, but plaintiffs also do not plead facts establishing that it was false.  Instead, they complain that Teladoc did not yet have the capacity to offer a specific function described as "whole patient remote monitoring"; that the company "was slow"

in developing a particular product marketed as a type of "whole person solution"; and that not all Livongo products were fully integrated by April 2022. *See* Br. 36; J.A. 248-249, ¶ 134; J.A. 257, ¶ 152; J.A. 300, ¶ 267.  But such anecdotes do not establish the falsity of Gorevic's "vision" for the combined company to, eventually, provide "whole patient care" through its various products (however one may go about disproving someone's "vision").  They merely identify "a handful" of alleged problems, which are "bound to" happen during a merger of this nature and size, and which are "consistent with unremarkable circumstances" rather than fraud.  *Rombach*, 355 F.3d at 173-174.  As the district court held, Gorevic "expressed pride about the [c]ompany's progress," but he "did not represent at any point that all product platforms had been fully integrated or that the aim of the merger had been fully accomplished." S.A. 21.

### 6.    *Statement By Verstraete On November 18, 2021*

Plaintiffs next target is a statement by Verstraete on November 18, 2021 that "we've significantly deepened our capabilities as we brought together and integrated the legacy Livongo and Teladoc marketing data and tech stacks." J.A. 346, ¶ 392.  Focusing in isolation on Tableau—"a tool for non tech-savvy employees to easily access and visualize [patient] data," J.A. 242, ¶ 121—plaintiffs argue that Verstraete's statement is false.  Br. 37-39.

As the district court correctly concluded, plaintiffs do not make any allegations about any "failure to integrate 'marketing data' or 'tech stacks,'" S.A. 21-22—instead, they focus on a particular software system ("Tableau") and unspecified "data systems," Br. 38. But "[p]recision matters." S.A. 22. Verstraete's statement "refers specifically to marketing data and tech stacks," and "does not refer to data systems or to Tableau." S.A. 22. As to the "marketing data," plaintiffs concede that "personnel could . . . pull [that data] from multiple databases," Br. 38 (citing J.A. 242-245, ¶¶ 122-126), so the data was "integrated"—and whether it was also input into the Tableau system is beside the point. Moreover, as to the "tech stacks," plaintiffs merely allege that CW-11 "believed" that was a reference to "applications used for marketing purposes," such as "email blasts or text messages to customers to market products." J.A. 273, ¶ 192. As the district court noted, "even if the SAC adequately pleads that the term 'tech stacks' is a reference to email blasts and text messages, it does not adequately plead that they had not been 'integrated' by November 2021." S.A. 22.

Plaintiffs argue that, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." Br. 39 (quoting *Meyer* v. *Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)). As the district court correctly recognized, however, plaintiffs' argument amounts to an assertion that, in commenting on one issue at a high level (the integration of "marketing data and

tech stacks"), defendants must address every related issue (such as the integration of a specific visualization system for patient data). S.A. 21-22. For that reason, contrary to plaintiffs' argument, this case is nothing like *Meyer* v. *Jinkosolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014). "[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014) (citations omitted). That Teladoc "brought together and integrated the legacy Livongo and Teladoc marketing data and tech stacks" (the alleged half truth) does not mislead anyone about whether a specific data visualization application like Tableau had also been integrated (the alleged whole truth). And, even setting that aside, taking issue with the alleged "half-truth" nature of Verstraete's statements "does not cure their generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment." *SAIC*, 818 F.3d at 97-98.

### 7. *Statement By "Management" On October 28, 2021*

Plaintiffs also challenge an unattributed statement from October 28, 2021, reported in an analyst report by Credit Suisse, that, "[o]verall, management pushes back on the claim that [Teladoc] is behind when it comes to the actual integration of Livongo." J.A. 343, ¶ 381. Plaintiffs argue that the reported "pushback" gave false reassurance because the "actual integration of Livongo" was, in fact, "behind" schedule. Br. 40.

As the district court held, plaintiffs' allegations are "not pled with the particularity required by the PSLRA." S.A. 17 n. 4.[1] Neither the Credit Suisse report nor plaintiffs' complaint identifies the members of Teladoc management responsible for the referenced statements. *See* J.A. 343-344, ¶¶ 379-382; J.A. 649, 651. Indeed, the statement itself is unknown, as Credit Suisse said "answers [reported] are not verbatim." J.A. 649. For that reason, this Court's decision in *Novak* v. *Kasaks*, 216 F.3d 300 (2000), is inapposite. *Id.* at 314. And so is *In re Synchrony*, 988 F.3d 157 (2d Cir. 2021), where the CEO represented that the company was "not getting any pushback" from a counterparty on a specific topic, all the while the plaintiffs pleaded particular facts demonstrating that the CEO was in fact aware of that specific pushback. *Id.* at 168-169.

In any event, the challenged statement by unspecified "management" is not false. *See* J.A. 651. The Credit Suisse report did not identify any specific aspect of the integration that was "behind" schedule, speaking instead in general and vague terms. Moreover, plaintiffs ignore the reference in the same article to "multi-product sales" as "a good proof point" and to Teladoc's successful launch of a product "just eight months" after the merger. J.A. 343, ¶ 381. Plaintiffs do not dispute the accuracy of those specific references. Plaintiffs again focus on the integration of one particular technology platform

---

[1] Plaintiffs oddly argue that the district court "entirely ignored" their argument, *see* Br. 39 (citing S.A. 17 n. 4), while citing the court's holding.

(Salesforce and Tableau), *see* Br. 40, but the Credit Suisse report does not refer to any particular platform, *see* J.A. 651, and thus plaintiffs have failed to plead the falsity of that statement.

### 8. *Form 10-Ks For 2020 And 2021*

Finally, plaintiffs take issue with Teladoc's cautionary statements in the Form 10-Ks filed on March 1, 2021 (at the beginning of the putative class period) and on February 28, 2022 (after the alleged corrective disclosure in *Business Insider*). Br. 41-45; *see also* J.A. 322-323, ¶¶ 319-321; J.A. 351-353, ¶¶ 407-408, 411. According to plaintiffs, those disclosures were misleading because they "characterized certain Livongo integration challenges as purely hypothetical risks, when in fact those risks had already materialized." Br. 41.

Plaintiffs' argument has no merit for multiple reasons. "Companies issue risk disclosures all the time, disclosing that certain known risks may impact their performance or operations," and because "[a] risk disclosure may just be what it purports to be—an identification by the issuer of the type of facts and events that could make the investment risky and not necessarily a representation one way or the other regarding whether the event has occurred to the extent that it presents a risk"—"the potential for the disclosure to mislead often turns on the specificity of the disclosure." *In re AppHarvest Securities Litigation*, Civ. No. 21-7985, 2023 WL 4866233, at *40 (S.D.N.Y. July 31, 2023) (citations omitted). Here, Teladoc started warning about integration-

related risks as early as September 2020, in the S-4 registration statement filed in connection with the merger that closed a month later. *See* J.A. 477-478. Those risks were repeated on March 1, 2021 and February 28, 2022. *See* J.A. 481, 502. The district court was correct that all those statements do is "ma[k]e clear to any reasonable investor that the integration process was complex and that different components of the integration effort might progress at different rates." S.A. 24. They were, in other words, "cautionary statements," which "are not actionable to the extent plaintiffs contend defendants should have stated that the adverse factors 'are' affecting financial results rather than 'may' affect financial results." *In re Noah Educational Holdings, Ltd. Securities Litigation*, Civ. No. 08-9203, 2010 WL 1372709, at *7 (S.D.N.Y. Mar. 31, 2010) (citation omitted).

Teladoc's general risk disclosures resemble those held inactionable in *Rombach* v. *Chang*, 355 F.3d 164 (2d Cir. 2004). There, this Court held that the presence of a "handful of incidents" in which a company "did not execute construction or operational projects, and had problems integrating newly acquired properties into their national system" did not support a broad categorization as to the company's wellbeing. *Id.* at 174-175. This Court reasoned that any company with expansive, nationwide operations is bound to have some challenges. *Id.* Similarly, here, no ordinary investor would understand Teladoc's general risk disclosure concerning the Livongo integration to be an

assurance that the integration proceeded without any difficulties across Teladoc's organization. Indeed, as plaintiffs themselves recognize, Teladoc represented that difficulties were already present by stating integration "will continue to be a time-consuming and expensive process." Br. 42 (quoting J.A. 323, ¶ 320; J.A. 352, ¶ 408).

Lastly, plaintiffs repeated reliance (at 29-30, 43) on *City of Omaha Police & Fire Retirement System* v. *Evoqua Water Technologies Corp.*, 450 F. Supp. 3d 379 (S.D.N.Y. 2020), does not help them. There, the disclosed risk about the integration had already materialized because the company had systematically fired key integration staff. *See Evoqua*, 450 F. Supp. 3d at 412. The same is not true here. As to the events leading up to the March 1, 2021 Form 10-K, plaintiffs allege confusion among salespeople about the types of issues that likely arise in every multi-billion-dollar integration: uncertainties about reporting lines; whether there would be layoffs; which Salesforce database to use; uncertainty about login passwords; how to do "customer centric integrated marketing"; and attrition of Livongo employees. J.A. 236-237, 238, ¶¶ 107-108, 112; J.A. 258, ¶ 155; J.A. 296, ¶ 251; J.A. 312-317, ¶¶ 301-305. None of those allegations plead specific facts showing that, before Teladoc started to warn the market about the integration-related risks, significant risks had materialized. As to the February 28, 2021 Form 10-K, this case is unlike

*Evoqua* insofar as that risk disclosure followed the alleged corrective disclosure in the *Business Insider* article concerning certain risks that Teladoc had been warning the market all along. And, in any event, "[c]ompanies issue risk disclosures all the time," and they are not "representation[s] one way or the other regarding whether the event has occurred to the extent that it presents a risk." *In re AppHarvest*, 2023 WL 4866233, at *40.

*   *   *   *   *

For all of those reasons, plaintiffs have failed plausibly to allege, with the specificity required by the PSLRA, that any of the statements they challenged were materially false or misleading. "Because the SAC fails to identify a material misrepresentation, it is not necessary to assess the adequacy of its assertion of scienter or loss causation," S.A. 14, and this Court should affirm.

## II. ALTERNATIVELY, THE COMPLAINT SHOULD HAVE BEEN DISMISSED BECAUSE IT FAILED TO ALLEGE A STRONG INFERENCE OF SCIENTER OR LOSS CAUSATION

The district court did not reach defendants' alternative arguments in support of dismissal. *See* S.A. 14. This Court also need not go farther. But assuming the district court's decision was erroneous as to the element of falsity, the SAC was nonetheless correctly dismissed on two alternative grounds. *First*, plaintiffs' complaint did not include any allegations supporting a strong inference of scienter. *Second*, plaintiffs failed to allege loss causation. For either reason, this Court should affirm.

## A. Plaintiffs Did Not Allege A Strong Inference Of Scienter

Any "inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Here, the far more plausible inference is that defendants were transparent about integration challenges that followed a record-breaking merger. Because plaintiffs have alleged neither "motive and opportunity" to defraud nor "strong circumstantial evidence of conscious misbehavior or recklessness," *Arkansas Public Employees' Retirement System* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022) (citation omitted), and because they cannot plausibly invoke the doctrine of corporate scienter, *see Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020), their claims were correctly dismissed.

### 1. Plaintiffs Did Not Allege Motive Or Opportunity By Any Individual Defendant

In order to allege motive, plaintiffs must allege that defendants "benefitted in a concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 311. In this case, plaintiffs' sole motive allegations consist of what they deem "substantial" stock sales by three of the five individual defendants, *i.e.*, Gorevic, Murthy, and Verstraete. *See* Br. 61. But even trades that generate "significant net profits" do not supply motive unless they are "unusual." *Arkansas Public Employees*, 28 F.4th at 355-356. Sales are not "unusual" if, among other things, they "constituted a similar (or lesser) proportion of the

individual defendants' trades as compared with the proportion of shares sold by those defendants before the putative class period"; if defendants "bought more shares than they sold during the putative class period"; if "the sales were conducted pursuant to a 10b5-1 trading plan"; and if the sales were not "timed suspiciously." *Id.* All of those considerations are true here.

*First*, Murthy increased her shares of Teladoc common stock by 200% during the class period, *see* J.A. 470, 575-593; Verstraete by 140%, *see* J.A. 472, 594-646; and Gorevic by 7.5%, *see* J.A. 467-468, J.A. 507-574. That shows "only confidence in the future of their company." *Avon Pension Fund* v. *GlaxoSmithKline PLC*, 343 Fed. Appx. 671, 673 (2d Cir. 2009); *see also Kalnit* v. *Eichler*, 264 F.3d 131, 139-141 (2d Cir. 2001).

*Second*, plaintiffs do not allege that the timing of the stock sales was suspicious—that is, they do not allege the sales occurred "on the heels" of any alleged misstatements or omissions, or just before alleged corrective disclosures. *See In re Initial Public Offering Securities Litigation*, 241 F. Supp. 2d 281, 365 n. 111 (S.D.N.Y. 2003).

*Third*, the sales during the class period are not unusual compared to the 17-month control period that preceded the class period. During that control period, Gorevic sold a net total of 126,736 shares—whereas, during the 17-month class period, he gained a net total of 39,276 shares. *See* J.A. 507-574.

And both Murthy and Verstraete gained shares—and increased their holdings—during the control period and the class period. *See* J.A. 594-646 (Verstraete); J.A. 575-593 (Murthy).

*Fourth*, all of Gorevic's, Murthy's, and Verstraete's sales during the putative class period (excluding gifts) were either pursuant to a 10b5-1 plan or to cover tax withholding obligations. *See* J.A. 507-646. Indeed, 22 of Gorevic's 26 total sales during the class period (excluding gifts) were made pursuant to a 10b5-1 plan, *see* J.A. 467-468, as were three of Verstraete's, *see* J.A. 472. Pre-planned sales under 10b5-1 plans do not support an inference of scienter. *See Arkansas Public Employees*, 28 F.4th at 355-356. Nor are sales for tax reasons indicative of fraud, and yet the remaining stock sales by Gorevic, Murthy, and Verstraete, *see* J.A. 507-646, "all involved the withholding of shares to satisfy tax requirements on vesting restricted stock," *North Collier Fire Control and Rescue District Firefighter Pension Plan and Plymouth County Retirement Association* v. *MDC Partners, Inc.*, Civ. No. 15-6034 (RJS), 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016) (citing *In re Bristol-Myers Squibb Securities Litigation*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004)).

Undaunted, plaintiffs contend that Gorevic's, Murthy's, and Verstraete's stock sales are "unusual" because they are above some 10% "threshold" and generated significant profits. *See* Br. 61. Plaintiffs are wrong. There is no 10% threshold rule, and sales are not "unusual" simply because they generate

large profits.  For instance, in *Arkansas Public Employees Retirement System* v. *Bristol-Myers Squibb Co.*, 28 F.4th 343 (2022), this Court recently found no unusual trading activity despite sales amounting to between 9% and 31% of each executive's overall holdings and netting $55 millions in profits, *see id*. at 351; Br. of Appellee 46, Dkt. 69, No. 20-3716 (2d Cir. May 6, 2021); *cf. Rothman* v. *Gregor*, 220 F.3d 81, 95 (2d Cir. 2000) ($20-million profits not "unusual").  In short, Gorevic's, Murthy's, and Verstraete's stock sales are not suspicious in timing or amount, and taking "the total weight of the circumstantial allegations together with the allegations of motive and opportunity," plaintiffs have not alleged a strong inference of scienter.  *In re Hain Celestial Group, Inc. Securities Litigation*, 20 F.4th 131, 137-138 (2d Cir. 2021).

### 2.    *Plaintiffs Did Not Allege Conscious Misbehavior Or Recklessness By Any Individual Defendant*

On appeal, plaintiffs argue that their complaint alternatively pleaded scienter in the form of conscious misbehavior or recklessness.  Where a plaintiff seeks to plead scienter alternatively under a theory of conscious misbehavior or recklessness, "the strength of the circumstantial allegations must be correspondingly greater if there is no motive."  *ECA*, 553 F.3d at 198-199 (internal quotation marks and citation omitted).  To plead conscious misbehavior, plaintiffs must allege that defendants "engaged in deliberately illegal behavior."  *Novak*, 216 F.3d at 311.  To plead recklessness, plaintiffs must "at the least" allege conduct that is "highly unreasonable and which represents an extreme

departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *ECA*, 553 F.3d at 202-203. Plaintiffs have failed to meet those high standards. And neither plaintiffs' vague allegations about unnamed executives nor their invocation of the "core operations" theory helps plaintiffs.

a. Contrary to their one-sentence argument (at 60), plaintiffs failed to allege any conscious misbehavior. Allegations that some defendants made "broad[]" and "very general" statements about integration efforts; that they "did not directly respond to . . . questions"; or that their answers "under-whelm[ed]" some employees, J.A. 234-235, ¶¶ 101-102; J.A 251-252, ¶¶ 138-143; J.A. 263-264, ¶¶ 169-170; J.A. 382-386, ¶¶ 514-525, do not even remotely suggest that those defendants "engaged in deliberately illegal behavior," *Novak*, 216 F.3d at 311. Nor plaintiffs' allegations about unnamed "Teladoc executives," J.A. 287, ¶ 228, do more than impermissibly suggest, at best, "guilt by association," *In re DDAVP Direct Purchaser Antitrust Litigation*, 585 F.3d 677, 695 (2d Cir. 2009). And though plaintiffs stress (at 60) defendants' "personal[] involve[ment]" in the integration, that has been found to "provide strong circumstantial evidence of conscious misbehavior" only with respect to a defendant's own statements *denying* that talks in which he was personally involved had ever occurred. *Buxbaum* v. *Deutsche Bank A.G.*, Civ. No. 98-8460, 2000 WL 33912712, at *19 (S.D.N.Y. Mar. 7, 2000).

b.     Plaintiffs put most of their eggs in the recklessness basket, and specifically only with respect to Shah and Gorevic.  Because scienter must be pleaded as to each defendant, *see In re DDAVP*, 585 F.3d at 695, plaintiffs have forfeited any arguments that the remaining three named defendants had the requisite recklessness.  And plaintiffs' allegations as to Shah and Gorevic are not sufficient, either.

As to Shah, plaintiffs argue that "CW-2 and internal [c]ompany documents confirm that Shah was directly informed[,]  .  .  .  shortly before" his February 2021 statement, that "Teladoc was struggling with product and sales team integration."  Br. 58-59.  But the SAC contains no such allegation.  *See* J.A. 249-250, ¶¶ 135-136; J.A. 251-252, ¶¶ 139-140.  Allegations that CW-2 raised subjective concerns about "RPM messaging" and asked for assistance with developing a patient-focused subscription model the day before the merger closed do not suggest that Shah "knew facts or had access to information suggesting that [his] public statements were not accurate," *ECA*, 553 F.3d at 199 (citation omitted), when he stated months later that the integration was generally "going really great," J.A. 310, ¶ 298.

As to Gorevic, plaintiffs' argument fares no better.  Plaintiffs point to a paragraph of the complaint (Br. 59) alleging that CW-2 was informed that Gorevic had "apparently discussed" with a prospective client, one day before the merger closed, the "possibility" of Teladoc co-developing with that client a

subscription model that would include urgent care and chronic care. *See* J.A. 383, ¶ 517. But the existence of such a discussion is not inconsistent with any statement by Gorevic. And the SAC fails to identify—whether from a CW or another internal report—allegations that Gorevic received any inconsistent private information. *See Novak*, 216 F.3d at 309. Moreover, the SAC lacks factual allegations that Gorevic was reckless when, in February 2021, he stated that integration "continues to progress," J.A. 317, ¶ 308, and that "[w]e have the capabilities to deliver and manage care virtually across the spectrum," J.A. 317-318, ¶ 309, or when he stated in November 2021 that the "vision that we laid out then—about whole-person care"—was "on track," J.A. 345, ¶ 386.

Plaintiffs next turn to purported "corroboration" of Gorevic's scienter from other confidential witnesses. *See* Br. 59. But those allegations similarly do not support plaintiffs' argument. For instance, plaintiffs cite (at 59) allegations by CW-2 and CW-4 that they perceived Gorevic "avoided" questions regarding "the integration or other issues" or provided "underwhelming" responses. J.A. 382, ¶¶ 514-515; J.A. 385, ¶ 523. Those "opinions of confidential witnesses," without "any factual underpinnings," are not sufficient to allege recklessness. *City of Dearborn Heights Act 345 Police & Fire R* v. *Axonyx*, 374 Fed. Appx. 83, 85 (2d Cir. 2010).

Lastly, plaintiffs appear to argue that Gorevic had the requisite recklessness because Sides (not a named defendant) allegedly "admitted that there

was no integration plan." Br. 59 (citing J.A. 268-269, ¶ 179; J.A. 384, ¶ 512). But the SAC does not plead this. According to the SAC, CW-2 asked Sides about the Livongo integration and, when Sides purportedly responded "[t]hat's a great question" or "I don't know," those responses "worried" CW-2. J.A. 315, ¶ 304(c); J.A. 330, ¶ 342. Plaintiffs did not allege that Sides believed there was "no integration plan," much less that he communicated that to Gorevic, and neither of Sides' alleged statements constitute strong circumstantial evidence that Gorevic "knew facts or had access to information suggesting that [his] public statements were not accurate." *ECA*, 553 F.3d at 199.

c.       Plaintiffs' last-ditch attempts to argue that the SAC alleges a strong inference of scienter involve vague allegations about unnamed executives and the "core operations" theory. Neither has merit.

As plaintiffs argue, CWs alleged that various (often unspecified) combinations of executives attended monthly town halls, group department team meetings, and other events to "broadly" discuss (often unspecified) issues like "integration difficulties," "challenges," and "plans." J.A. 382-83, ¶¶ 514-516; J.A. 385, ¶ 523. But such generic allegations are insufficient to establish scienter. *See Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer Holdings, Inc.*, 679 F.3d 952, 955 (7th Cir. 2012). Instead, plaintiffs "must specifically identify the reports or statements containing [the] information" that allegedly suggested defendants' public statements were not accurate, *Novak*,

216 F.3d at 309, and there is no strong inference of scienter where confidential witnesses "fail[ed] to specifically identify the reports or statements made in connection with those meetings that contained incriminating information," *Town of Davie Police Officers Retirement System* v. *City of North Miami Beach Police Officers' & Firefighters' Retirement Plan*, No. 21-909, 2021 WL 5142702, at *2 (2d Cir. Nov. 5, 2021) (quotation marks and citation omitted).

Plaintiffs also invoke the so-called "core operations" theory, under which an inference may be drawn that a company and its senior executives have knowledge of information concerning the "core operations" of a business. *See* Br. 59-60. But this Court has "not yet expressly addressed whether, and in what form, the 'core operations' doctrine . . . survived the PSLRA's enactment without alteration." *Frederick* v. *Mechel OAO*, 475 Fed. Appx. 353, 356 (2d Cir. 2012). In any event, the "core operations" theory is of no help to plaintiffs for two reasons. *First*, as plaintiffs concede (Br. 59), the "core operations" theory is, "without more," "plainly insufficient" to raise a strong inference of scienter. *Jackson*, 960 F.3d at 99. *Second*, the "core operations" theory goes to whether defendants can be inferred to have knowledge of the relevant misstatements. *See, e.g.*, *Cosmas* v. *Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989). Though plaintiffs contend that the "size and 'transformative' nature" of the Livongo acquisition rendered integration a core operation, *see* Br. 59-60, plaintiffs do not suggest that routine integration of specific software programs or

sales-team confusion about RPM capabilities—the subjects of the relevant alleged misstatements—constituted "core operations" for Teladoc. That is fatal.

### 3. *Plaintiffs Did Not Allege Corporate Scienter*

Plaintiffs' last attempt at showing a strong inference of scienter is corporate scienter. *See* Br. 61-62. Corporate scienter requires "pleading facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson*, 960 F.3d at 98 (quotation marks and citation omitted). Accordingly, "the most straight forward way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Id.* at 98 (quotation marks and citation omitted). The high standard for corporate scienter is plainly not met here.

As support for their argument (at 62) that the complaint "alleges widespread knowledge within Teladoc" concerning integration challenges, plaintiffs point to a series of vague allegations. *First*, plaintiffs cite CW-2's allegation that she asked Sides about integration during a meeting. J.A. 253, ¶ 144. But even CW-2 equivocates between alleging that the question concerned "the plan to integrate RPM" and "the plan [] to integrate Livongo" generally, and in any event CW-2 only alleged that Sides did not provide a plan in response, not that he stated there was no plan. *Id. Second*, plaintiffs cite CW-2's allegation that U.S. Group Health President Kelly Bliss and Hospitals and Health

Systems President Joe DeVivo "provided more details about the difficulties the [c]ompany faced regarding integration" during "department team meetings." J.A. 383, ¶ 516. But plaintiffs do not allege when these meetings took place, or who participated in them. *Id.* *Third*, plaintiffs cite CW-2's allegation concerning an "Open Issues" document she drafted. J.A. 385, ¶ 522. But the complaint only alleges that this document was "intended" for certain non-defendants among "Teladoc management," not that any of them ever received the document, let alone when, whether, or how they responded to it. *Id.*

Those allegations do not rise to the level of corporate scienter. None of the allegations about Sides, Bliss, or DeVivo rise to the level of alleging individual scienter, much like the allegations concerning the individual defendants do not. *See* pp. 46-52, *supra*. And this Court has cautioned that only "[i]n exceedingly rare instances," where a statement is so "dramatic," can collective corporate scienter be inferred despite a lack of individual scienter. *Jackson*, 960 F.3d at 98-99. Not even plaintiffs suggest that standard could be met here.

## B. Plaintiffs Did Not Allege Loss Causation

Failure to allege loss causation is yet another independent ground for dismissal. Loss causation can be established by allegations "that the market reacted negatively to a corrective disclosure of the fraud." *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501, 511 (2d Cir. 2010). To be "corrective," a disclosure must "reveal some then-undisclosed fact with regard to

the specific misrepresentations alleged in the complaint." *Id.* Here, plaintiffs identify three statements they allege to be corrective disclosures. *See* Br. 63-64. Only one of those concerns integration, but it is not "corrective" because it merely described the materialization of previously disclosed risks. The other two statements concern Teladoc's revision of revenue and earnings projections due to competitive pressures, and plaintiffs are not appealing dismissal of statements concerning competition. *See* Br. 4 n. 2.

*First*, plaintiffs contend that the November 10, 2021 *Business Insider* article was a corrective disclosure. But it "do[es] not reveal to the market the falsity" of any prior statements. *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 175 n. 4 (2d Cir. 2005), merely describing instead the materialization of risks that were previously disclosed. For example, the article expressly highlights challenges such as post-merger employee attrition and a purported "culture clash" due to the companies' "very different backgrounds." J.A. 654, 656. But Teladoc had previously warned shareholders about the risk that it may "have difficulty integrating the Livongo business" and that these difficulties might include "the integration of . . . products and services," "the integration of corporate cultures," and "the retention of key employees." J.A. 484. Indeed, the article itself acknowledges that those difficulties were to be expected with a merger that would create "the largest virtual-care company," noting that "it's normal for mergers . . . to cause a lot of employee turnover." J.A. 654,

657. A merged company can combine sales teams and cross-sell products *and* still experience personnel issues such as attrition, confusion about product offerings, and difficulties navigating internal systems and meeting quotas.

*Second*, plaintiffs contend that Teladoc's April 27, 2022 quarterly earnings announcement was a corrective disclosure. As discussed at pp. 10-11, *supra*, Teladoc reported revised revenue and earnings projections due to increased competition, and a goodwill impairment. Plaintiff claims that "the market tied" Teladoc's subsequent $6.6 billion goodwill impairment charge "to the Livongo integration problems." Br. 63. But the April 27 announcement did not draw this connection. *See, e.g.*, J.A. 364, ¶ 454. The only discussion of integration was Gorevic's statement that the integration of Livongo products into the "whole-person care experience" was ongoing. J.A. 363, ¶ 451. Teladoc did not attribute the goodwill impairment or the lowered projections to the integration—to the contrary, it expressly identified external market dynamics. And the April 27 announcement does not correct any alleged misstatement about integration. Accordingly, that statement does not contradict any previous one, and thus cannot be corrective. *See Central States, Southeast and Southwest Areas Pension Fund* v. *Federal Home Loan Mortgage Corp.*, 543 Fed. Appx. 72, 75 (2d Cir. 2013).

*Third*, plaintiffs argue that Teladoc's July 27, 2022 quarterly earnings announcement was a corrective disclosure, based on a single statement that

the integration "still continues." Br. 63. Again, that statement does not correct any challenged statement. And, again, plaintiffs admit that the July 27 announcement revealed an "additional $3 billion goodwill impairment charge *and the continued adverse impact of competition*." J.A. 373, ¶ 484 (emphasis added). Because plaintiffs' complaint does not plead any new nonpublic information about integration revealed on July 27, this disclosure is not corrective.

\* \* \* \* \*

In short, plaintiffs have not alleged either scienter or loss causation. Even if this Court were to find that the district court erred in concluding that plaintiffs failed to identify any materially false or misleading statements, the dismissal of their complaint should be affirmed.

## III. THE DISTRICT COURT CORRECTLY DISMISSED WITH PREJUDICE AND DENIED LEAVE TO AMEND

Plaintiffs last take issue with the district court's guidance that they would forgo the opportunity to amend their complaint for a *third time* if they chose instead to oppose defendants' second motion to dismiss. There was nothing improper about that "amend or oppose" order, let alone an abuse of discretion; for that reason alone, this Court should affirm the decision to dismiss with prejudice and find that any purported error in denying leave to amend was harmless. In any event, the district court was correct in denying plaintiff's perfunctory request, made in a footnote, for leave to file a *fourth* complaint. *See* S.A. 28-29.

A.     The district court's "amend or oppose" instruction in its case management order was clear and uncontroversial.  In setting a deadline for plaintiffs to file their SAC, the district court instructed that, "[i]f a motion to dismiss the amended complaint is filed, [plaintiffs] may further amend [their] complaint," but "[i]t is unlikely that [plaintiffs] will have a further opportunity to amend" if plaintiffs instead "elect[] not to further amend the complaint" and "file [their] opposition to the motion to dismiss."  J.A. 18.  This Court has repeatedly approved of similar instructions, *see Ritchie Cap. Mgmt., L.L.C.* v. *General Electric Capital Corp.*, 821 F. 3d 349, 352 (2016) (Judge Engelmayer's instructions), and it has affirmed district court decisions applying those "amend or oppose" orders for decades, *see In re Merrill Lynch Ltd. Partnerships Litigation*, 154 F.3d 56, 60 (1998) (Judge Mukasey's instructions).

Here, dismissing the SAC with prejudice in light of the "oppose or amend" order was not an abuse of discretion.  Plaintiffs are not entitled simply to ignore a district court's order.  Contrary arguments are so meritless that this Court routinely disposes of them by summary order.  This Court's recent decision in *Black* v. *Ganieva*, No. 22-1524, 2023 WL 2317173 (Mar. 2, 2023), is instructive.  There, plaintiff "failed to follow the district court's guidance that he would forgo further opportunity to amend by responding to the motions dismiss."  *Id.* at *3.  Under those circumstances, as is true here, "the district court did not abuse its discretion in dismissing the [SAC] with prejudice," and

this Court "need not reach the question of whether [the district court] abused its discretion in denying" further leave to amend, given that "any such error was harmless" in light of the correct dismissal with prejudice. *Id.* at *4 (citing *In re Agent Orange Product Liability Litigation*, 517 F.3d 76, 104 (2d Cir. 2008)).

B.     In any event, the district court did not abuse its discretion in denying plaintiffs' footnote request for leave to amend for at least three reasons.

*First*, the district court was correct that plaintiff "has not shown" why its "amend or oppose" order "should be ignored." S.A. 29.  "The district court explicitly warned [plaintiffs] that . . . they would likely not be given another opportunity to amend." *In re Merrill Lynch*, 154 F. 3d at 60.  Where, as here, plaintiffs choose to ignore a court's instructions, they "must [] live with the consequences." *National Credit Union Administrative Board* v. *U.S. Bank National Association*, 898 F. 3d 243, 257 (2d Cir. 2018).

*Second*, the district court was correct that plaintiffs' perfunctory request was insufficient because it failed to attach a proposed pleading. *See* S.A. 28. Where plaintiffs make a "footnote request in their opposition brief for leave to amend if the district court deems the claims against Defendants insufficiently pleaded," and do "not submit proposed amendments," denying that informal, cursory request is not an abuse of discretion. *Rosner* v. *Star Gas Partners, L.P.*, 344 Fed. Appx. 642, 644-645 (2d Cir. 2009) (quotation marks and citation

omitted).  Indeed, even "not addressing" that request at all would not have been an abuse of discretion.  *Id.* (citation omitted).

*Third*, the district court was correct that plaintiffs' perfunctory footnote did "not identif[y] how further amendment would address the deficiencies" in the SAC, *see* S.A. 28—*i.e.*, any amendment would be futile, *see IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund* v. *Royal Bank of Scotland Group, PLC*, 783 F.3d 383, 389 (2d Cir. 2015).  All plaintiffs wrote in their perfunctory footnote requesting leave to amend was that their amendment "may" address "new, relevant developments that occurred after the SAC filing, which [p]laintiffs are still investigating."  J.A. 755 n. 40.  But plaintiffs are not entitled to amend their complaint over and over simply because they "may" uncover some new unspecified facts.  Even on appeal plaintiffs do not explain the relevance of their "new facts" or how further amendment would not be futile.  *See Black*, 2023 WL 2317173, at *2.[2]

C.  Finally, plaintiffs argue that Rule 15(a) sets a "permissive standard."  Br. 55 (quoting Fed. R. Civ. P. 15(a)).  Yet, although courts "should

---

[2] Plaintiffs' footnote referred to a February 2023 disclosure – well *after* the end of the putative class period – of another $3.8 billion goodwill impairment, which analysts purportedly linked to the Livongo integration.  J.A. 755 n. 40. Plaintiffs did not explain how that post-class period "new fact" could address the fatal flaws with plaintiffs' SAC.  *See* pp. 59-60, *supra*.  If, at long last, plaintiffs were to address this argument for the first time in their reply brief, this Court should decline to consider it, since it was forfeited below.  *See ABKCO Music, Inc.* v. *Sagan*, 50 F.4th 309, 324 n. 11 (2d Cir. 2022).

freely give leave [to amend] *when justice so requires*, . . . this is not carte blanche for a plaintiff to continually amend its pleadings." *Public Employees Retirement Association of New Mexico* v. *PricewaterhouseCoopers LLP*, 305 Fed. Appx. 742, 745 (2d Cir. 2009) (quotation marks and citation omitted). That is, at bottom, what plaintiffs ask for here: carte blanche to file a *fourth* complaint, based on an informal, cursory request in a footnote. This Court's decision in *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Securities, LLC*, 797 F.3d 160 (2015), does not hold otherwise. There, denial of leave to file a first amended complaint was reversed because there had not yet been full briefing on a motion to dismiss. *See id.* at 190. Here, plaintiffs had the benefit of *two* amended complaints before dismissal pursuant to defendants' *second* motion to dismiss. They are not entitled to yet another bite at the apple.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

/s/ Audra J. Soloway

MATTEO GODI
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*

AUDRA J. SOLOWAY
DANIEL J. KRAMER
CAITLIN E. GRUSAUSKAS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*
  *(212) 373-3000*
  *asoloway@paulweiss.com*

FEBRUARY 16, 2024

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Audra J. Soloway, counsel for appellees and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4)(A), that the attached Brief of Defendants-Appellees is proportionately spaced, has a typeface of 14 points or more, and contains 13,996 words.

/s/ Audra J. Soloway
AUDRA J. SOLOWAY

FEBRUARY 16, 2024